IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

RACHELLE BEAUBRUN, KAYLA          Jacksonville, Florida
BUCHANAN, AMANDA DIMURO,
KRISTEN GODUTO, KARA GUGGINO,    Case No.  5:19-cv-615-Oc-32PRL
SARA HOEHN, APRIL JOHNSON,
MAGGIE LEON, REBECCA MORA,        June 4, 2020
TERRY NAGY-PHILIPS, LAUREN
REYNOLDS, ANN URSINY, CRISTIAN   2:00 p.m.
VILLALTA-GAR, and KAREN WATSON,

          Plaintiffs,

   vs.

UNITED STATES OF AMERICA,

          Defendant.
_____


TELEPHONIC PRELIMINARY PRETRIAL CONFERENCE AND MOTION HEARING
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE


COURT REPORTER:

      Shannon M. Bishop, RDR, CRR, CRC
      221 North Hogan Street, #150
      Jacksonville, Florida  32202
      Telephone:  (904)549-1307
      dsmabishop@yahoo.com


      (Proceedings recorded by mechanical stenography;
transcript produced by computer.)

A P P E A R A N C E S

PLAINTIFFS' COUNSEL:

**BRYAN E. BUSCH, ESQ.**
Busch Slipakoff Mills & Slomka, LLC
2859 Paces Ferry Road S.E., Suite 1700
Atlanta, GA  30339

**MAX G. SOREN, ESQ.**
Soren Law Group, P.A.
4200 N.W. 7th Avenue
Miami, FL  33127

**PHILIP LOUIS REIZENSTEIN, ESQ.**
Reizenstein & Associates PA
2828 Coral Way, Suite 540
Miami, FL  33145

**KELLIE PETERSON, ESQ.**
Kellie Peterson, Esq., PA
2828 Coral Way, Suite 540
Miami, FL 33145

DEFENSE COUNSEL:

**ADAM R. SMART, ESQ.**
**JULIE POSTERARO, ESQ.**
United States Attorney's Office
400 West Washington Street, Suite 3100
Orlando, FL  32801

ALSO PRESENT:

**JEFFREY MIDDENDORF, ESQ.**

P R O C E E D I N G S

June 4, 2020                                    2:00 p.m.

- - -

THE COURT:  Good afternoon.  We're on the record in the case of *Beaubrun versus United States*, 5:19-cv-615.

I know that my law clerk has -- I know that my law clerk has taken appearances, and so I'm not going to do that again.  I will just ask you to identify yourself if you're the one speaking.

I will also ask:  Who is going to be the spokesperson for the plaintiff?  Is there one lawyer that's going to speak on behalf of the plaintiffs?

MR. BUSCH:  Your Honor, this is -- this is Bryan Busch.  I believe that there's going to be multiple lawyers speaking since we have lawyers that are representing different plaintiffs.

MR. SOREN:  Your Honor, this is Max Soren.  And I'm speaking for the other plaintiff that Bryan doesn't represent.  We're okay with him -- Bryan to take the lead in arguing the response.  The only thing I want to bring to the Court's attention is that our clients have come to an agreement with the AUSA, Adam Smart, regarding the severance portion of the motion.  And I think we should get that set out first before Bryan begins his response.

THE COURT:  All right.  Who's going to speak for the

1   government?

2          MR. SMART:  Your Honor, this is Adam Smart on behalf

3   of the government.  I will be addressing the -- any of the

4   motion portion of it.  Any of the scheduling portion will be

5   addressed by my colleague.

6          THE COURT:  All right.  So -- and we also have

7   separate counsel for Plaintiff Leon.

8          Is it Mr. Reizenstein?  Is that how you say it?

9          MR. REIZENSTEIN:  Good afternoon.  Philip

10  Reizenstein, that is correct.  Kellie Peterson, who is

11  co-counsel, is also on the call, I believe.

12         THE COURT:  Okay.  And are you -- what role are you

13  anticipating playing today?

14         MR. REIZENSTEIN:  The gentleman who just spoke, Max,

15  is going to speak on our behalf as well at this time regarding

16  the announcement that he has spoken with the government about.

17         THE COURT:  All right.

18         All right.  Mr. Soren, then what's the issue on the

19  severance?

20         MR. SOREN:  Yes, Your Honor.  Our clients, who are

21  Lauren Reynolds, Maggie Leon, Amanda Dimuro, and Rebecca Mora,

22  have agreed to the severance portion of the motion filed by

23  Mr. Smart, with the caveat -- and Mr. Smart is in agreement --

24  that our complaints are not dismissed, so that we don't fall

25  into a statute of limitations trap.  We ask that new case

1   numbers need to be given to our four plaintiffs.

2           And Mr. Smart and I have agreed that we'll talk about

3   consolidating the plaintiffs down the road.

4           THE COURT:  And why did you agree to that?  What's

5   the -- what's the value of that?

6           MR. REIZENSTEIN:  Well, it's based upon

7   communications with our clients in terms of why we're agreeing

8   to sever.  But as far as the -- how it's disposed of, like I

9   said, we don't -- we don't want it -- we don't want to fall

10  into a statute of limitations trap.

11          THE COURT:  Well, no, I'm not -- I understand the

12  mechanics of it.  What I'm saying to you is, I guess -- I mean,

13  I hadn't heard argument yet.

14          But as -- initially I was inclined to not -- not do

15  the severance.  And so you're now telling me that you

16  voluntarily agreed to do it, which means that I'm going to have

17  a separate lawsuit, and in theory have to try the same issues

18  twice.  And so I'm just wondering why that's a good idea.

19          MR. REIZENSTEIN:  Well, I don't know if it's a good

20  idea for you, Your Honor.  But as far as our clients are

21  concerned, this is how they feel.  And I can't divulge some of

22  that, obviously, because of attorney/client privilege.  But

23  what we would suggest is that Mr. Busch's clients are

24  consolidated in one case and our four clients are consolidated

25  in another.

1      THE COURT:  Mr. Busch, do you have anything to add to

2  this?

3      MR. BUSCH:  Your Honor, I -- I don't object to that.

4  We certainly don't have any problems with -- with the -- with

5  the plaintiffs being split up that way.

6      I mean, I guess the only thing I would suggest is

7  that that's going to require duplicative work on behalf of the

8  government and also on behalf of the Court.  But if the

9  government and the Court is okay with that, that's fine with

10  us.

11      THE COURT:  So, Mr. Smart, I'm not really sure I'm

12  quite getting it.  I understood -- I thought I understood, at

13  least, that you wanted me to sever everybody out from everybody

14  and make them all pay a filing fee and treat them all like

15  separate actions, which I -- I was prepared to rule against.

16      I didn't think you were right under the -- under the

17  statute and under the case law that I was looking at.  I'm not

18  really sure I'm understanding this kind of partial severance

19  that you -- that you've agreed to and why it makes sense to do

20  it.

21      So can you -- Mr. Soren says he can't tell me why

22  it's a good idea.  Maybe you can.

23      MR. SMART:  Yes, Your Honor.

24      So appreciating that you were inclined to rule

25  against us on that issue, I think there's sort of two separate

1    issues here; one, whether they can bring the case together.

2    And the second issue being whether the Court can consolidate

3    for purposes of discovery or trial.

4            And those are sort of two separate questions.  And so

5    I think one of the ways the courts have dealt with this is they

6    have not allowed the cases to be brought together as sort of a

7    joint case in and of itself.  But to the extent it makes sense

8    to consolidate aspects of the cases, the courts have done that.

9            And the United States has no objection to

10   consolidation.  But from our standpoint, the -- the rule in the

11   Eleventh Circuit is to not allow multi-prisoner lawsuits to

12   proceed as just a separate case.

13           And that's an important issue for the United States

14   and -- just to preclude prisoners from doing that.  However, we

15   understand that when there are multiple prisoners that have

16   claims that are related, there is a lot of value in

17   consolidating aspects of those cases.

18           However --

19           THE COURT:  I guess the reason -- the reason that I

20   was -- I didn't think that the principle of law that you were

21   relying upon that basically says prisoners can't file multi- --

22   you know, you can't have multi-prisoner plaintiff cases and you

23   can't only pay one fee and have a bunch of people be the

24   plaintiffs -- I understood that rule to be in the context of an

25   in forma pauperis proceeding, which, of course, this isn't.

1          And, in fact, I've actually tried to verdict and all

2     the way through the Eleventh Circuit a multi-plaintiff prisoner

3     case that was filed by counsel, just like this one, and

4     litigated all the way through, and then -- and then went up to

5     the Eleventh Circuit where it was -- it was affirmed.

6          And so I didn't -- I felt like your position on that

7     was incorrect because of the kind of -- of the fact that this

8     is a counseled case brought by counsel and you're not relying

9     on the in forma pauperis statute, which -- what is the name of

10    the case?  Is it *Hubbard*?

11         MR. SMART:   *Hubbard*, yes, Your Honor.

12         THE COURT:   Yeah.  So why I didn't -- I'm not -- I

13    understand the principle that the government wants to maintain,

14    which is you can't have a bunch of pro se in forma pauperis

15    plaintiffs getting together filing -- you know, filing one suit

16    together when they don't have a lawyer and they're all

17    representing themselves and they only want to pay one filing

18    fee or get in forma pauperis.

19         I understand that.  I don't understand it in this

20    context, where you have a counsel suit that's filed and there's

21    multiple plaintiffs.  I just didn't understand that to be the

22    law.

23         Obviously you can disagree with me, but...

24         And so I -- I guess I wasn't prepared to grant

25    severance on that basis.  And now I'm hearing if I don't do

1    that I'm going to just have two different lawsuits, and you

2    say, "Well, let's consolidate it for discovery and trial

3    purposes and so forth."

4            Well, then what's the point in having the two

5    different lawsuits?  Why don't we just keep it all together?  I

6    just don't understand what we're doing here.

7            MR. SMART:  Well, and I'll -- Your Honor, we're

8    relying on the *Garcia* case, which found that having counsel

9    didn't matter.  But I understand your view is different than

10   that, in the *Garcia* case out of the Northern District.

11           But as to the second question, I wasn't

12   representing --

13           THE COURT:  You're talking about the *Garcia* case.

14   What's the -- what's the point then?  Why is it -- it just is,

15   you're saying, because 1915 says so?  There's not a good reason

16   for it?  Or is there a good reason for it in the case of a

17   counseled case?

18           MR. SMART:  I think the point we're relying on is

19   *Hubbard* didn't make that distinction.  I mean, you can still be

20   IFP if -- and have an attorney appointed, for example.  I have

21   other cases like that.

22           And so it doesn't -- the fact that there's an

23   attorney, it doesn't -- the statute doesn't mention that.

24   *Hubbard* didn't point that out.

25           I understand that there's a lone case holding that.

1  And so, of course, the Court is free to disagree with that.

2  But the basis of our argument is that neither the statute nor

3  *Hubbard* said that, "Well, if you have counsel, it's okay."

4          You had the -- you know, previous arguments were --

5          THE COURT:  So the work- -- the workaround that is

6  to -- for me to separate all these cases out, require each to

7  pay a filing fee, and then to consolidate them right back again

8  for discovery and trial purposes?  That's -- then I would be

9  honoring the statute in that way, you're saying?

10         MR. SMART:  Well, I -- yes.  I don't think a decision

11 needs to be made on trial yet.  Because I will say there are

12 discrete claims in this action.  There obviously are some that

13 overlap.  However, there are very discrete claims as well.

14         And so we're a long ways from knowing who the parties

15 will be at the time when trial is to come.  And there are

16 different guards that are alleged to have conducted the

17 conduct.

18         We have motions pending right now on issues regarding

19 supervisory-type conduct.  And so until we know what issues

20 remain to be tried, that decision probably is -- is down the

21 road.

22         Because as you can probably imagine, if only the sort

23 of direct tort-type claims remain, and one of the plaintiffs

24 alleges they were assaulted by a guard that no one else has

25 been -- alleged to have been assaulted by, there's really no

1    reason for them to be in the trial, and so they would have a

2    separate trial.  And so those are all issues that -- frankly,

3    it's premature to address that.

4           As for discovery purposes, assuming that after this

5    motion -- if there are any of these sort of overarching claims

6    that are left, it does make sense to consolidate for discovery.

7           And it would still -- like you said, it -- the

8    statute would be abided by, but it would allow the Court to

9    proceed and avoid the complications for resources that would

10   result from just making them all proceed separately.

11          THE COURT:  So just so I'm making sure I'm

12   understanding the government's position on this, is there any

13   such thing as a class-action prisoner lawsuit that could be

14   brought by counsel if each person involved has to have their

15   own suit?  Is that just -- you're just not allowed to have a

16   class-action suit in a prisoner scenario?

17          MR. SMART:  As it stands in the Eleventh Circuit, the

18   answer would be no.  And the reason -- I can tell you the

19   reason for that.

20          Because so far the Eleventh Circuit has rejected

21   joining the plaintiffs under Rule 20 and under Rule 24.  And so

22   there's no reason Rule 23 would be different, aside from your

23   point about counsel.  That would be the difference.

24          The rule itself -- the class-action rule itself is no

25   different than a Rule 24 or Rule 20, on the theory being that

1   the subsequent inaction of the statute trumps the language in

2   those rules of procedure.

3         So --

4         THE COURT:  So the --

5         MR. SMART:  Sorry.

6         THE COURT:  The class-action suit that I tried --

7   there's actually multiple plaintiffs -- that I tried to verdict

8   and went up to the Eleventh Circuit and was affirmed, you're

9   saying it -- we just didn't follow the statute?

10         MR. SMART:  I suspect no one raised it to you, would

11   be my -- would be my guess.

12         THE COURT:  Yeah.  Okay.

13         MR. SMART:  And I know they didn't -- I looked at the

14   Eleventh Circuit cases.  And it may have been the one you're

15   referring to.  I confess, I didn't look at the lower court.

16         But I think I noted two cases that went up to the

17   Eleventh Circuit.  But neither of those addressed the issue, so

18   it looks like the issue was not raised.

19         I would presume if no one raises it and the Court

20   doesn't -- doesn't raise it on its own, then it would just

21   proceed.

22         THE COURT:  Okay.  All right.  Well -- yes?  I'm

23   sorry.  Who was going to speak?

24         MR. SOREN:  This is Max Soren again, just to sort of

25   provide more clarity.

1      Our concern is that we don't -- mainly our concern,

2   myself and the other two attorneys that represent the four

3   clients that I told you -- our concern is that we don't want to

4   be handcuffed when it comes to discovery or filing responses

5   and so forth.

6      We want the ability to, you know, file our own

7   responses, if -- if we deem it necessary.  And we don't want to

8   have a situation where, you know, only one attorney -- you

9   know, namely, Bryan Busch -- can speak for all of the clients

10  at a depo or anything like that.

11      We want to be able to equally participate.  And, of

12  course, we realize that that may cause some time issues, in

13  terms of depositions maybe not taking, you know, the eight

14  hours, or whatever it is.  But that's our main concern, Your

15  Honor.

16      THE COURT:  So, Mr. Soren, two questions arise out of

17  that.  Why did you file it together in the first place?  That's

18  the first question.

19      So what's the answer to that?  If you didn't want

20  to -- if you didn't want to be part of -- part of the team,

21  then why -- why did you file it this way in the first place?

22      MR. SOREN:  There's an easy answer to that one, Your

23  Honor.  We -- myself and the other attorneys did not file the

24  case.  Mr. Busch filed the case to begin with, and then a

25  number of plaintiffs broke away and sought other counsel.

1     THE COURT:  But you haven't sought to disassociate

2  yourself until now?  So the way you decided to do that was to

3  just agree to the motion to sever?

4     MR. SOREN:  I'm sorry?  I'm sorry, Your Honor?  Say

5  that again.

6     THE COURT:  Well, it -- at the point that happened,

7  is that the point at which you wanted to be separate from

8  Mr. Busch's case?

9     MR. SOREN:  No.  This was a decision that our

10 clients, you know, came to after -- after the motion to dismiss

11 was filed.

12    THE COURT:  And what's your position on -- if I do

13 what you're asking me to do, the government isn't happy with

14 that, exactly.  The government wants you to have to file four

15 separate suits.

16    Is that -- you're agreeing to that?  Or are you just

17 agreeing to have the four clients put together in one suit?

18 What was your agreement with Mr. Smart?

19    MR. SOREN:  My understanding -- and Mr. Smart can

20 verify.  But my understanding is that at least as to our four

21 clients, we would be consolidating into one suit, and then he

22 was going to proceed however Your Honor shook out with the rest

23 of the plaintiffs that are represented by Mr. Busch.

24    THE COURT:  All right.  So, Mr. Smart, you've agreed

25 with Mr. Soren to have a multi-plaintiff suit with four

1   plaintiffs?

2         MR. SMART:  No, Your Honor.  We agreed to have them

3   severed out as to their own case numbers, and then -- and then

4   we would agree to consolidate them for discovery and see

5   what -- we both said we'd see if trial seemed appropriate to be

6   consolidated, depending on what was there.  That was my

7   understanding.

8         So that's what I thought we agreed to.  I mean,

9   obviously, Your Honor's indication on how he's going to rule on

10  the first motion may change that.  That may not be necessary,

11  given that the Court seems to be inclined to allow them to join

12  together as a group.

13        THE COURT:  So, Mr. Soren, here's what -- here's what

14  I don't quite get.  If -- I understand -- and Mr. Smart pointed

15  this out.

16        I understand if we're just talking about a particular

17  client being allegedly assaulted or -- assaulted, I'll just use

18  that word -- by a particular guard or a particular scenario --

19  I understand why those could be fact-specific situations and --

20  and might lend themselves more toward individualized

21  consideration.

22        But to the extent that Count I attempts to hold --

23  hold the institution -- hold the institution responsible, or

24  the management, or wants to hold the actors involved with the

25  Bureau of Prisons for negligent retention or negligent

1  supervision, or that type of thing, and incorporates into the

2  complaint allegations of essentially what I would call pattern

3  and practice; that is, a number of different guards over a long

4  period of time -- it alleges knowledge by supervisory officials

5  and failure to act.

6        To me, you know, without commenting on the merit of

7  those, because, of course, I don't know the merit -- but, to

8  me, those are things that would lend themselves to a trial by

9  all who were aggrieved against those institutions or those --

10  that segment of it.

11        And the question I have for you is, if you sever out,

12  is it your desire to try that whole scenario independent of

13  Mr. Busch, and so the Court would literally be trying the same

14  scenarios twice?

15        MR. SOREN:  Well, there's two answers, Your Honor;

16  one I can short-circuit by saying that we don't have a problem

17  with staying -- you know, all staying together for purposes of

18  a trial.

19        Like I said, our main concern is the discovery

20  portion and being able to communicate with Your Honor through

21  the responses and motions and so forth.  So that's -- that's

22  our main concern.

23        If we were allowed to have our cake and eat it too,

24  we would -- we would be able to conduct -- we would --

25  discovery -- we would be able to conduct discovery in a manner

1    that we would get equal seating at the table and we would be

2    able to file our own responses if we feel it necessary, or our

3    own motions, as opposed to only having to be a joint response

4    or a joint motion.

5           If that was -- if that was possible, Your Honor, I

6    don't think the issue would be at the actual trial itself.  But

7    if that's not possible and in the scenario that has presented

8    to you, that there's two cases, I believe that we can still try

9    that case by bringing in witnesses and so forth.

10          But the short answer to that is, yes, Your Honor, you

11    would be trying, you know, cases which -- which are similar in

12    some ways.

13          THE COURT:  Well, similar -- I mean, if -- if I sever

14    your four clients out and open up new cases for them, what

15    complaint am I using?  Do I just use this complaint and somehow

16    that's going to make sense, even though it's an individual case

17    and even though all these other people are in that complaint?

18          Are you selling -- telling me you're going to file

19    new complaints?  Are those new complaints going to reallege

20    Count I, but individually; that is, an individual plaintiff is

21    going to allege in Count I this institutional claim, or is that

22    individual plaintiff just going to allege intentional torts

23    against them by the guards?

24          I guess I'm -- I am -- I'm a little bit -- I want to

25    make sure I don't get myself into a quagmire.  And I'm -- I

1    really am having a hard time understanding how this happened.

2    I don't -- I'm really having a hard time figuring out -- I

3    assumed -- and I guess I shouldn't have.

4            But I assumed that if y'all were all on the same side

5    that you all were pulling in the same direction.  And I didn't

6    know anything about the fact that you got in late and so forth.

7    I don't know when you got in.

8            When did you get in?

9            MR. SOREN:  We came in, I believe, in December.

10           THE COURT:  Well, isn't that when the complaint was

11   filed?

12           MR. SOREN:  I'm sorry, Your Honor.  I think maybe

13   January.

14           THE COURT:  So the -- so the complaint got filed by

15   Mr. Busch, who I assume represented these folks when he filed

16   it, or he wouldn't have filed it on their behalf, and then --

17   let me see when you came in.

18           You came in in March.  You came in in March; is that

19   right?

20           MR. SOREN:  Yes.  Yes, Your Honor.

21           THE COURT:  Okay.  So how -- so what -- so you've

22   agreed with Mr. Smart to sever your claims out.  But what's

23   going to happen after that?

24           MR. SOREN:  Well --

25           THE COURT:  I don't think you could use the same

1   complaint.  Do you?

2          MR. SOREN:  What would happen -- what would -- no,

3   Your Honor.  What would have to happen is that the complaint

4   would be -- would be filed with separate case numbers or a

5   consolidated case number for the four of us, and then we could

6   amend the complaint thereafter to -- to make it appropriate.

7          Or, Your Honor, if we can -- if there's a way to do

8   it that we can, like I said, engage in discovery and responses

9   and so forth, that might be the better thing, if possible.

10          THE COURT:  Well, I don't know what I'm going to do.

11   But all I'm saying to you is a case that was already

12   complicated enough seems unduly complicated by this, but -- but

13   we'll see.  It also calls into question as to when we would be

14   able to go to trial in the second set of cases and so forth.

15          One of the things that I was concerned about when I

16   looked at the case management schedule -- you know, the

17   government doesn't want to go to trial until 2022.

18          And even the plaintiff seemed like kind of a long

19   time from now.  And then I saw something about a limitation to

20   75 depositions.  And I was thinking, "I don't know if I've ever

21   heard of a case with 75 depositions before."

22          So we're going to have to talk about case management

23   when we get to it.  But I guess let me think about this a

24   minute while we're going through some of this other stuff.

25          So -- and I'm just going to -- I'm going to try to

1    kind of cut to the chase here and talk to you-all about these

2    issues.  And the way that we have parsed them out is we

3    literally tracked the motion to dismiss.

4            And at the very end of the motion to dismiss it

5    said -- it said specifically what relief was being sought.  And

6    so we have looked at that.  And that's -- that's what I'm

7    basing my issue analysis on.

8            And so what I'm talking about is pages 37 and 38 of

9    the motion to dismiss, which is doc 25.  It lists seven items

10    of relief that the motions seek.  And so I'm going to address

11    those issues.

12            We've just addressed severance.  And -- and so I'll

13    think about that some more, but we've addressed it.  And, of

14    course, I -- I'm getting some feedback.

15            I don't know if somebody isn't -- doesn't have their

16    phone on mute or whether we've just got a bad connection.  I'm

17    going to just be quiet for a minute and see if we can get that

18    resolved, if somebody needs to mute or something.

19            Okay.  Well, it's quiet now.

20            So we have talked about the severance.  I'll think

21    about what y'all are saying to me.

22            So before I leave that, though, Mr. Smart, let me ask

23    you again.  So tell me how this is going to work.  Tell me

24    exactly how it's going to work.  They've agreed to your motion

25    to sever.  Okay.  So now that's been agreed to.

1          So tell me exactly what it is that the Court is going

2     to do, what these complaints are going to look like.  Do we

3     have to replead?  Are we starting all over again with these

4     four?  What -- what is -- what was the contemplation of the

5     government in this -- in this agreement?

6          MR. SMART:  I will tell you I got a call about this

7     as we were sitting on the phone waiting for this, so I'm going

8     to do my best to try and think through this with you, as I've

9     been listening to you.

10          THE COURT:  So you're telling me this is hot off the

11     press?

12          MR. SMART:  Yes, Your Honor.  I literally got an

13     e-mail from Mr. Soren to call him on his cell phone while we

14     were waiting.  So I'm doing the best I can with this at this

15     point, so...

16          THE COURT:  Well, that doesn't make me feel very

17     good.

18          MR. SMART:  I appreciate that, Your Honor.  I just

19     wanted you to understand why I don't have a wholesome answer

20     for you.

21          THE COURT:  That doesn't really bespeak the kind of

22     due consideration I would have hoped for before that was

23     brought to me.  But go ahead and answer my question as best you

24     can.

25          I did not realize that this is something y'all just

1    talked about before I got on the line.  That -- I would have

2    thought that it would have been discussed sooner.  It's a

3    pretty big deal.

4             Don't you agree, Mr. Smart?

5             MR. SMART:  I do, Your Honor.

6             And what I actually contemplated when we spoke was

7    that -- it seems like that might not work, given what you

8    said -- was that we would try to come up with a proposal for

9    how to consolidate things and submit that to you, but -- you

10   know, with some time.

11            Recognizing this is our time with you on the phone

12   for the hearing, I know that's a little difficult.  My thinking

13   was, is that the cases -- to the extent there's overlapping

14   discovery, which there is a lot, depending on what claims

15   survive the motion to dismiss, that it would make sense to

16   consolidate things for discovery, so that we're not answering

17   essentially the same thing multiple times.

18            But as for trial, I still think it makes sense to

19   wait and see what's left.  And to the extent -- I'm not certain

20   that two trials are necessary.  They may be.  But if they are,

21   it -- it would make sense only to do that where there's not a

22   real overlap of issues.

23            You know, that -- that's sort of -- I think that

24   question does not have to be decided today.  I recognize that

25   leaves some uncertainty.  But I think the mere fact of how many

1    claims and plaintiffs are at issue, it sort of -- it's almost

2    difficult to make that decision at this point.

3           I do recognize that presents a problem for how many

4    trial dates we need to set.  And that's probably overly

5    complicated by sort of the issues we've had -- you know, I know

6    with the trial dates that aren't going now, what that means for

7    rolling trial dates and things in the future.

8           So I'm -- I'm a little unable to directly address,

9    because, frankly, I think it does -- like you said, it raises a

10   lot of issues, and it's a big deal.

11          So I --

12          THE COURT:  Well, I'll --

13          MR. SMART:  What I'd propose -- I'm sorry.

14          THE COURT:  We'll leave that for the moment.  I will

15   only point out to you -- but I guess mainly to Mr. Soren, if he

16   was the one that initiated this agreement, I would point out

17   that the notice of hearing in this case went out on April 1st

18   of 2020, some two months ago -- two-plus months ago.  It was

19   set for May 27th originally, but then because of scheduling I

20   had to move it even further out to June the 4th.

21          The point being that the parties have known for over

22   two months that this case was being heard; the parties have

23   known for over two months that severance was an issue.  And I'm

24   disappointed to hear that this discussion was occurring even as

25   I was just getting on the phone.

1        So I just -- I'm not sure what to do with it.  I'm

2  not sure what to think about it.  And it sounds like y'all

3  aren't either, to be honest with you.

4        And so -- so I'll probably have to put that to the

5  side.  I'm sorry that I'm having to do that, but I -- I don't

6  know how else to do it.  So we'll -- we'll figure that out at

7  the end.  And it may end up impacting scheduling and all kinds

8  of things.

9        So, you know, anyway -- all right.  I guess I would

10  say -- if I said more than that, it would be obvious that I'm

11  perturbed.  And I don't want to be --

12        MR. SMART:  Your Honor, this is Mr. Smart.  Perhaps I

13  could propose that Mr. Soren and our side, after this hearing,

14  discuss this matter and submit something to you with our

15  proposal.  That might make the most sense, and try to do that

16  within -- say, by Monday?

17        THE COURT:  That's fine.  That's fine.  That's

18  probably what we're going to have to do.

19        MR. SMART:  Okay.

20        THE COURT:  All right.  Okay.  Well -- and I don't

21  know if it has to be by Monday, but we'll see.  We're going to

22  talk about scheduling.

23        MR. SMART:  Okay.

24        THE COURT:  Let's go ahead and talk about the

25  remainder of the motion to dismiss.  Obviously, there's quite a

1   lot of meat in here.

2           I'm going to try to -- I'm going to try to focus you

3   on what I'm -- what I want to talk about in relationship to

4   that.  And I'm going to ask the question of the party that I

5   have the most question about their position.

6           So, Mr. Busch -- I guess you wrote the complaint,

7   Mr. Busch; is that right?

8           MR. BUSCH:  I did, Your Honor.

9           THE COURT:  Yeah.  So -- okay.  So I'm going to

10  address my questions about the complaint to you.  And I may ask

11  you to make specific reference to the complaint, so I hope you

12  have it in front of you, because I do have a couple of

13  questions.

14          So I -- I see Count I.  And Count I is obviously

15  where the focus is here.  As I understand it, the government

16  has not moved against the intentional tort allegations.  And

17  I -- you know, I suspect I know why.

18          I mean, they -- they -- they are what they are.  And

19  the legal issues that are presented in Count I don't really

20  attain too well in the rest of the counts.

21          But what that also likely means is we're going to go

22  forward with this case one way or the other, and so -- so

23  there's that.  But -- so let's focus on Count I.

24          And I read your -- I read your complaint.  Of course,

25  it's very detailed.  I -- you know, obviously, you had the

1  benefit of, I assume, not only interviews with your clients,

2  but you must have had the benefit of some investigation or some

3  documentation that enabled you to be as specific as you were.

4  And I want to ask the government about that momentarily.

5          But -- so -- so Count I is entitled negligence and

6  negligence per se.  My question for you is:  Why negligence

7  per se?  And what is the per se?

8          As I understand it, per se negligence under Florida

9  law has to -- has to have attached to it a -- a breach for

10 failure to comply with a specific statutory or other regulatory

11 provision.  And I know you cite this federal act here that --

12 you know, that is used to kind of inform the negligence.

13         And I don't have a big problem with that.  I know the

14 government doesn't like it, but -- but I didn't have a big

15 problem with that.

16         But I'm not understanding -- because it has to be

17 with reference to the state law, Florida state law, under the

18 Federal Tort Claim Act matter.

19         I'm not understanding why you have a negligence

20 per se title.  And I'm not understanding why you need it, as

21 opposed to just a negligence claim.

22         So if you could explain that, please.

23         MR. BUSCH:  Sure, Your Honor.  And you may be correct

24 that -- that it -- at the end of the day, it certainly may not

25 be necessary to have both a negligence per se and a negligence

1   claim in there.

2          But I think that the -- the thought process with

3   respect to the -- the negligence per se was that Florida does

4   have a statute -- I believe it's Statute 944.35 -- which does

5   prohibit any sort of sexual contact between inmates and

6   officers that are -- that are in charge of supervising them.

7          And so recognizing that the PREA statute itself

8   certainly does not provide for an independent negligent cause

9   of action claim, the rationale for the negligence per se was

10  the general federal statute Your Honor just referenced, and

11  also this Florida statute.

12         And so that was the -- that was the thinking when we

13  originally drafted the lawsuit.

14         THE COURT:  All right.  And help me, if you will --

15  because I'm not remembering where the Florida statute is cited

16  in the -- in the complaint.

17         MR. BUSCH:  Your Honor, I don't know that the Florida

18  statute was cited specifically in the complaint.  I don't

19  recall it being in there.  I have it up in front of me and I

20  don't see it.  I think the Florida statute was cited in our --

21  in our response papers to the motion to dismiss.

22         THE COURT:  So you're telling me that your negligence

23  per se argument is based on this Florida statute and you feel

24  like -- is there a case -- are you aware of a Florida case that

25  has said that that gives rise to a negligence per se cause of

1   action in Florida?

2         MR. BUSCH:  I am not aware of that, Your Honor.  I'm

3   not aware of a specific case that held that.

4         THE COURT:  Okay.  Mr. Smart, what's your view of

5   reliance upon the Florida statute that -- that Mr. Busch has

6   just referenced?

7         MR. SMART:  I looked at the statute.  And it's --

8   it's a use of force statute.  And so usually it's in the sort

9   of immunity context that it's -- you're allowed to use force,

10  but not in these ways.

11        So I -- I am not aware of the Florida statute holding

12  that affirmative negligent per se claim.  And it usually is in

13  the context of sort of the excessive force claims, and, you

14  know, what the immunity to that is.

15        THE COURT:  And so, Mr. Busch, I guess negligence

16  per se is -- because you -- because as I understand it,

17  Mr. Busch -- and, actually, this will give me a chance to ask

18  you a question.

19        You -- at the end of your complaint, you pray for

20  all -- let me get the exact language.  You pray for -- that

21  I'll grant you a jury trial on all claims triable by a jury.

22        I wasn't aware that the Federal Tort Claim Act would

23  countenance a jury trial.  Are you -- I know you can impanel an

24  advisory jury.

25        But do you have some different view of it?

1        MR. BUSCH:  I don't, Your Honor.  I don't believe the

2   Federal Tort Claim Act does warrant a jury trial.  I think

3   it -- that that phrase was put in there out of an abundance of

4   caution, just in the event there was any sort of claim that

5   did -- that did rise to a jury level.

6        THE COURT:  Okay.  So we know it's going to be a

7   non-jury trial.  And so that means we won't have jury

8   instructions, but we'll still have elements of the crime -- I'm

9   sorry, elements of the cause of action that the Court will be

10  testing the proof against.

11       And what are you gaining in that scenario?  What are

12  you gaining by a negligence per se?  Are you going to be able

13  to argue that a -- that if you can prove that that statute was

14  violated -- that Florida statute you're referring to, that that

15  is negligence per se?

16       Is that what you're trying to say?

17       MR. BUSCH:  Yeah.  I think that was the -- that was

18  the initial thought in drafting the lawsuit, Your Honor, was

19  that, you know, if we could tie the specific actions here to a

20  violation of that Florida statute, that it could rise to that

21  negligence per se level.

22       THE COURT:  Okay.

23       MR. SMART:  Your Honor, this is Mr. Smart.  If I

24  could respond to that?

25       THE COURT:  Sure.

1    MR. SMART:  I've been looking while we've been

2    talking to try -- I did not find a case that allowed it.  I

3    just found a recent opinion from this court in 2018 that held

4    that they're criminal statutes and it doesn't explicitly -- and

5    it doesn't allow for a civil suit based on it.  And I can give

6    you the citation for that.

7         And I just found it as I was looking right now.

8    It's -- the case name is *Tierney*, T-i-e-r-n-e-y, *v Ferguson*,

9    F-e-r-g-u-s-o-n.  And it's in the Middle District of Florida.

10   And the Westlaw number for it is 2018 WL 10669740.

11        THE COURT:  All right.  Thank you.

12        MR. SMART:  Uh-huh (affirmative).

13        THE COURT:  All right.  I am -- I'm going to grant

14   the motion to dismiss with respect to the negligence per se

15   claims.  And I'm going to do so without prejudice, meaning that

16   if, Mr. Busch, you look at this again and you really feel like

17   you've got a negligence per se, I'm going to allow you to try

18   to replead it.

19        You're going to have to cite the Florida statute.

20   You're going have to overcome that case that Mr. Smart just

21   told me about.  Of course, I haven't read it yet.  And you

22   would also -- I would prefer it to be in a separate count,

23   rather than the negligence.

24        So I would think -- typically you would see a

25   negligence per se count in a separate count from the negligence

1    count.

2         And so I'm going to be granting the motion to dismiss

3    to that extent, but allowing you to replead, if you have a

4    basis to do so, and if it makes sense to do so, as well.  So

5    that's the Court's ruling on that aspect of the motion to

6    dismiss.

7         All right.  We are on, now, the -- the thing that

8    took a lot of the argument and is always a difficult issue, and

9    that's discretionary function.

10        And I want to -- but I'm going to skip over it.  And

11   here's why I'm going to skip over it.  I want to see what

12   portions of Count I are going to be viable, because I do think

13   that that might bear on discretionary function.  I know

14   discretionary function is a subject matter jurisdiction issue

15   and I need to deal with it, but -- and here's what I'm talking

16   about.

17        So -- and, Mr. Busch, I'll talk to you again.  So

18   I -- the -- I'm going to back into it.

19        So among the more unusual things about this case,

20   other than what I just heard about for the first 30 minutes of

21   the hearing, is that in a -- what I'm sure is a little bit of

22   irony -- the best formulation of the theory that I think the

23   plaintiffs might be traveling under was actually given to me by

24   the government.

25        And that's at footnote 8 of the government's

 1    response -- I'm sorry, the government's motion to dismiss,

 2    doc 25.

 3           So the government says, "The United States will

 4    address the substance of Plaintiffs' negligent supervision,

 5    retention, failure to discipline and failure to report claims

 6    on summary judgment in the event these claims survive

 7    discretionary function."

 8           And then it says, "Under Florida law," quote,

 9    "negligent supervision and retention occurs when during the

10    course of employment the employer becomes aware or should have

11    become aware of problems with an employee that indicates his

12    unfitness and the employer fails to take further action such as

13    investigation, discharge, or reassignment."

14           And the government cites one of my colleagues from

15    Orlando quoting another Middle District case.

16           So when I read that footnote, I said to myself, "I

17    think that's what this case is about, it seems to me.  That's

18    what Count I is about."

19           And -- but you not only have alleged that, Mr. Busch,

20    in your own way, but you've also alleged negligent hiring and

21    negligent training.  And those are much tougher hills to climb,

22    not only under law, but also vis-a-vis the discretionary

23    function exception.

24           It's hard to have a negligent hiring or negligent

25    training claim under a Federal Tort Claim Act case, because

1  typically that's viewed as discretionary function.  And your

2  complaint doesn't really tell me what they did that was

3  negligence when they hired these folks or when they trained

4  them or didn't train them.  It just says that they did.

5         I think it does.  You can point me to language in

6  your complaint if it -- if there's more to it.

7         I guess my question is:  What is your basis for

8  alleging negligent hiring and negligent training?  What facts

9  do you have other than just saying they didn't do it, or they

10 did it, or whatever you're saying?

11        What is it that you're relying upon for that piece,

12 negligent hiring and negligent training?

13        MR. BUSCH:  Sure.  So obviously on the negligent

14 supervision and retention claim that the government cited to in

15 footnote 8, we had more information at our disposal to make

16 specific allegations about what the prison knew about these

17 individuals and allowed them to -- to continue working there.

18        That was the information that I was able to gain

19 through some of my interviews with some of the employees.  What

20 we do not -- what we were -- what we did not have access to at

21 the time of filing this complaint were the personnel records,

22 any sort of, you know, employment applications, aptitude tests,

23 all the stuff that you would typically find when you are, you

24 know, looking to maintain a negligent hiring type case.

25        And so we were at a little bit of a disadvantage,

1  Your Honor, with respect to filing a complaint -- that portion

2  of the complaint, and certainly agree with you that there

3  are -- there are not many facts, if any, that go into

4  supporting that, other than, you know, our just general belief

5  that these folks, you know, were unsuitable for the positions

6  that they were put into.  So --

7         THE COURT:  Well, let me ask you this -- let me ask

8  you this, Mr. Busch.  If you're able to muster evidence, as

9  your complaint at least alleges that -- if you're able to

10 muster evidence that -- and I'm going to quote the government

11 again, that during the course of employment the employer became

12 aware, or should have become aware, of problems with an

13 employee that indicates his unfitness and the employer failed

14 to take further action, such as an investigation, discharge, or

15 reassignment, then, according to the government -- and I think

16 they're correct -- then you're going to have a potential claim

17 under Florida law.

18        We have to discuss about -- we have to discuss

19 discretionary function, but put that to the side for the

20 moment.

21        So isn't that what your case is really about, is

22 you -- you don't really know or even need, do you, negligent

23 hiring or training?  Maybe you do.

24        I mean, if -- are you -- do you have reason to

25 believe, for example, that the government -- do you know

 1  anything about the backgrounds of these guards or anything that

 2  would lead you to believe that the government knew that they

 3  might be -- that they might end up being -- allegedly being

 4  sexual predators?

 5          MR. BUSCH:  Well, and here's where it gets a little

 6  complicated.  Because, you know, based on, you know, some

 7  discussions with some inmates and their discussion with the

 8  guards, at least some of the guards have -- have discussed or

 9  talked about their own criminal backgrounds prior to working at

10  the facility.

11          I have no way of verifying that yet, you know, at

12  this point in time, and wasn't able to verify it before I filed

13  the lawsuit.  And that is certainly something I would like to

14  look into when I look through the employment records.

15          But I agree with Your Honor that at the end of the

16  day, if we can show that they were retained and kept there when

17  the government had knowledge of their misconduct, it -- maybe

18  it doesn't even matter.

19          THE COURT:  You --

20          MR. BUSCH:  And that's certainly the easier claim to

21  show.

22          THE COURT:  Based on your investigation, do you have

23  a level of confidence you'll be able to show that?

24          MR. BUSCH:  I have a -- I have a high level of

25  confidence that I'll be able to show that there was prior

1  sexual acts that were reported to the prison from these

2  officers and that they kept them on duty.  I have a high level

3  of confidence in that.

4          I do not have a high level of confidence about these

5  guards' backgrounds prior to joining the Bureau of Prisons, and

6  would not be able to -- to tell you either way until I have an

7  opportunity to take some discovery.

8          THE COURT:  All right.  And, Mr. Smart, my question

9  to you regarding discretionary function, if you put aside for

10  the moment -- put aside hiring, and you put aside training, and

11  assume arguendo that those are -- would be -- would be barred

12  by the discretionary function exception -- and so now we're

13  talking about the thing that you were talking about in

14  footnote 8, that is, negligent supervision and retention,

15  because the employer was aware, or should have been aware, of

16  problems with an employee that indicated unfitness and failed

17  to take action, such as investigation, discharge, or

18  reassignment -- is it your position that those allegations

19  would be barred by the discretionary function exception, as

20  well?

21          MR. SMART:  I think that is obviously a tougher

22  question.  And my thought on that is that when you put it

23  broadly like that, it's hard to say that everything possibly

24  could be.  Right?  The failure to act at all would not be.  I

25  mean, I think I've cited plenty of cases on that.

1          If you have knowledge of something and you do nothing

2     about it, that's not discretionary, right?  You haven't

3     exercised your discretion.  However, if you do have knowledge

4     and you choose to investigate or do things in a certain way

5     which is within discretionary-type situations, then it would.

6          And so I think what I'm probably saying -- the way

7     you're framing it, I -- I'd hate to sort of concede these sorts

8     of things.  But I would think that the way you're phrasing

9     it -- it sounds more like there needs to be a more specific

10    claim than you -- what was done, and is that discretionary or

11    not.  It may be a summary judgment issue as to those claims,

12    depending on what the actual conduct is.

13          Does that make sense?

14          THE COURT:  Well, that's what got me started, of

15    course.  I read your footnote 8, even though it's really tiny

16    type.  And you yourself say that this is the kind of stuff we

17    need to be talking about at summary judgment.  Although I'm not

18    even too big on a summary judgment in a non-jury scenario, but

19    we'll get to that.

20          MR. SMART:  Well, I think -- I apologize.  I think

21    what I'm saying right now is not the same thing I'm saying in

22    that footnote.  I appreciate that you think if there's issues

23    of fact, the substance of the claim itself should go to trial.

24          What I'm talking about right now is saying that if

25    the case law is such that things about retention and

1  discipline -- failing to do anything may not be discretionary.

2      But if actions are taken, whether those come within

3  the ambit of the discretionary function would be a matter for

4  summary judgment.  And I think because of the broad way you're

5  framing it, it probably would be --

6      THE COURT:  Give me --

7      MR. SMART:  Yeah.

8      THE COURT:  In the context of this case, give me an

9  example of what you're talking about.  What would be -- so

10 let's say that the -- let's say that the higher-ups in Coleman

11 knew that these officers were committing sexual misconduct with

12 inmates and -- let's say they knew it.

13     MR. SMART:  Okay.

14     THE COURT:  And so what is it that you're saying

15 would be actionable once they know that, or should have known

16 it, and what wouldn't be actionable?  What's the distinction

17 you're trying to draw?

18     MR. SMART:  Sure.  The distinction would be if they

19 knew it and they just sat on their hands and did nothing, that

20 would be actionable.  That's a pretty easy example.

21     Where it gets more difficult -- let's say they knew

22 it or -- or they -- I think it's -- the problem is if you say

23 they knew it, sort of, you take out some of the responses.

24     So if they hear rumors of it or allegations of it and

25 they go and do an investigation and the investigation is

1    inconclusive, the fact that they did the investigation and then

2    didn't do anything or evaluate the evidence from it, that's

3    discretionary.  How do you take that information?

4         If the report came back from this and it said they

5    absolutely did this and then again they sat on their hands,

6    that would be actionable.

7         But if the decision was, "Well, we're going to --

8    we're going to look to refer this person for a potential

9    criminal prosecution or we're going to suspend them, or we're

10   going to move -- we think we need to move some of the -- the

11   targets of this to a different location so we can protect them

12   while we sort this out with the union and figure out how to

13   deal with that" -- those are all things that are discretionary.

14   And they get into a lot of detail.

15        And so the reality is, on those retention questions,

16   it likely is a subject that actually is amenable for summary

17   judgment and harder on a motion to dismiss.

18        And so that's what I'm saying.  I'm not saying the

19   substance of the negligent retention or disciplining is

20   necessarily amenable for summary judgment.  It would have to

21   be -- the facts would have to be pretty clear for that, I

22   think.

23        But whether the actions that were taken -- whether

24   those are, quote, sufficient or not is -- is -- that starts

25   bleeding into the discretionary function.  I think that may

1    very well be an issue for the Court again on summary judgment,

2    if that makes sense.

3           THE COURT:  Yeah.  I hear what you're saying.  The

4    discretionary function is -- it's tough.  I mean, you know,

5    it's a -- when you read the cases and you read the distinctions

6    that are made and so forth, it's -- it's -- it can be pretty

7    tricky.

8           The -- I posited to Mr. Busch that negligent hiring

9    and negligent training were always going to be potentially

10   problematic under discretionary function.

11          Am I -- am I right about that?

12          MR. SMART:  I agree with that, Your Honor.  I think

13   that is -- I think they would have to make a pretty significant

14   showing at this point to bring that out.  And I'm not even sure

15   how they would do that.

16          But -- but I think the reality is what I heard -- so

17   that's on just the subject matter jurisdiction.  I don't think

18   you would even have to necessarily address the failure to plead

19   sufficient facts under 12(b)(6) on that.  I think it's

20   sufficient under 12(b)(1) for that.

21          But I will say -- what I heard Mr. Busch saying is he

22   couldn't verify if the prior guards have a criminal history.

23   And I think that's not correct.  I think you can check that

24   sort of thing.

25          I think I cited that there was a D.C. Circuit case or

1  District of D.C. case where it was found to be sort of allowed

2  to go forward where they knew that a prior -- that a guard had

3  a prior history of assaulting prisoners at another location.

4  And there's been no allegation of anything like that.

5         And the fact that -- you're not allowed to just sort

6  of plead a conclusory claim like that and then go on a fishing

7  expedition for discovery.  That's just not how that works.

8         But, again, I don't think you need to get into that,

9  because I think you're correct that the negligent hiring and

10  the negligent training claims are -- almost resoundly fit

11  within the discretionary function exception.

12         THE COURT:  All right.  Mr. Busch, do you want to say

13  anything else on this topic?

14         MR. BUSCH:  Your Honor, I will add -- we do have

15  evidence which I -- which I think will be -- will be proven out

16  on -- I am confident in it -- that several of these guards were

17  moved from one facility to the next because of their -- their

18  history of sexual abuse.

19         So for whatever reason the prison thought it would be

20  a good idea to -- to put them in another facility, somehow that

21  would rehabilitate them.  So just to -- just to argue with

22  Mr. Smart just for a second on that point.

23         But, broadly speaking, I think even transferring them

24  inter-facility is still a negligent retention claim and not a

25  negligent hiring claim, because I don't believe they were

1   rehired when they go to a different facility.  But I don't know
2   that for sure.
3           THE COURT:  Yeah.  And, Mr. Busch, while I'm at it,
4   y'all -- I felt like y'all were kind of talking past each other
5   on this failure to investigate and so forth.  You said failure
6   to investigate, transferring, and retaliation, and not
7   providing access to counsel.
8           Are those -- are those actual claims that you're
9   making, or are those -- is that, for lack of a better term,
10  background, or --
11          MR. BUSCH:  Yes, those are -- those are not
12  individual claims, Your Honor.  It's part and parcel of the
13  system that was put in place there.  I think some of that
14  evidence goes to support the negligence claims.  But certainly
15  there's no -- there's no basis that I have found for an
16  independent claim for failure to investigate.  And so that
17  was -- that was, for lack of -- to use your term, kind of
18  background information.
19          THE COURT:  Yeah.  All right.  So I'm going to grant
20  the motion to dismiss under 12(b)(6) with respect to the
21  negligent hiring and negligent training aspect of Count I on
22  the basis that the allegations are conclusory and do not have
23  enough factual content to allow them to go forward.
24          I will say that in determining whether to replead
25  them that the discretionary function issue is also a very

1    powerful issue with respect to those claims.

2           It was not clear to me under what circumstances those

3    claims could go forward under a Federal Tort Claim Act

4    scenario, because hiring and training are probably considered

5    discretionary-type acts, where choices are made and so forth,

6    unless, as Mr. Smart suggested, you have some pretty good

7    allegations you can make about past criminal conduct or past

8    conduct in a -- as a prison guard, or something like that.

9           And I understand that's hard to get until you get

10   discovery.  I suppose if you're deposing one of these guards

11   and they -- you ask them those questions and it turns out that

12   there's great stuff, then maybe those claims could be

13   reintroduced.

14          But right now I just -- I'm not seeing the factual

15   content and I think you've got a discretionary function

16   problem, as well.

17          However, with respect to the -- the footnote 8

18   allegations, that is, negligent supervision and retention, I

19   feel like -- that the allegations of the complaint are

20   sufficient under Florida law and that I am not prepared to say

21   at this time that they would be barred by the discretionary

22   function exception.

23          I suppose the government, as the case progresses,

24   might try to convince me on a summary judgment record or in

25   some other way that I ought to revisit that.

1          But it seems to me -- and I -- I saw there was -- you

2     know, there's not even clear agreement among the cases as to

3     who's got the burden of proof and who's got to do what in terms

4     of discretionary function.

5          But my best understanding of it is -- is that the

6     plaintiff has to allege enough to show that it -- that it's not

7     barred by discretionary function, and then it's up to the

8     government as a matter of proof to show otherwise.

9          And I feel like the allegations of the complaint are

10    sufficient under a negligent supervision and retention-type

11    theory.

12         And I noticed in the government's footnote 8 that

13    they -- part of that is that -- whether the employer was aware,

14    or should have been aware, of the problems indicating

15    unfitness, and then fails to take further action, such as

16    investigation, discharge, or reassignment.

17         So I think those types of allegation as pled in Count

18    I are legally sufficient under 12(b)(6).  And I am not prepared

19    to say at this time that they're barred by the discretionary

20    function exception.

21         I am throwing out for the moment the negligent hiring

22    and negligent training claims.  And I am worried for the

23    plaintiff that they may well be barred by discretionary

24    function.  And so the plaintiff should take a hard look at that

25    before deciding whether to replead.

1          And -- all right.  So we're now, I believe -- and

2    I -- I take Mr. Busch at his word that he's not trying to plead

3    separate causes of action for failure to investigate or

4    transfer -- transferring in retaliation, not providing access.

5    I take that to be part of a negligent supervision or retention

6    theory, as indicated in footnote 8; that is, fails to take

7    further action, such as investigation, discharge, or

8    reassignment -- it seems to me that that quote leaves open the

9    possibility that the government could be liable if they

10   mishandled the information that they had.

11         And -- and so we'll see about that.  I think

12   Mr. Smart might have a different view of it.  But he'll have an

13   opportunity at some point to get that back in front of me.

14         All right.  So we're now on to the issue of the six

15   plaintiffs.  And I'm not sure -- I have to make sure that -- do

16   these six plaintiffs cross over between Mr. Busch and

17   Mr. Soren, or not?  Are they -- who --

18         MR. BUSCH:  They do not.  All of these are mine, Your

19   Honor.  This is Mr. Busch.

20         THE COURT:  Okay.  All right.  So we can -- I can

21   just talk to you about this then.

22         All right.  So -- so I guess for some reason the

23   statute says that, I guess, prisoners can't sue if they're

24   relying on emotional damages and the sexual contact did not

25   occur unless they were unclothed, I guess.  It's kind of an

1    oddly written statute, but...

2         So, Mr. Busch -- and I didn't quote it quite

3    accurately, but I -- but you-all know what I mean.

4         So, Mr. Busch, I understand that there's two ways to

5    come within that statute and have a cause of action.  One is if

6    there's physical injury of your client.  And the other is if

7    there was a sexual act performed as defined.

8         So it was a little bit unclear to me from your

9    response what you're saying about these six plaintiffs, why

10   they do not run afoul of this statute.

11        MR. BUSCH:  Sure.  So -- so I think that if the

12   Court, you know, reads the -- the complaint, especially the

13   section for each one of these six, the Court will see there's a

14   decent amount of detail in what actually occurred during the

15   sexual acts, although not -- you know, there certainly would be

16   more detail in a deposition-type setting.

17        But, you know, as far as the pleadings go, you know,

18   it is our obligation to simply set forth the facts that -- that

19   the Court can then reasonably infer from the allegations in the

20   complaint would demonstrate defendant's liability.  And that's

21   the standard here on a motion to dismiss.

22        And we think that we have more than met that burden

23   with respect to these six individuals, because we have alleged

24   repeatedly, over and over again, that these individuals were

25   groped and fondled in their genitalia area.

1       And certainly the government is on notice that those

2  acts -- or that those actions of the guards encompass sex acts,

3  and can reasonably infer that even groping someone, even with

4  the slightest amount of penetration, you know, over or under

5  the clothes, which is what the -- what the act says, occurred

6  in this case.

7       And so I don't think it was necessary that we plead

8  specifically that penetration occurred over or under the

9  clothes.  I think it was ample for us just to say that they

10  were groped and fondled.

11       And I think a reasonable inference from that can be

12  that even the slightest amount of -- slightest amount of

13  penetration would meet that definition of a sex act.

14       The defendant --

15       THE COURT:  Let me stop -- let me stop -- let me stop

16  you right there and ask Mr. Smart a question.

17       Sir, why would this not be something that had to be

18  understood through evidence, as opposed to me throwing these

19  claims out?  I mean, when you read what happened -- allegedly

20  happened to these women, it's, obviously -- I believe your own

21  word in your own brief was reprehensible.

22       And, you know, when you read the statute, as

23  Mr. Busch said, a little bit of difference could make a

24  difference, in terms of what exactly happened in these cases.

25       And is it really necessary for him to go back to his

 1     client and ask all those questions and then put it in a

 2     pleading just to try to plead around the statute?

 3            Or since they're going to be deposed anyway and, you

 4     know, eventually those details would have to come out, either

 5     in deposition or at trial or at both, wouldn't the Court be in

 6     a better position at that point to understand whether or not

 7     this statute would bar relief?

 8            MR. SMART:  Sorry, Your Honor.  I was on mute.

 9            Let me address two things.  First of all, I do want

10     to point out that two of the plaintiffs, Goduto and Buchanan --

11     they actually don't allege any groping of their genitalia area.

12            So I think there's sort of two issues here.  One

13     would be the argument that Mr. Busch seems to be making, that,

14     "Well, because there was groping of the genital area over the

15     clothes, there probably was some -- some penetration."

16            I think that's -- I'm paraphrasing that's what he's

17     saying.  So that's four of the plaintiffs.  Two of them,

18     however, there was just -- there was no allegations of that

19     whatsoever.

20            So for Plaintiffs Goduto and Buchanan, I think this

21     discussion is sort of not pertinent.  They have not alleged

22     enough to even allow an inference of that nature.

23            Secondly, I think because this is a sovereign

24     immunity issue -- this is not -- this is not a failure to state

25     a claim standard.  This is a sovereign immunity issue.

1        And the plaintiff has the burden to show that the

2   United States has waived their sovereign immunity.  And if it

3   is as simple as Mr. Busch says for them to allege sufficiently

4   to fit within the statute, then they can amend the complaint to

5   do so.  And it's simply a matter -- because this is a sovereign

6   immunity issue, that -- that is why, because it is their

7   burden.

8        I'm not saying they can't do that, but I take the

9   complaint as it's written.  I mean, there is a lot of detail.

10  However, there's a lot of detail about when there were sex acts

11  committed here.  And these were the six that did not appear to

12  do so.

13       If they can amend the complaint and add those in and

14  then we can explore that at deposition, that's fine.  But you

15  still have to plead it.

16       And I recognize the statute is a -- is sort of a

17  strange statute.  However, that's a line that -- that Congress

18  drew.  And I can speculate on why they might have drawn it

19  there, and it probably doesn't necessarily relate to the

20  allegations here.  But, as a matter of fact, that is the -- the

21  line they drew.

22       And so that -- that would be my response to that.  I

23  mean, I've pointed some cases out where the allegations -- you

24  know, where the evidence is -- is sort of not -- not what meets

25  the standard.  And if they didn't allege that, then there's no

1    reason that we have to wait and go through discovery on those

2    claims.

3         If they can't allege it, they can amend the

4    complaint.  And it's pretty easy to do.

5         THE COURT:  I don't know, Mr. Smart.  I guess the

6    government has to take this position, but --

7         MR. SMART:  I mean, this doesn't -- Your Honor, I

8    would say this doesn't preclude them seeking relief in other

9    ways.  I mean, there -- they could sue the guards directly for

10   *Bivens* claims and things of that nature.  They chose not to do

11   that.

12        And I know the reasons you might not do that.  But

13   this is just simply a sovereign immunity issue.  It's not a --

14   it's not a moral commentary on the conduct itself.  It's simply

15   the way the statute is written.

16        And I cited some cases where these things are

17   dismissed for this reason, even though the conduct that's

18   described -- no one would approve of what's being described in

19   there.

20        THE COURT:  All right.  Well, I'll tell you what I'm

21   going to do.  I'm not -- I'm not happy about doing it or having

22   to do it.

23        But since -- since I'm going to require a repleader

24   of this complaint anyway -- and I've already indicated to

25   Mr. Busch a couple of areas that he's either going to need to

1    give up on or he's going to need to plead better, I'm -- I'm

2    going to require you, Mr. Busch, to plead these six -- the

3    claims on behalf of these six plaintiffs with this statute in

4    mind; that is, in good faith what -- what can you really allege

5    that would either be a physical injury, which we haven't really

6    talked about, or -- or a sex act as -- as defined.

7           And I'm not going to try to handicap whether you're

8    going to be able to do that or not.  I'm just telling you

9    you've got to go back, look at it.  And if you -- whatever, in

10   good faith, you can plead, that's what you ought to plead, and

11   then we'll -- then I'll take another look at it.

12          I am -- so that's what we're going to do.  And I

13   won't predict how that will come out.  But I do think I'm going

14   to require you to do it.

15          MR. BUSCH:  Your Honor, I understand what Your Honor

16   is asking.  And, again, we'll certainly -- we'll certainly

17   replead that.  I think that my hope was only that we wouldn't

18   have to go down that path in these public -- public documents.

19   But if we do, we do.

20          THE COURT:  I understand.  And I -- you know, and --

21   you know, I -- I probably would have been willing to consider

22   having your clients be identified by initials or something

23   along those lines.

24          We do that in some -- some cases where there's

25   sensitivities involved.  But, you know -- but for the fact

1   that -- that it's a sovereign immunity issue and the Court has

2   an obligation to make sure that the Court has subject matter

3   jurisdiction -- but for that, I would not require a repleader.

4   But I'm -- I'm -- I feel constrained to do so since the

5   government has taken the position that it has, so...

6          All right.  And the last issue on the motion to

7   dismiss was the untimeliness of Ms. -- is it Guggino?  Her

8   claim based on Tallahassee.

9          So I guess, Mr. Busch -- I guess the way I'm reading

10  it, you -- you agree that it's not timely, but you're hoping

11  for the Court to make an equitable tolling decision based on

12  the apprehension and other alleged inhibitors for Ms. Guggino

13  to come forward on a more timely basis?

14         MR. BUSCH:  Yes, Your Honor, that's correct.  The --

15  fortunately, the -- the tort act that we've sued under does

16  allow -- and the case law is clear that the Court does have the

17  authority to enact the equitable tolling doctrine when we start

18  talking about statute of limitations under this -- under the

19  act that we've pled under.

20         And the courts have also said that a strict

21  interpretation of the statute of limitations can be

22  inequitable, especially when there are extraordinary

23  circumstances.

24         And I think this is a case that is -- if ever there

25  was a case that had extraordinary circumstances, it is this

1    one, Your Honor.

2         And if the Court -- without going line by line

3    through Ms. Guggino's experience, while she was in the -- in

4    the facility there in Tallahassee --

5         THE COURT:  Let me just stop you right there.  Let me

6    just stop you right there and ask Mr. Smart.

7         Mr. Smart, I've had a decent amount of experience

8    with equitable tolling, and mostly in capital habeas cases,

9    whether the issue is whether the lawyer -- whether the client

10   needed to do more to get the lawyer to file something on time,

11   that type of thing, but I've also had it in other cases.

12        And I guess my question for you is this:  Why is that

13   not just a factual determination that I would have to make on a

14   factual record, as opposed to trying to decide an equitable

15   tolling issue on the pleadings?

16        MR. SMART:  I think -- with respect to the prong of

17   the extraordinary circumstances, I think that's probably a fair

18   assessment.  Because anytime we have to start detailing the

19   facts, which we did in response to their laying it out, that's

20   difficult.

21        But I think as to the part of whether -- whether she

22   exercised any diligence, there's not a single allegation that

23   she sought, you know, to -- to tell anyone at any point, or

24   sought protection from -- from the guard, which is -- I cited a

25   case to you from the -- this is the Southern District of New

1   York, in the opening brief, where that was the kind of

2   allegation that the court was looking there:  Did you -- and

3   this is a period of, I want to say, like, four years where this

4   was going on.

5          And there's not a single allegation that, you know,

6   she tried to get protection from -- from Mr. Urdialez or went

7   to the warden, went to the superintendent, when she went to

8   psychology and told them about it.

9          And, in fact, here, if you'll recall, the allegations

10  are that while she was in Alabama, the psychology people were

11  asking her about it and they were interviewing her about it.

12  They were looking into him.  So it was clear that authorities

13  were actually looking into what was going on.  And there's no

14  allegation of diligence.

15         So it's not an issue of weighing and making a factual

16  determination as to that prong.  I agree that that may be where

17  the Court would come down on the extraordinary circumstances.

18  But that's only one component of the equitable tolling

19  argument.

20         And the case law is pretty clear that you have to

21  make specific allegations about it.  It doesn't -- you don't

22  just get to make cursory allegations that you're entitled to

23  tolling.

24         THE COURT:  What if -- what if her allegation was she

25  was too scared to tell anybody?  Would that be good enough, or

1   not?

2           MR. SMART:  Well, I don't think that's fair, in the

3   entire reason she was scared to tell anyone.  That -- it's not

4   what was alleged.  I mean, the Court would have to evaluate

5   that.

6           But if that's the case, then any -- any prisoner

7   could say, "I was afraid to tell anyone about anything," and

8   that would meet the requirement, and that -- for the diligence

9   part.  And that doesn't seem to be the standard.

10          You know, there are people there who -- they have

11  reporting systems in place.  I understand this case is about

12  allegations that no one did anything.

13          But even in the plaintiffs' complaint, there's --

14  there's admissions that investigations were taking place and

15  that people were removed.

16          So I just think a broad allegation that "I was afraid

17  to tell anyone anything" is simply not sufficient to show you

18  exercised diligence.  There would have to be something more

19  specific.  And there's just not here.  I recognize there's a

20  lot of specificity about what she explained the extraordinary

21  circumstances were.

22          You know, I -- I will note the cases they then relied

23  on in the response are all ones under, sort of, torture and

24  terrorism.  And I think that's a completely different statute

25  and a different standard here.

1        But there's not been an allegation that no one would

2   listen to these people anywhere, that -- and I don't know how

3   they could make that allegation without making any effort to go

4   talk to somebody.

5        THE COURT:  Okay.

6        MR. BUSCH:  Your Honor, I -- with all due respect to

7   Mr. Smart, that is an offensive series of comments that he just

8   made there.  Because when you are in the circumstances that

9   Ms. Guggino was in in this case, and she was raped and tortured

10  and psychologically abused for years -- and when there was any

11  discussion of the abuse, she was immediately placed into a

12  special housing unit, her personal property was destroyed, she

13  had threats against her family.

14       And so to say that she then had -- to place the

15  burden on her at that point in time to overcome all of that, to

16  try to find, you know, a lawyer or somebody who would listen,

17  when her abuser specifically said he had friends in all parts

18  of the system, is a completely unreasonable standard here, and

19  it completely ignores the situation -- her specific situation

20  that she was in.

21       And, frankly, there's not a lot of prisoners that are

22  going to be able to be in her situation that were handcuffed to

23  furniture, left there, and raped repeatedly.

24       So this is a special circumstance.  She did the best

25  she could under the circumstance.  And, clearly, the due

1   diligence part of it is part of the extraordinary

2   circumstances.

3          It is -- it is impossible for her to do -- to do due

4   diligence when everyone at every turn in every stage of the

5   events -- she was placed in the special housing unit anytime

6   the discussion of the abuse was -- was brought up to her.

7          THE COURT:  Okay.

8          MR. BUSCH:  So you can't look at --

9          THE COURT:  Okay.  I hear you.  What -- what this

10  tells me is -- what I just heard from the government, and what

11  I just heard from Mr. Busch, tells me that this is a factual

12  dispute.

13         And I am disinclined to grant the motion to dismiss

14  based on the statute of limitations without allowing a full

15  airing of an equitable tolling argument.

16         So the motion to dismiss on that basis is due to be

17  denied.  Obviously, we'll revisit that issue at whatever the

18  appropriate stage --

19         MR. SMART:  Your Honor, may I just ask a question --

20  this is Mr. Smart.  May I ask a question or just mention

21  something here?  It doesn't have anything to do with the ruling

22  itself, but sort of the impact of the ruling on the scheduling.

23         Because this plaintiff is the only one alleging

24  conduct at Tallahassee, this is an important issue for the

25  scope of discovery and the amount of time it's going to take.

1      And so I would intentionally request that if we get

2   to scheduling that there be some ability to sort of do

3   discovery on this issue and file an earlier motion on this than

4   the normal scheduling for the rest of the case, because I think

5   it could really deal with some of the work that will need to be

6   done on the case.

7      THE COURT:  All right.  Yes, sir.

8      Okay.  So I believe I have now ruled on all of the

9   grounds raised in the government's motion.  I will say this,

10  that -- I do have one other thing, Mr. Busch, because -- so,

11  basically, as I'm looking at this complaint right now, and --

12  and I'm looking at this complaint right now.

13     There is no legal attack against -- against the

14  intentional torts, at least in this motion.  And so that means

15  that Counts II, III, and IV are -- have not been attacked and,

16  therefore, will be permitted to go forward.

17     Count I, obviously, is where the attention has

18  fallen.  And I have granted in part and denied in part aspects

19  of the government's motion with respect to that count.

20     And so I am going to permit Mr. Busch to replead

21  Count I if he wishes to do so, and in the manner he wishes to

22  do so, based on the Court's rulings and inclinations as

23  expressed on this record.

24     And if anybody -- I'm going to probably issue a brief

25  order that says, "For the reasons stated at the hearing, you

1   know, the motion's granted in part and denied in part," and

2   I -- I'll try to capture why -- you know, what the issues were.

3   But it's going to be very short.

4          So if you really want to know what happened, you'll

5   need to get the transcript from the court reporter, but -- but

6   I am going to allow a repleader of that.

7          But I think -- I think, Mr. Busch -- the government

8   said in another footnote somewhere that if I -- regardless of

9   what I did with -- with Count I, that they were advocating that

10  the intentional tort counts be pled separately for each client.

11         And even though that's a little more work -- I mean,

12  you know, you just have to be careful to only incorporate the

13  specific factual allegations from the general allegations,

14  incorporate the specific ones that you need for each of your

15  respective clients.

16         I think that's probably going to be a better way to

17  proceed, so that -- I know it will make the complaint longer,

18  but -- so what I'm saying is for -- for your clients, that

19  each -- each count -- each count of -- for each count of the

20  intentional torts, which, again, is -- let me get it here.  I

21  had it in front of me and I took it away.

22         Yeah.  So for each count of -- or for each of your

23  clients, you'll have a separate assault and battery count that

24  will just incorporate by reference the allegations regarding

25  that client that you need.  You'll have a separate false

1  imprisonment count for each of your clients.  And you'll have a
2  separate intentional infliction of emotional distress.
3          I think that's going to, in the long run, maybe be a
4  cleaner way to do it.  So as long as you've got to replead
5  Count I anyway, I'm going to ask you to -- to do that, as well.
6          Are you following what I'm suggesting, Mr. Busch?
7          MR. BUSCH:  Yes, sir.  Yeah.  I understand.
8          THE COURT:  Okay.  I know it makes the complaint
9  longer, but I think it's -- I just think it will make it
10  cleaner as we go forward.
11         MR. BUSCH:  No problem.
12         THE COURT:  Yeah.  So -- and so I'll give you a date
13  by which to file your amended complaint, and then I'll give the
14  date by which the government should respond.
15         Is the government -- may be in a position to answer,
16  or they may move again.  If they do, we'll deal with it at that
17  point.  But, obviously, the case is going to go forward in some
18  form or fashion.  So that -- and now I've got to figure out
19  this severance thing.
20         And so, Mr. Soren, Mr. Reizenstein, and Mr. Smart, I
21  guess you-all will have to get together and try to tell me what
22  it is you want me to do.  And make sure -- I don't know what
23  I'm going to do, to be honest with you.  I'm not -- for the
24  reasons I've already indicated.
25         But make sure your plan is complete.  Make sure I

1    understand what will happen once I do whatever it is you're

2    asking me to do.  Tell me how it's all going to work, in terms

3    of scheduling and so forth, what -- what we're going to do,

4    what relationship it's going to have to Mr. Busch's case.  I --

5    there's a lot of things that -- a lot of moving parts that

6    obviously haven't -- in my mind, haven't been carefully

7    considered, so -- and I'll give you a date by which to do that,

8    as well.

9         But let's go ahead and talk about scheduling, at

10   least -- I guess we're at least talking about scheduling for

11   Mr. Busch's case.  And, you know, we may or may not be talking

12   about scheduling for everybody.  But I had a couple of --

13        MR. SMART:  Your Honor, before we leave that, I just

14   want to make one clear -- ask for one clear clarification on

15   the order of dismissal.

16        THE COURT:  Yeah.

17        MR. SMART:  So as to -- I think this is -- was

18   apparent.  But as to the six plaintiffs, those were to all

19   claims.  So I recognize they're going to be potentially

20   repleading on those.  But as to those -- for the reasons --

21   that was all claims, not just Count I.  I think that was clear

22   in the motion.  But in case it wasn't, it was for each

23   plaintiff in entirety.

24        THE COURT:  Okay.  So -- so your position is that

25   under that statute they have to be able to allege either a

 1  physical injury or a sex act in order to have any cause of
 2  action at all?
 3          MR. SMART:  Yes.  It's an FDCA standard.  So all of
 4  their claims are brought under the FDCA.  So it applies to all
 5  of them.
 6          THE COURT:  All right.  Okay.  I understand what
 7  you're saying.  And Mr. Busch already told me he'll replead
 8  those counts, and so -- I mean, he'll replead the factual
 9  allegations which will support those claims, and so we'll let
10  him do that.
11          MR. SMART:  Okay.
12          THE COURT:  All right.  I had a couple of broad
13  questions here.
14          First of all, Mr. Smart, these are all former
15  government employees, these guards now; is that correct?
16          MR. SMART:  Yes, Your Honor.
17          THE COURT:  So does the government have them under
18  its control?  Or are they just free-floating non-parties that
19  anybody can interview and talk to and so forth?
20          What's the -- what's the situation with respect to
21  representation of these guards?  And that's kind of the first
22  question.
23          The second question is:  Given the allegations
24  against them, are they -- are they likely to assert any Fifth
25  Amendment privileges?  Do they have their own lawyers?  What --

1   what's the -- give me an -- give me your understanding of what

2   the situation is with respect to the former correctional

3   officials.

4           MR. SMART:  Well, I will tell you I have not spoken

5   to any of them.  So as to whether they have lawyers or whether

6   they intend to assert any immunities, I have not received any

7   indication from them on that and can't really speak to that.

8           As to whether they -- we would assert they can't be

9   spoken to, I would say that they're not -- they're not our

10  employees.  So the question is going to come down to whether

11  they can be binding on the United States for things.

12          And so it may depend on the types of questions

13  they're asked, but that's -- that's a more tricky question, I

14  guess I would say, and gets into some ethical issues, I guess.

15          But as to -- they're not -- they're not current

16  employees, so they obviously don't come under that prong of

17  represented parties.

18          THE COURT:  Well, it is tricky.  And that's why I was

19  asking you.

20          You know, I mean, is -- so -- Mr. Busch, let me

21  just -- you know, because I know you were -- you filed the case

22  first.  Have you -- have you talked to any of these guards?

23          Or is it your belief that the way -- the only way

24  you'll be able to talk to them would be to subpoena them for a

25  deposition?  Are you intending to do that?  What's -- what's --

1   how is this going to work?

2   　　　　MR. BUSCH:  Your Honor, I have not spoken to any of

3   the guards.  Last I knew, there were several that were still

4   employed and/or either on suspension or under some sort of a --

5   under some sort of a contractual relationship still with the

6   government.

7   　　　　So if all of them are now gone, then we would

8   certainly take the position that we're free to speak to them.

9   But I did not know that that was the case until Mr. Smart just

10  said that.

11  　　　　THE COURT:  Of course, they may not want to speak to

12  you, so --

13  　　　　MR. BUSCH:  Well --

14  　　　　THE COURT:  Yeah.  So -- so -- but is it -- well, let

15  me just ask you this:  Is it your intention, as part of this

16  case, to depose these guards?

17  　　　　MR. BUSCH:  Yes.  If they're no longer employed,

18  either they're going to sit for a deposition or they're going

19  to give me a detailed affidavit.

20  　　　　THE COURT:  Yeah.  Okay.  Well, Mr. Smart, if the

21  government is going to take the position that -- that Mr. Busch

22  or Mr. Soren cannot talk to these folks because of -- because

23  of some -- you know, some former employer -- I think the test

24  is whether they can bind the -- the government, I think.

25  Right?

1    MR. SMART:  That's right, Your Honor.  What I will

2 do, I will look into that and get to an answer on that in short

3 order.

4    THE COURT:  Okay.  Now, if you take the position that

5 they can't, does that put any responsibility on you to

6 facilitate their ability to testify?  I almost think it might.

7    MR. SMART:  Yeah.  I think the way I've dealt with

8 that in the past is it -- is it -- I will -- if they will talk

9 to me, which I don't know that they will either, I will attempt

10 to facilitate a deposition.

11    But I will be frank with you, I've run into

12 situations with current employees where they won't cooperate

13 with me.  And what we can do is -- while I'm prohibited in a

14 lot of ways of providing contact information under the Privacy

15 Act, we can seek Privacy Act protective orders to get that

16 information, and I can -- you know, for addresses and stuff

17 like that, if they don't have it or can't find it publicly.

18    So I -- there's no intention to try to block them

19 from, you know, subpoenaing them or anything like that.  I can

20 tell you that right now.  And we will work with them to

21 facilitate that through the means that we can do so.

22    THE COURT:  All right.  Well, Mr. Busch and

23 Mr. Soren, it seems to me you need to wait for Mr. Smart to

24 decide whether he is not going to lay any claims to these

25 guards and then let you contact them as you will, or set them

1  for deposition as you will, or whether he's going to contend

2  that their statements could be binding on the government and,

3  therefore, they need to facilitate that.

4        I'll -- you need to wait to hear from him on that.

5  Obviously -- and proceed as you're advised.  Obviously, if I

6  have to get into it, I will.  I hope I won't.  But -- but it's

7  a little bit of a tricky issue.

8        And I also -- of course, everybody is familiar with

9  the concept in a civil case.  The invocation of the Fifth

10  Amendment, if that were to occur, can't be used as an adverse

11  inference, and it -- there will be a question as to whether or

12  not that adverse inference could be applied against the

13  government or not.

14        So those are all things that I can foresee down the

15  road that need to be thought through and -- and -- as you go

16  through this.

17        All right.  The second question I had -- Mr. Smart,

18  you indicated in the case management report, and maybe -- is

19  it Ms. -- is it Posteraro?

20        Am I saying that right, ma'am?

21        MS. POSTERARO:  That's correct, Your Honor.

22        THE COURT:  Are you in charge of scheduling and case

23  management?  Is that right?

24        MS. POSTERARO:  As much as anyone is, Your Honor.

25        THE COURT:  Okay.  Well, I'll take that.

1    So in your report here you said you wanted each side

2  to be limited to 75 fact depositions.  And I found myself

3  thinking, "I don't think I've ever seen a case with 150

4  depositions before."

5    So what was the -- what was the basis for that?

6  Where did you come up with that number?  And what are you

7  trying to accomplish here?

8    MS. POSTERARO:  Right, Your Honor.  I think that

9  reaching that limit might be extraordinary.  But in this case,

10  before Mr. Soren severed his particular plaintiffs -- this is a

11  case involving 14 plaintiffs, so we know we're going to have at

12  least 14 depositions.  Plus we anticipate that there will be

13  other, you know, witnesses or, you know, damages witnesses that

14  we'll want to depose, and I think pretty quickly.  At least the

15  depositions that the United States will want to take will get

16  pretty high.

17    And we also looked at just the default rules of the

18  Federal Rules of Civil Procedure in which 14 plaintiffs -- if

19  they each get 10 depositions, that's going to get up to, you

20  know, 140 pretty quick, I mean, in theory; whereas, the United

21  States would be allowed 10 depositions under the rules.

22    And so we tried to pick a limit that would allow fair

23  discovery for each of the parties, but that would not unfairly

24  limit the number of depositions that the United States would be

25  able to take.

1        And, you know, having Mr. Soren's plaintiffs

2    considered differently alters this number a little bit.  If you

3    were to take the -- the 14 plaintiffs that were in the case and

4    75 depositions, it comes out to, I think, just about six

5    depositions per plaintiff that the United States is -- is

6    asking to take, which viewed on that level isn't so

7    extraordinary.  And that's -- that's sort of where we're coming

8    from on that.

9        THE COURT:  All right.  And, Mr. Busch, I see there's

10   expert report deadlines in here.  Can you just give me an idea

11   of what kind of experts you're thinking about in this case?

12   What kind of experts are experts in this type of litigation?

13       MR. BUSCH:  Yeah.  I think that the -- at least for

14   my clients, I think we may have some

15   psychologist/psychiatrist-type experts testify with respect to

16   damages.  That's -- that's the only thing I had in mind at this

17   point.

18       THE COURT:  Okay.  And what about the government?

19       MS. POSTERARO:  I think that Mr. Busch is correct.  I

20   think that we can expect some expert disclosures with respect

21   to damages, certainly.  And we've not looked into it yet.

22       But if there are, you know, other experts, you know,

23   with respect to expected practices or that sort of thing,

24   that's always a possibility, as well.

25       THE COURT:  Well, I'll tell you this -- I'm looking

1    at your schedules and I see you don't agree, but that's okay.

2    We'll get -- figure it out.

3          I don't -- I don't think we're going to be waiting

4    until June of 2022 to try this case, so -- matter of fact, when

5    I looked at October 4th of 2021, I said, "You know, that's --

6    that's still a year and a half from now."

7          I don't know.  I mean, I know it's a -- I know it's

8    probably a difficult case.  And, of course, we're in the middle

9    of this pandemic, where it's hard to do things.

10         But, you know, I -- I'm not too interested in

11   stretching this out any further than it needs to go out.  And

12   so I'm going to be looking to either get the case resolved or

13   get it tried as soon as we reasonably can do so.

14         So -- and in terms of limits and so forth, you know

15   what I'm thinking about doing -- I'm just thinking out loud,

16   and I may -- I may talk to my colleague Judge Lammens in Ocala,

17   who is the magistrate judge assigned to this case.

18         I may talk to him about maybe actually holding a case

19   management conference at which you-all would have to have

20   prepared for it, you know, who you want to depose, what you

21   have to do, what -- what kind of work you need to do, where --

22   that type of thing, and maybe let him come up with a -- with a

23   good schedule for us.

24         Because right now I think I -- I don't know that

25   we're going to take -- have the ability to do that today.

1  Plus, it could well change, depending on what I do with

2  Mr. Soren and his -- and his -- his situation.  And I don't

3  know that yet.

4         So I think I'm going to probably defer actually

5  issuing a case scheduling order at the moment.  That does not

6  mean, though, that -- I think the parties can at least --

7  because I know we're going to have a case.  You know, we're

8  not -- the case isn't going anywhere.  And I know there's

9  potential issues of who -- which clients are in it, what -- you

10 know, whether Count I goes forward, in what format, but, you

11 know, we're going to have a case.

12        And so I think it's -- I think it's appropriate for

13 you-all to at least be able to start doing paper discovery with

14 each other.  I don't know -- I don't even know if paper

15 discovery is still in paper.  But you know what I mean.

16        And -- and I think it's okay for that to get started,

17 in terms of document requests and interrogatories and so forth,

18 and perhaps requests for admissions.  I think at least that

19 part of it can get going.

20        And then I'm going to decide -- I'm going to get

21 you-all to submit this severance issue and try to figure out

22 what to do with it.  I'm going to get an amended complaint in

23 here and get the government to respond to it, and then -- then

24 either I or Judge Lammens may convene a case management

25 conference and actually set a specific schedule.  And if we

1    need limits on depositions or -- whatever we need.

2            You know, I told you already -- and I know Mr. Smart

3    resisted it, and I -- I can understand maybe why.  But, you

4    know, I'm -- I am very often reluctant to engage in dispositive

5    motion practice when I'm going to be trying the case non-jury

6    unless there's really some issue or reason to do so that I

7    can't just carry with the case.

8            So I'm going to be looking for -- if I do -- if we

9    have dispositive motion practice, I'm going to be looking for

10   it to be meaningful, and not just something where -- and I

11   recognize we're talking about a 10-day trial, so that's -- or

12   15, in -- in somebody's estimation.  So I understand that there

13   might be some reason to do it.  But I'm just telling you before

14   you file one, make sure you're -- you've got a good reason to

15   do so.

16           And, Mr. Smart, you know, if you think you want to

17   file early on equitable tolling and, you know, you've got the

18   goods to do so, you know, I'll -- I'm not going to stop you

19   from doing that.  I'll try to get you a ruling, if I can, if

20   that will -- if that will be helpful.  I can't promise it, but

21   I'll try.  So I think that's what we're going to do.

22           So, Mr. -- before I call the rest of the play,

23   Mr. Busch, did you have anything else you wanted to say for the

24   moment?

25           MR. BUSCH:  No, Your Honor.  Thank you.

1          THE COURT:  Mr. Soren?

2          MR. SOREN:  No, Your Honor.  Thank you.

3          THE COURT:  Mr. Smart?

4          MR. SMART:  No, Your Honor.

5          THE COURT:  And, Ms. Posteraro, anything else?

6          MS. POSTERARO:  Yes, Your Honor.  I do have just two

7  things I'd like to bring up.

8          As long as, you know, you're going to proceed with

9  allowing paper discovery and things of that nature, the parties

10  have not yet exchanged mandatory initial disclosures.

11          And so, you know, if we have a case management

12  conference or hearing with Judge Lammens, the exchange of

13  initial disclosures would be helpful, I think, in the parties

14  being able to frame the issues before Judge Lammens, you now,

15  who they want to depose, that sort of thing, and, as well --

16          THE COURT:  Well, I -- I think that's right.  I

17  thought I read that it was y'all that said you were having

18  trouble meeting the deadlines because you couldn't get into the

19  BOP or something?  I didn't know that was an issue for the

20  plaintiffs.

21          Didn't you say that in your papers somewhere?

22          MS. POSTERARO:  We did.  We -- the United States

23  footnoted at footnote number 2, "Restrictions on visitation to

24  BOP facilities enacted on Friday will hamper the ability of the

25  United States to provide complete Rule 26(a) disclosures in the

 1    near future, hence, the request for the later than normal

 2    deadline."

 3            THE COURT:  I didn't think -- I didn't think that was

 4    as juicy a footnote as footnote 8 in your motion to dismiss,

 5    but I did read it, and -- I did read it.  So I'm surprised to

 6    hear you -- so are you -- are you ready to go with that now?

 7    You're ready to make your initial disclosures?  Is that what

 8    you're saying?

 9            MS. POSTERARO:  We have put together initial

10    disclosures.  We anticipate that we will need to supplement

11    them, but we would like to at least begin the exchange of

12    information, particularly before Judge Lammens.  We need to

13    show up with a list of people we'd like to disclose.  We'd like

14    to start to get those people from the plaintiffs, as well.

15            THE COURT:  Okay.  All right.  Well, that's --

16    that's -- I'm sure that's doable.

17            All right.  What else?

18            MS. POSTERARO:  And the second issue, Your Honor, is

19    the motion to add or to amend the pleadings, or to add parties.

20    The plaintiff had indicated that they thought they might have

21    maybe three additional plaintiffs to add.

22            You know, that will be an important consideration

23    going forward for the discovery, you know, particularly

24    depositions of witnesses and things of that nature that we'll

25    want to proceed with.

1    THE COURT:  So, Mr. Busch, is that you that -- do you

2  have any more?  Or is it Mr. Soren that's got some more?

3    MR. BUSCH:  This is Mr. Busch.  I have three more,

4  Your Honor.  We just finished the six-month notification and

5  got our rejection letters back from the government, so those

6  are just now ripe to add.

7    And at the same time that I file the amended

8  complaint, I'll be filing a motion to add those three

9  individuals, as well.

10    THE COURT:  Well, since you're filing the amended

11  complaint, I don't think you need to ask.  You can just do it.

12  And then the government can respond.  Okay?

13    MR. BUSCH:  Okay.  Thank you, Your Honor.

14    THE COURT:  All right.  But I agree with -- and,

15  Mr. Busch, as far as you know, is that going to be it?  You're

16  not going to have any more?

17    MR. BUSCH:  That's it, Your Honor.

18    THE COURT:  All right.  Mr. Soren, are you going to

19  have any more than your four?

20    MR. SOREN:  No, Your Honor.

21    THE COURT:  Okay.  All right.  So that will be the --

22  the way we'll do it.

23    All right.  So, Mr. Busch, I want to be -- I want to

24  be fair to you to give you time to think through what your

25  amended complaint is going to look like.

1    I want it to, you know, comply with the Court's

2  orders, of course.  And, you know, I want that to be those

3  documents we're going to go forward on.

4    So what I'm saying is I don't -- you know, it doesn't

5  have to be real quick, although I'd like to kind of get the

6  case moving.

7    So today is June the 4th.  How much time do you need

8  to file an amended complaint?

9    MR. BUSCH:  Until the 15th, Your Honor.

10    THE COURT:  15th of June?

11    MR. BUSCH:  June, yep.

12    THE COURT:  Yeah.  That's -- that's too quick.  I

13  mean, I -- I mean, maybe.

14    MR. BUSCH:  Your Honor, we --

15    THE COURT:  I'll give you until -- I'll give you

16  until -- I don't know.  I'll give you until the 22nd.  That's

17  an extra week.  I just -- I want you to make sure you're

18  thinking about this.  All right?  June 22nd.

19    MR. BUSCH:  I understand.

20    THE COURT:  All right.  And, Mr. Smart and Mr. Soren,

21  I'll give you until June 22nd to file your proposal regarding

22  severance.  Okay?

23    MR. SOREN:  Yes, Your Honor.

24    THE COURT:  All right.  June 22nd.  In the meantime,

25  I will talk to -- and I've got to look at that and figure out

 1   what we're doing.

 2          In the meantime, I'll talk to Judge Lammens and see

 3   if -- see if I can talk him into having a case management

 4   conference with you-all.

 5          Again, a little will depend on this severance thing.

 6   And that's kind of -- kind of quizzical.  I'm trying to think

 7   how that's going to work.  But we'll -- I don't think I'll slow

 8   Mr. Busch's case down if Mr. Soren wants to bust out.

 9          But, on the other hand, it's going to make sense to

10   do consolidated stuff, especially on Count I.  And so I don't

11   know.  I've got to think about it myself.  Y'all think about it

12   and tell me -- tell me what the right way to proceed is.

13          MR. SMART:  Your Honor, this is Mr. Smart.

14          THE COURT:  Yeah.

15          MR. SMART:  This is related to that.  Sorry, I just

16   didn't want to get too far afield from it.  When Mr. Busch

17   files his amended complaint, because he's going to be adding

18   some new parties and we normally have 14 days on responding,

19   can we request 30 days instead?

20          THE COURT:  Yeah.  You can have time.  Let me see.

21          That's fine.

22          Mr. Busch, do you really think you -- I mean, I'll

23   give the government a chance to respond.  30 days is kind of a

24   long time, but I'll think about it, only because I just want to

25   get the case moving a little bit, but...

1          MR. SMART:  We can do 21.

2          THE COURT:  All right.  Let's do that.  Okay.  I'll

3     feel better about that.  All right.

4          MR. SMART:  Okay.

5          THE COURT:  So that would be -- what?  I gave him the

6     22nd.  So that would be, what, July 13th?  Is that right?

7          MR. SMART:  Yes, Your Honor.

8          THE COURT:  Okay.  I tell you what, July 15th since

9     you got the 4th of July in there.

10         All right.  July 15th --

11         MR. SMART:  All right.

12         THE COURT:  -- to respond to the amended complaint.

13    Obviously, Mr. Busch, if they move to dismiss it again, you're

14    going to have to respond to that.  And I don't know if they

15    will or they won't.  But you would have three weeks to respond.

16    And that would be July -- or that would be August the 5th, sir.

17    All right?

18         MR. BUSCH:  Okay.

19         THE COURT:  Okay.  And then, again, I'm a little

20    bit -- just sitting here, I'm not sure if I'm talking to

21    Mr. Soren, too, or I'm not.  I guess I'm just going to have to

22    see what -- what we're -- what they're going to propose to me

23    on the 22nd.  So -- so these dates would only apply to

24    Mr. Busch at the moment.

25         If Mr. Soren and the rest of his -- and his clients

1    decide to go their own way and I allow it, I guess I'll have to

2    set up a schedule for them too, but, anyway.

3          All right.  All right.  So that's what's going to

4    happen.  And do I have -- is there any other scheduling matter

5    or anything -- I've got one more thing I want to talk to y'all

6    about, and -- but it's a completely separate topic.

7          Is there anything else, Ms. Posteraro, on scheduling

8    or -- or the calendar we're going to have early on?

9          Oh, initial disclosures -- I tell you what, we'll --

10   let's do initial disclosures by June 22nd, as well.

11         And, Mr. Soren, just for purposes of moving this

12   along, I'm going to require you, on behalf of your clients, to

13   do initial disclosures, as well.

14         Mr. Busch, you'll do it with your client.  And the

15   government will do it for the government.

16         June 22nd, three weeks -- no, that's not three weeks.

17   Yeah, it is -- oh, it's two and a half.  Anybody got a problem

18   with that?

19         MR. SOREN:  That would be great, Judge.  Thank you.

20         MR. BUSCH:  Thank you.

21         THE COURT:  Okay.

22         MS. POSTERARO:  No problem, Your Honor.

23         THE COURT:  Okay.  All right.  Anything else on

24   scheduling or what we're going to be doing?  I think I --

25   hopefully we've -- I've got some kind of structure to what

1    we're doing here, subject to the severance.

2             Anything else on that that you can think of,

3    Mr. Busch, right this minute?

4             MR. BUSCH:  No, Your Honor.

5             THE COURT:  Mr. Soren?

6             MR. SOREN:  No, Your Honor.

7             THE COURT:  Mr. Smart?

8             MR. SMART:  No, Your Honor.

9             THE COURT:  All right.  Here's the last topic and

10   then I'll let you go.  When I -- when I first saw this

11   complaint, obviously it made serious allegations.  And I

12   understand they're only allegations.

13            But it's a serious case.  It involves a number of

14   plaintiffs.  It involves the government -- not only the

15   government as government, but it also involves some former

16   employees of the government as witnesses, and it's -- as we can

17   all tell just from talking today, it's going to be a relatively

18   complex and massive undertaking in order to get the case

19   discovered and pled up and then get it to trial.

20            Whether that's in October of 2021 or June of 2022 or

21   some other date that I decide is better, you know, we're

22   looking at a 10- or 15-day trial, probably.  If we sever out

23   these claims, I don't know what -- you know, we'll have to

24   figure that out.  So, you know, it's a very -- we're getting

25   ready to embark on a very long and complex voyage here.

1          And it strikes me that perhaps in a case in which the

2    plaintiffs seem to have more information as they file the suit

3    than plaintiffs typically have -- and, of course, the

4    government is privy to information that it has.  It seems to me

5    that we ought to discuss the idea of whether an early

6    settlement conference should take place.

7          And I don't necessarily mean that it would delay the

8    deadlines I'm giving you now, because I do think we need to

9    kind of get moving here a little bit, but it strikes me that

10   that would be a good thing to do, assuming the parties could go

11   in good faith and try to resolve these cases, which I think

12   would be in the interest of justice.

13         So I am -- you know, I read in here that you-all were

14   attempting to locate a mediator that has experience with this

15   type of case and requested additional time.  That was back in

16   March.  I haven't heard that you found a person.

17         That could have been something that got written in

18   there and nobody has thought about it since.  That wouldn't

19   surprise me.  But the -- what I'm wondering is whether an early

20   settlement conference would be appropriate.

21         And in service of that, every once in a while -- not

22   very often, because, obviously, we all have very busy

23   caseloads.  But every once in a while one of my colleagues will

24   agree to help me out in a -- in a case that I -- that seems to

25   merit it.  And -- and we'll try to settle that case with the

1    parties.

2           And, you know, I would actually -- I don't usually

3    try to settle my own cases, but I would consider doing it, but

4    I don't think I should.  I don't usually try to do it anyway.

5    But especially in a case where I'm going to be the fact finder,

6    I don't think it's prudent or wise for me to try to settle the

7    case.

8           So unless the parties have found a mediator that

9    they're ready to go with, I'm suggesting to you that my

10   colleague Judge Marcia Morales Howard has expressed a

11   willingness to conduct a settlement conference with the

12   parties, and -- which I greatly appreciate.  And I'm suggesting

13   to you that that effort be made sooner rather than later, for

14   lots of good reasons.  So that's my proposal.

15          And I'll start with you, Mr. Busch, as to how you

16   view that proposal.

17          MR. BUSCH:  Your Honor, we would be in favor of that.

18   I think that's a good suggestion.  I like having one of your

19   colleagues do it.

20          I think the only -- the only challenge I have on my

21   side is I would like to have as many plaintiffs there as are --

22   as are not incarcerated anymore, which is most of them.  I

23   think only a couple of them are still left in there.  Because I

24   think they need to -- to appear and be part of it in order for

25   it to be fruitful.

1    THE COURT:  Well, of course, we do have some

2  challenges now with having people, you know, come into the

3  courthouse and all that.  But probably by the time we are able

4  to put this together, hopefully those restrictions will be

5  eased and we would be able to figure out a safe way to have a

6  settlement conference here in Jacksonville.

7    All right.  So I hear what you're saying.

8    All right.  Mr. Soren, what's your reaction, sir?

9    MR. SOREN:  Absolutely, Judge.  We're in favor of

10  attending a settlement conference.

11    THE COURT:  Okay.  And, Mr. Smart -- Mr. Smart, who

12  is your -- I see here -- is it Mr. Middendorf?  Are you on the

13  line, sir?

14    MR. MIDDENDORF:  I am, Your Honor.

15    THE COURT:  So it says agency counsel for BOP.  So is

16  BOP the client agency in this case?

17    MR. MIDDENDORF:  Yes, Your Honor.

18    THE COURT:  Okay.  So -- and are -- so are you the

19  one that would decide about settlement?  Or who -- who would be

20  the one that would decide about it?

21    MR. MIDDENDORF:  I would be talking to the people up

22  in central office, along with the U.S. Attorney's Office, in

23  getting any type of authority.

24    THE COURT:  Okay.  So -- so should I ask you the

25  question or should I ask Mr. Smart the question as to whether

1  an early settlement conference and early -- you know, we'd have

2  to define -- you know, probably by the time we got it put

3  together, it would be, you know, a little bit in the future,

4  but whether the government would be able to appear in good

5  faith and to try to settle these cases in good faith.

6          MR. SMART:  I can step in, Your Honor.  This is

7  Mr. Smart.  We would have no objection to that.

8          THE COURT:  Okay.  All right.

9          Okay.  Well, I'm going to work on that.  And,

10  obviously, I'll talk to my colleague.  Timing is an issue.  And

11  consistent with Mr. Busch's concerns -- Mr. Busch, I assume

12  your clients don't all live around here, right?

13          They probably -- just because they were incarcerated

14  in Coleman doesn't mean they live around here.  Is that right?

15          MR. BUSCH:  Yeah.  I would say that probably 70

16  percent of them are still in the Florida area.

17          THE COURT:  Okay.  All right.  Well, I'm -- you know,

18  I'm guessing, just -- I'm guessing that it wouldn't happen

19  before August, I'm sure, maybe even later than that.

20          So, you know, it's not like we're talking about next

21  week or anything.  That would just be a guess.  I'd talk to

22  Judge Howard.  Plus, y'all have got a little bit of work to do

23  and we've got the severance.  So maybe we need a little bit of

24  clarity as to where we are and so forth before the parties sit

25  down.

1        I will say this, though.  I don't think that --

2  obviously, everybody would love to have perfect knowledge.

3  They'd love to know what everybody is going to say in every

4  deposition.  They'd love to be able to have all that before --

5  you know, before you settle.

6        But I don't think this is the kind of case that needs

7  that.  And I think that there's lots of reasons why everybody

8  ought to be able to take a serious look at this and -- and see

9  if it can be reasonably resolved.  And I think that would be in

10  the best interest of -- of everyone.

11        So -- so I'm -- you know, I'm talking relatively

12  early in the process here, sometime -- I'm just spit-balling

13  here, but sometime in the August, September, maybe October time

14  frame, something there.

15        And I'll be talking to Judge Howard.  I'll wait and

16  get your severance stuff.  I'll talk to Judge Lammens about a

17  case scheduling conference.  And I'll try to put together a

18  plan that I think is appropriate.

19        All right.  Mr. Busch, anything else, sir?

20        MR. BUSCH:  No, Your Honor.  Thank you for your time.

21        THE COURT:  Mr. Soren, anything else, sir?

22        MR. SOREN:  No, Your Honor.  Thank you for your time.

23        THE COURT:  Mr. Smart, Ms. Posteraro?

24        MR. SMART:  Nothing for the government, Your Honor.

25        MS. POSTERARO:  No, Your Honor.  Thank you.

1      THE COURT:  Okay.  And I know there's a number of

2  other counsel on the line, as well.  I won't try to call out

3  the roster, but -- all right.  Then -- and for those who are on

4  the line who are interns, I will -- again, save up your

5  questions and I'll try to have a session with you-all at some

6  point to talk about all these hearings that you've been

7  listening in on.

8      So all right then -- hold on one second.  I'm going

9  to put you on a brief hold.  I want to check with my law clerk

10  to make sure that there's no other matters that I -- I'm

11  overlooking here.  So hold on one second.  I'll be right back

12  with you.

13     (Brief pause in proceedings.)

14      THE COURT:  All right.  Counsel, I think we've

15  covered all the matters.  The Court will issue an appropriate

16  order off of this hearing.

17      I'll probably -- well, I'll probably go ahead and

18  issue an order that has these dates in there at least, and

19  then -- and a ruling on the motion.  I'll do a short order.

20      But, as I said, I'm not going to say much.  And if

21  you really -- really want to know what happened, you're going

22  to probably have to get the transcript, so...

23      All right.  Mr. Busch, Mr. Soren -- I think I've

24  already gotten counsel.  So I'm going to go ahead and adjourn

25  the hearing.  And I'll hear from you-all as indicated.

1          Thank you.

2          MR. SMART:   Thank you, Your Honor.

3          MR. BUSCH:   Thank you, Your Honor.

4          MR. SOREN:   Thank you.

5      (The proceedings concluded at 4:09 p.m.)

6                          - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## **CERTIFICATE**

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


        I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


        DATED this 16th day of June, 2020.



                        s/Shannon M. Bishop
                        Shannon M. Bishop, RDR, CRR, CRC