# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

RACHELLE BEAUBRUN,       :
KRISTEN GODUTO,        :
KARA GUGGINO,         :
SARA HOEHN,           :       Civil Action File
APRIL JOHNSON,         :
TERRY NAGY-PHILIPS,    :       No. 5:19-cv-00615-TJC-PRL
ANN URSINY,           :
KAREN WATSON,        :
CARLEANE BERMAN,     :
MIRANDA FLOWERS, and  :
JUDI ALOE,            :
                        :
      Plaintiffs,        :
                        :
vs.                       :
                        :
UNITED STATES OF AMERICA,  :
                        :
      Defendant.       :
_____ :

## FIRST AMENDED COMPLAINT FOR DAMAGES

NOW COMES Rachelle Beaubrun, Kristen Goduto, Kara Guggino, Sara Hoehn, April Johnson, Terry Nagy-Philips, Ann Ursiny, Karen Watson, Carleane Berman, Miranda Flowers and Judi Aloe (collectively "Plaintiffs") and file this Complaint for Damages against Defendant United States of America (hereafter "United States" or "Defendant") on claims of negligence, assault, battery, false imprisonment, and intentional infliction of emotional distress pursuant to 28 U.S.C. § 1346 et seq. (Federal Torts Claim Act) as follows:

1

## PARTIES

### *Plaintiffs*

1.

Rachelle Beaubrun ("Ms. Beaubrun") is a 48-year-old female who was remanded into the custody of the Federal Bureau of Prisons (hereafter "BOP") for 8.5 years on charges of conspiracy to commit wire fraud and identity theft.  Ms. Beaubrun was a non-violent, first time offender who served her prison sentence at the Coleman Federal Correctional Institution in Sumpter County, Florida (hereafter "Coleman Federal Prison") from 2013 to 2019.

2.

Kristen Goduto ("Ms. Goduto") is a 36-year old female remanded into the custody of the BOP for 10 years on charges of drug possession.  Ms. Goduto was a non-violent, first time offender who served her prison sentence at Coleman Federal Prison from 2015 to 2019 before transfer to the Tallahassee Federal Prison.

3.

Kara Guggino ("Ms. Guggino") is a 35-year old female remanded into the custody of the BOP for 10 years on charges of armed robbery.  Ms. Guggino was a first-time offender who served her prison sentence at FCI Tallahassee from 2012-2015 and Coleman Federal Prison from 2016 to 2019.

4.

Sara Hoehn ("Ms. Hoehn") is a 30-year old female remanded into the custody of the BOP for 27 years on charges of conspiracy to possess and distribute drugs.  Ms. Hoehn was a non-violent, first time offender who is currently serving her prison sentence at Coleman Federal Prison beginning in 2016.

5.

April Johnson ("Ms. Johnson") is a 40-year old female remanded into the custody of the BOP for 8 years on charges of conspiracy to manufacture drugs. Ms. Johnson was a non-violent, first time offender who served her prison sentence at Coleman Federal Prison from 2015 to 2019.

6.

Terry Nagy-Phillips ("Ms. Nagy-Phillips") is a 49-year old female remanded into the custody of the BOP for 12 years on charges of conspiracy to commit wire fraud.  Ms. Nagy-Phillips was a non-violent, first time offender who served her prison sentence at Coleman Federal Prison from 2012 to 2020.

7.

Ann Ursiny ("Ms. Ursiny") is a 56-year old female remanded into the custody of the BOP for 15 years on charges of mortgage fraud.  Ms. Ursiny was a non-violent, first time offender who served her prison sentence at Coleman Federal Prison from 2012 to 2020.

3

8.

Karen Watson ("Ms. Watson") is a 37-year old female remanded into the custody of the BOP for 5 years on charges of bank fraud.  Ms. Watson was a non-violent, first time offender who served her prison sentence at Coleman Federal Prison from 2017 to 2018.

9.

Carleane Berman ("Ms. Berman") is a 26-year-old female remanded into the custody of the BOP for 3 years on charges of conspiracy to possess and distribute drugs.  Ms. Berman served part of her sentence at Coleman Federal Prison from 2017 to 2018.

10.

Miranda Flowers ("Ms. Flowers") is a 35-year-old female remanded into the custody of the BOP for 2 years on charges of wire fraud.  Ms. Flowers was a non-violent, first time offender serving part of her sentence at Coleman Federal Prison from 2017 to 2018.

11.

Judi Aloe ("Ms. Aloe") is a 60-year-old female remanded into the custody of the BOP for 4 years on charges of odometer tampering.  Ms. Aloe was a non-violent, first time offender serving part of her sentence at Coleman Federal Prison from 2016 to 2019.

<u>*Defendant*</u>

12.

Defendant United States of America is a sovereign country subject to
liability and damages for the wrongful conduct of its employees and agencies
under the Federal Torts Claim Act.  The United States may be served with process
pursuant to Fed. R. Civ. Pro. 4(i)(1) as follows:

Ms. Maria Chapa Lopez or designee
United States Attorney, Middle District of Florida
400 North Tampa Street, Suite 3200
Tampa, FL 33602

*Certified mail copy to*:

United States Attorney, Middle District of Florida
c/o Civil Process Clerk
Middle District of Florida, Ocala Division
35 S.E. 1st Avenue, Suite 300
Ocala, FL 34471

Mr. William Barr
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

<u>*Immune Individual Employees*</u>

13.

The Federal Employee Liability Reform and Tort Compensation Act
("FELRTCA") was passed into law in 1988 and extended absolute immunity for
common law torts to all federal employees regardless of whether the conduct at

issue was discretionary or intentional.  But for the immunity protections afforded federal employees under FELRTCA, the individuals identified below would be liable to Plaintiffs for monetary damages for their misconduct.

14.

Wardens Manuel "Manny" Ocasio, R.C. Cheatham, Charles L. Lockett, Shannon D. Withers and various other associate wardens, executive staff, department heads, supervisors and prison management (hereafter "Coleman Management Team") were grossly negligent in the management, supervision and retention of male correctional officers at Coleman Federal Prison engaged in the sexual harassment and abuse of female inmates.  As a result of these failures, and upon information and belief, Warden Ocasio was forced into an early retirement.

15.

Lieutenants Kajander and David DeCamilla worked for the Special Investigative Services Unit ("SIS") assigned to Coleman Federal Prison and were responsible to investigate any alleged criminal activity involving staff members or inmates.  Lieutenants Kajander and DeCamilla were grossly negligent and derelict in their duties to manage, supervise and retain male officers at Coleman Federal Prison engaged in the sexual harassment and abuse of female inmates.  As a result of these failures, and upon information and belief, Lieutenant DeCamilla was demoted and forced into early retirement.

6

16.

Dr. Ojeda and other professional service providers at Coleman Federal Prison directly employed by the BOP were negligent in managing, supervising and retaining male officers at Coleman Federal Prison engaged in the sexual harassment and abuse of female inmates.  As a result of these failures, and upon information and belief, Dr. Ojeda was disciplined and demoted.  (Dr. Ojeda and the other professional service providers at Coleman Federal Prison are included hereafter in the "Coleman Management Team").

17.

The Office of Internal Affairs ("OIA"), the Office of Inspector General ("OIG"), the U.S. Department of Justice ("DOJ") and many other special agents and supervisory attorneys were responsible for the investigation and prosecution of male correctional officers sexually abusing female inmates at Coleman Federal Prison.  These agencies failed to timely investigate and prosecute the criminal activity perpetrated by the male correctional officers identified below.  (SIS, OIA, OIG and DOJ are collectively referred to herein as the "Prison Investigative Agencies").

18.

Officer Palomares served as a correctional officer at Coleman Federal Prison until his resignation in 2018 stemming from years of unchecked sexual misconduct

with female inmates.  Officer Palomares was a known sexual predator by the Coleman Management Team and the Prison Investigative Agencies but was allowed <u>unrestricted</u> and <u>unsupervised</u> access to female inmates.  Officer Palomares engaged in the systematic sexual abuse and harassment of Plaintiffs Ms. Beaubrun, Ms. Hoehn, Ms. Johnson, Ms. Ursiny, Ms. Watson, Ms. Bearman, Ms. Flowers and Ms. Aloe as admitted in recent interviews with the Prison Investigative Agencies.  Officer Palomares faced no criminal prosecution for his admitted sexual abuse of female inmates and was permitted to retire with full benefits from the BOP.

19.

Officer Phillips served as a correctional officer at Coleman Federal Prison until his recent resignation in 2019 stemming from unchecked sexual misconduct with female inmates.  Officer Phillips was a known sexual offender to the Coleman Management Team and the Prison Investigative Agencies but was allowed <u>unrestricted</u> and <u>unsupervised</u> access to female inmates.  Officer Phillips engaged in sexual abuse and harassment of Plaintiffs Ms. Goduto, Ms. Guggino, Ms. Hoehn, Ms. Ursiny, Ms. Bearman and Ms. Flowers as admitted in interviews with the Prison Investigative Agencies.  Officer Phillips faced no criminal prosecution for his admitted sexual abuse of female inmates and was permitted to retire with full benefits from the BOP.

20.

Officer Campbell served as a correctional officer at Coleman Federal Prison until his recent resignation in 2019 stemming from unchecked sexual misconduct with female inmates.  Officer Campbell was a known sexual offender to the Coleman Management Team and the Prison Investigative Agencies but was allowed <u>unrestricted</u> and <u>unsupervised</u> access to female inmates.  Officer Campbell engaged in sexual abuse and harassment of Plaintiffs Ms. Nagy-Phillips, Ms. Ursiny and Ms. Aloe as admitted in interviews with the Prison Investigative Agencies. Officer Campbell faced no criminal prosecution for his admitted sexual abuse of female inmates and was permitted to retire with full benefits from the BOP.

21.

Officer Vann served as a correctional officer at Coleman Federal Prison until his suspension in 2019 stemming from unchecked sexual misconduct with female inmates.  Officer Vann was a known sexual offender to the Coleman Management Team and the Prison Investigative Agencies but was allowed <u>unrestricted</u> and <u>unsupervised</u> access to female inmates.  Officer Vann engaged in sexual abuse and harassment of Plaintiff Ms. Guggino, Ms. Bearman and Ms. Flowers.  Officer Vann faced no criminal prosecution for his sexual abuse of female inmates and continues to receive full benefits and pay from the BOP.

9

22.

Officer Urdialez served as a correctional officer at FCI Tallahassee until his recent resignation in 2019 stemming from unchecked sexual misconduct with female inmates.  Officer Urdialez was a known sexual offender to the wardens, executive staff, department heads, supervisors and prison management at FCI Tallahassee (hereafter "FCI Tallahassee Management Team") and the Prison Investigative Agencies but was allowed <u>unrestricted</u> and <u>unsupervised</u> access to female inmates.  Officer Urdialez engaged in sexual abuse and harassment of Plaintiff Ms. Guggino as admitted in interviews with the Prison Investigative Agencies.  Officer Urdialez faced no criminal prosecution for his admitted sexual abuse of female inmates and was permitted to retire with full benefits from the BOP.

## **JURISDICTION AND VENUE**

23.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1346 et seq. (Federal Torts Claim Act) as it involves liability of the United States of America reserved to federal courts.

24.

This Court has personal jurisdiction over Defendant United States of America pursuant to 28 U.S.C. § 1346 et seq. (Federal Torts Claim Act).

25.

Venue is proper in this Court pursuant to 28 U.S.C. § 1402(b) as the acts and omissions set forth herein occurred within this federal judicial district.

## FEDERAL BUREAU OF PRISONS

26.

The Federal Bureau of Prisons ("BOP") is a United States federal law enforcement agency responsible for the custody of individuals who have violated federal laws.  The BOP's stated mission is to "protect public safety by ensuring that federal offenders serve their sentences of imprisonment in facilities that are safe, humane, cost efficient and appropriately secure."  The BOP employs over 35,000 individuals at 122 institutions across the country.  The BOP is currently responsible for the custody and care of over 13,000 female inmates incarcerated at 27 separate BOP facilities.

27.

Despite its stated mission, the BOP has created and maintained a sanctuary for male correctional officers to sexually assault and abuse female inmates. The sexual abuse at these female prisons is rampant but goes largely unchecked as a result of cultural tolerance, orchestrated cover-ups and organizational reprisals of inmates who dare to complain or report sexual abuse.

11

28.

This systemic misconduct within the BOP was the subject of a recent U.S. House of Representatives investigation for the Committee on Oversight and Government Report.  The nine-page report concluded that misconduct by prison officials is "largely tolerated or ignored altogether" allowing officials to operate outside of the rules.  The committee reviewed specific cases where "individuals deemed responsible for misconduct were shuffled around, commended, awarded, promoted or even allowed to retire with a clean record and full benefits before any disciplinary action could apply."

## PRISON RAPE ELIMINATION ACT

29.

The Prison Rape Elimination Act ("PREA") was signed into law by President Bush in 2003 and applies to all federal facilities managed by the BOP. PREA's goal is to deter the sexual assault of prisoners and to curb prison rape through a zero-tolerance policy.

30.

Because the female inmates are fully dependent on the correctional officers for basic necessities and privileges, all sexual contact, with or without the consent of the inmate, is classified as abuse.  Sexual abuse and sexual harassment are defined in section 115.6 of the Act as follows:

*Sexual abuse* of an inmate, detainee, or resident by a staff member, contractor, or volunteer includes any of the following acts, *with or without consent* of the inmate, detainee, or resident:

(1) Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;

(2) Contact between the mouth and the penis, vulva, or anus;

(3) Contact between the mouth and any body part where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(4) Penetration of the anal or genital opening, however slight, by a hand, finger, object, or other instrument, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(5) Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(6) Any attempt, threat, or request by a staff member, contractor, or volunteer to engage in the activities described in paragraphs (1)-(5) of this section;

(7) Any display by a staff member, contractor, or volunteer of his or her uncovered genitalia, buttocks, or breast in the presence of an inmate, detainee, or resident, and

(8) Voyeurism by a staff member, contractor, or volunteer.

*Sexual harassment* includes

(1) Repeated and unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a derogatory or offensive sexual nature by one inmate, detainee, or resident directed toward another; and

(2) Repeated verbal comments or gestures of a sexual nature to an inmate, detainee, or resident by a staff member, contractor, or volunteer, including

13

*demeaning references to gender, sexually suggestive or derogatory comments
about body or clothing, or obscene language or gestures.*

31.

As mandated by PREA, the BOP conducts annual PREA audits ("Audits") at
each federal prison facility. The annual Audits for Coleman Federal Prison are
<u>materially</u> incomplete as the auditors failed to interview any female inmates that
were involved in or witness to PREA violations.

32.

The reports suggest that these female inmates were not available for
interview as they had been transferred to another prison facility.  The failure to
interview victims of PREA violations undermines the Audit results and
incentivizes Coleman Federal Prison to transfer victims of sexual abuse rather than
cooperate with a thorough PREA investigation.  By transferring victims of sexual
abuse, Coleman Federal Prison shields itself from legitimate investigation and
suppresses complaints by punishing the victims.

33.

The Coleman Federal Prison transfer policy also demonstrates the BOP's
failure to put the rights of the victims ahead of its own economic interest.  Before
any BOP employee can be punished, transferred or reassigned for sexual abuse,
administrators must carefully navigate the collective bargaining agreement.  In
almost every instance, the collective bargaining rights of the employees outweigh

14

the rights of the victim and it is the victim that receives the full weight of punishment by transfer to another facility or other punitive measures.  In no other context are the rights of the sexually abused subordinated to the economic interests of the institution and the collective bargaining rights of the abusers.

## COLEMAN FEDERAL PRISON

### 34.

The Coleman Federal Prison located in Sumter County, Florida houses approximately 6,000 federal inmates in both low and medium security facilities.  The campus includes a minimum-security satellite prison camp housing approximately 500 female inmates ("Coleman Prison Camp").  Coleman Federal Prison is operated by the BOP through the United States Department of Justice.

### 35.

Female inmates at the Coleman Prison Camp are segregated into distinct housing units with dormitory style cubicles for each inmate.  The Coleman Prison Camp is operated under a work/camp model where non-violent inmates are afforded work privileges within the Coleman complex.  Inmates are subject to daily "counts" but are otherwise free to move around the Coleman Prison Camp subject to specified rules and regulations.[1]

---

[1] This Complaint for Damages also encompasses instances of abuse at FCI Tallahassee, Florida, a low security federal prison for female inmates operated by the BOP which utilized the same model, systems, procedures and punishments as Coleman.

15

36.

The Coleman Prison Camp employs correctional officers, facilities staff and management to oversee and operate the prison facility.  The correctional officers are trained, managed, overseen and paid by the BOP through the United States Department of Justice serving "investigative or law enforcement" functions.  The correctional officers are federal employees subjecting the United States of America to liability for improper actions committed within the course and scope of their employment.

37.

The Coleman Prison Camp and FCI Tallahassee employed no less than five (5) male correctional officers that sexually abused and harassed Plaintiffs.  These individuals included Officers Palomares, Campbell, Phillips, Vann and Urdialez (collectively "Offending Officers").

38.

The Offending Officers were known sexual predators to the Coleman Management Team and the Prison Investigative Agencies.  The Offending Officers had been investigated on numerous occasions for sex crimes against female inmates.  The Coleman Management Team and Prison Investigative Agencies were well aware of the female inmates' reluctance to come forward with information on sexual abuse for fear of reprisal, including, but not limited to, transfer to a different

16

facility, disciplinary segregation, loss of early release rights, detrimental write-ups

loss of work privileges, and interference with vocational skills programs.

39.

In fact, the Coleman Management Team instituted a strict policy whereby

inmates complaining of mistreatment by prison officials were automatically

removed to a local county detention center.  This relocation policy intentionally

suppressed complaints of misconduct as the county facilities are higher levels of

security and do not permit the work details or vocational training offered at the

Coleman Prison Camp.

40.

Despite the known issues of abuse, the Coleman Prison Camp granted the

Offending Officers unrestricted and unsupervised contact with Plaintiffs including

work details, bed checks, visitation, etc… which granted them one on one access.

The Offending Officers used their position of authority to threaten and coerce

Plaintiffs into engaging in sexual activities and keep the abuse quiet for fear of

immediate retaliation.  The Offending Officers also used their access to personal

history files, telephone call recordings, and personal emails giving them additional

leverage to extract sexual favors and threaten the safety of Plaintiffs.

## ACCESS TO COUNSEL

### 41.

Coleman Prison Camp maintains a system of checks and balances that makes access to competent counsel virtually impossible for female inmates that are victims of sexual abuse.

### 42.

First, the Offending Officers threatened Plaintiffs with direct and immediate retaliation in the event Plaintiffs reported any instances of sexual abuse including time in the Special Housing Unit ("SHU"), loss of privileges, removal from work detail, and write "ups."   The Offending Officers reviewed Plaintiffs' confidential prison files, emails and recorded telephone conversations to intimidate Plaintiffs as part of their psychological coercion.  Additionally, Plaintiffs observed many examples of punishments handed out to other inmates that challenged or reported abuse by the Offending Officers.  Because of the dependency of the officer/inmate relationship for basic necessities and privileges as identified in PREA, any threats of retaliation were magnified and Plaintiffs were unable to safely report the sexual abuse to potential legal counsel.

### 43.

Second, the Prison Management Team introduced a policy of removal of the female inmates to a medium security county prison for any victim reporting

18

allegations of sexual abuse.  Plaintiffs observed this policy enforced by the Prison

Management Team on countless occasions making reporting instances of abuse to

any Coleman employee or counselor a significant safety risk.

44.

Third, the Prison Management Team monitored all of Plaintiffs' telephone

and email communications with their friends and families and any mention of

sexual abuse was flagged and immediately stamped out.  On several occasions,

Plaintiffs were confronted by the Offending Officers who said they were aware of

communications to family members regarding issues of sexual misconduct at

Coleman and were threatened never to mention those problems again or there

would be "serious" consequences.

45.

Fourth, the Prison Management Team refused to give Plaintiffs access to a

secure telephone line to discuss their legal rights with competent legal counsel

requiring Plaintiffs to use the "open" lines for initial attorney/client interviews that

were monitored by the Offending Officers.

46.

Unable to report instances of sexual abuse to Coleman staff for fear of

immediate retaliation, unable to discuss instances of sexual abuse with

family/friends over email or telephone that were constantly monitored, and unable

to utilize a secure phone line to speak with potential counsel, Plaintiffs were effectively cut off from the outside world and unable to procure legal representation to protect their rights.

47.

Through a series of chance encounters, impromptu meetings, and cryptic messaging, the undersigned learned of a group of female inmates at Coleman Prison Camp that were in desperate need of legal assistance.  Undersigned counsel arranged for visitation on November 10, 2018 during regularly scheduled visitation hours but had to have a visitation form approved/signed by a staff counselor before gaining access to the facility.

48.

Visitation on November 10, 2018 was scheduled to begin at 8:30 am, however, the Coleman Management Team initiated an emergency "fog" delay. Despite the absence of any "fog", the visitation was delayed for over two hours limiting counsel's opportunity to conduct full interviews.  Once inside the Coleman Prison Camp, the undersigned was forced to meet with Plaintiffs one at a time in a small, storage closet.

49.

With counsel engaged and the limited protection of a larger group, Plaintiffs courageously came forward to tell their story in hopes of facilitating change at

Coleman Prison Camp and submitted a demand letter to the BOP on March 15, 2019 in compliance with the Federal Tort Claims Act.  A true and accurate copy of the March 15, 2019 demand letter is attached hereto as Exhibit "A."[2]

50.

Even after formally engaging counsel, the Coleman Management Team made communication difficult by reviewing attorney client privileged emails, listening to attorney client privileged phone calls, refusing to deliver attorney client privileged letters and refusing to allow for secure counsel phone calls by insisting that Coleman staff be present in the rooms where the calls took place.

## RACHELLE BEAUBRUN

51.

Ms. Beaubrun arrived at Coleman Prison Camp in September 2013 after serving parts of her prison sentence at three (3) other institutions.  Shortly after her arrival, Officer Palomares began sexually harassing Ms. Beaubrun.

52.

Palomares began making comments to her about her body and described sex acts he wanted her to perform.  Palomares then moved into grabbing and fondling her for brief moments when he was able to find her alone in certain areas of the

---

[2] While not part of the original March 15, 2019 demand letter, Plaintiffs Ms. Berman, Ms. Flowers and Ms. Aloe also filed notices to the BOP which are included in Exhibit A.

compound that were not under surveillance.  Palomares would threaten her by

saying that he could make her time at Coleman Prison Camp "easy or hard"

depending on how she responded to his advances.

53.

Ms. Beaubrun tried to avoid Palomares as much as possible and tried never

to be alone around him.  She was able to keep her distance for several months until

2014 when Palomares was on duty for visitation.  As Ms. Beaubron was being

checked back in from visitation, Palomares ordered her into the "search room"

adjacent to the visitation area.

54.

Once inside, he closed all of the doors and began kissing her mouth and

neck.  He then lifted up her shirt and began fondling her breasts.  He put his hands

down her pants and put his fingers inside her vagina.  After several minutes he

pulled his penis out and told Ms. Beaubrun to "suck my dick."  She then proceeded

to give Palomares oral sex and as he was about to ejaculate, she tried to pull her

mouth away from his penis.  He forced her head down on his penis and ejaculated

into her mouth forcing her to swallow his semen.

55.

This incident terrified Ms. Beaubrun and she managed to stay clear of

Palomares for several years.  Then, on two separate occasions in 2016 and 2017,

22

Palomares came to her room after the 10:00 pm count and demanded she follow

him to the staff rest room between F1 and F2.  He pushed her inside the rest room

and told her not to make a sound.  He then touched her breasts, inserted his fingers

into her vagina and demanded that she perform oral sex on him.  Ms. Beaubrun

reluctantly followed his instructions and he once again ejaculated in her mouth

forcing her to swallow his semen.  At no time did Ms. Beaubrun consent to giving

Palomares oral sex or give him permission to touch her.

56.

Ms. Beaubrun did not report these incidents immediately because it is

common knowledge among the inmate population that upon reporting sexual abuse

the victim is removed from Coleman Prison Camp and transferred to the county

jail, a higher security prison with no educational or work opportunities.  Ms.

Beaubrun witnessed other victims of sexual abuse being transferred to the county

jail and feared if she reported the instances of abuse with Officer Palomores she

would receive the same punishment.

57.

As a result of these sexual assaults and harassment from Officer Palomares,

Ms. Beaubron has suffered extensive psychological trauma, depression, pain and

suffering, physical trauma and is in constant fear of being trapped alone with

another abusive man.  Ms. Beaubron demands compensation from the United

States of America for this abuse in an amount to be determined at trial.

## KRISTEN GODUTO

58.

Ms. Goduto arrived at Coleman Prison Camp in August 2015.  Shortly after

her arrival, she began working in general maintenance under the direction and

supervision of Officer Phillips.  Ms. Goduto was approached by another inmate at

the direction of Officer Phillips to gage her interest in a sexual relationship.  She

declined and Officer Phillips began speaking directly to Ms. Goduto.

59.

At first, he spoke generally about sex saying that it must be really hard for

her to go without sex for so long and that he could help her with her sexual urges.

Towards the end of 2015, his sexual advances intensified and he forced Ms.

Goduto to show him her breasts behind his office at facilities by threatening to kick

her out of the maintenance group unless she showed him whether they were "real

of fake."  He also mentioned on several occasions that he would "listen" to Ms.

Goduto's phone calls and repeated information he learned from listening to these

private phone calls.

24

60.

Thereafter, Officer Phillips began stalking Ms. Goduto by showing up in her unit unannounced and pushing his way into her actual room.  Officer Phillips brought her small gifts such as lotions and face creams always saying that Ms. Goduto would "pay him back."  On one occasion while she was exercising, Officer Phillips demanded that she get in his truck and drove her to the edge of the campus.  He pulled out his penis and asked Ms. Goduto to "suck his dick."  When another vehicle approached, he put his pants back on and drove her back to the main unit.

61.

In 2016, the maintenance team was painting the parking lot at the low facility when Officer Phillips against asked Ms. Goduto to get into his truck.  This time, he drove her to the back of the facility where a semi-truck was parked.  He ordered her to get out and go inside.  He forced her onto a mattress in the back of the truck and told her to get undressed.  He took all of his clothes off and pulled out a condom placing it on his penis.  He removed Ms. Goduto's bra and began kissing on her breasts.  He grabbed her genital area inserting his fingers into her vagina.  When he tried to remove her panties, she told him she was on her "period" and begged him not to rape her.  Officer Phillips stopped but insisted she start taking birth control.

62.

In 2017, Ms. Goduto was approached by Dr. Ojeda and Lieutenant DeCamilla about wearing a wire and trying to entrap some of the male officers at Coleman Prison Camp that were sexually assaulting the female inmates.  Ms. Goduto was scared and did understand or trust the intentions of the Coleman Management Team but was offered "time off" if the operation was successful.  She reluctantly agreed to participate but was later informed that the FBI did not approve the operation.

63.

Ms. Goduto did not consent or give permission to Officer Phillips to touch her or engage in any sexual activity.  Ms. Goduto did not fully report these incidents of abuse for fear of reprisal.  As a result of these sexual assaults and harassment, Ms. Goduto has suffered extensive psychological trauma, physical trauma, depression, pain and suffering and is in constant fear of being trapped alone with another abusive officer.  Ms. Goduto demands compensation from the United States of America for this abuse in an amount to be determined at trial.

## **KARA GUGGINO**

64.

Ms. Guggino was initially sent to the federal prison in Tallahassee, Florida known as "FCI Tallahassee" beginning in 2012.  Several years into her sentence,

26

Ms. Guggino started a job in the kitchen at FCI Tallahassee.  After a few months, she noticed that a Lieutenant Urdialez began following her to work in the early morning hours.  Weeks later, Urdialez started making comments to her about her private phone calls and emails with her family and admitted he had been "checking up" on her.

65.

One morning while Ms. Guggino was walking to work, Urdialez noticed that she was sick and offered to walk her to the medical office so he could get her out of work for the day. While at the medical office, Urdialez told her he would get her out of the kitchen job and she could work with him as an orderly.  Urdialez told her there was a long wait list for the job but that he would move her to the top.

66.

Several days later, Urdialez barged into Ms. Guggino's room without knocking while she was getting dressed and informed her he had been in an email battle with the captain's secretary, Daisy Solado, about the open position as his orderly.  Urdialez showed Ms. Guggino the emails and said she could start working for him the next week.  Ms. Guggino started immediately working as Urdialez's night orderly, after the 9:00 pm count along with another inmate, Kathy Navarro.

67.

After several weeks at the new job, Urdialez began making sexual comments about things he would like to do to Ms. Guggino and referred to her as "forbidden fruit."  One day he called all of the day and night orderlies into his office and explained that one of them had leaked confidential information and he had to interview each one of them individually.  He called Ms. Guggino into his office for the interview and when she arrived the lights were turned off.  Urdialez asked Ms. Guggino if she know why she had been called to his office.  When she answered no, Urdialez walked over to Ms. Guggino and began kissing her.  He then put his hands under her shirt and started fondling her breasts.  He reached his hand into her pants and inserted his fingers into her vagina.  When he removed his fingers, he licked them and told Ms. Guggino not to tell anyone what happened.  He went on to say that he could make her life "easy or hard" depending on her cooperation with his sexual advances and instructed her not to wear panties to work.  This first sexual encounter ended with Urdialez threatening Ms. Guggino "not to do or say anything to make me mad."

68.

Several days after this first encounter, Urdialez ushered Ms. Guggino upstairs to a conference room above his office.  When they walked in, Urdialez spread a blanket on the floor and ordered Ms. Guggino to undress.  After removing

28

her clothes, he instructed her to lie down on the blanket and spread her legs.  He

then proceeded to perform oral sex on Ms. Guggino.  After several minutes his

name was called over his prison radio and he instructed Ms. Guggino not to leave

the room while he was gone.  Before leaving the room, Urdialez pulled out his

handcuffs and attempted to handcuff her to the table but could not see in the dark.

He then left the room carrying Ms. Guggino's clothes and locked the door behind

him.  Ms. Guggino waited naked in the conference room for his return.  When

Urdialez finally returned, he removed his belt and pants, got on top of Ms.

Guggino and raped her without the use of a condom.

69.

Urdialez then began bringing food, treats, alcohol and sleeping pills for both

Ms. Guggino and Ms. Navarro in exchange for the sexual abuse of Ms. Guggino

and the silence of Ms. Navarro.  Urdialez began putting money on Ms. Guggino's

books and sending her emails under the name of "Ronald Ernst."  After these

initial sexual assaults, Urdialez forced Ms. Guggino to engage in sexual intercourse

or oral sex at least one time per week for several years while she worked as his

nighttime orderly.

70.

On most occasions, Urdialez asked Ms. Guggino to remove her pants and

bend over items such as tables, chairs etc.. so he could rape her from behind.  On

one Halloween night, Urzialez took Ms. Guggino to an upstairs room in G-Unit. Urdialez removed Ms. Guggino's clothes and demanded that she bend over a table. He then raped her from behind and on this particular occasion ejaculated into her vagina.  When Ms. Guggino went to the bathroom to clean up, she noticed semen in her panties dripping out of her vagina.  Urdialez barged into the women's bathroom and observed Ms. Guggino cleaning semen out of her vagina.  The next day, Urdialez showed up in Ms. Guggino's unit and saw her and her roommate, Inmate Leya Stapleton, across the compound.  He ran to meet them and handed Ms. Guggino the "morning after pill" right in front of Inmate Stapleton.

71.

Urdialez became increasingly more controlling of Ms. Guggino and her movements within the prison.  He would show up at odd times, odd places and even on his days off to monitor her behavior and to make sure she did not disclose his misconduct to anyone.  One night in his office, Urdialez showed Ms. Guggino her home residence on Google Maps.  Urdialez reminded Ms. Guggino not to tell anyone about their "relationship" and even suggested he would buy a house in her parents' neighborhood to be with her.  The rape became more violent and Urdialez attempted on several occasions to handcuff Ms. Guggino to various items.  Ms. Guggino became terrified by the abuse and believed Urdialez would physically harm her if she upset him in any way.  Urdialez also began reading her personal

emails and listening to her phone calls and became enraged when he realized she had communications with other men.

72.

When FCI Tallahassee administrators heard rumors about Ms. Guggino and Urdialez, they punished Ms. Guggino instead of terminating Urdialez' employment.  Prison officials placed Ms. Guggino into the special housing unit ("SHU") as punishment for the alleged involvement with Urdialez on three separate occasions.  While in the SHU, Ms. Guggino was under 23 hour lock down with no phone, no email and no work privileges.  Ms. Guggino was questioned repeatedly about her "relationship" with Urdialez but was too scared to report the abuse as Urdialez was sending her cards and emails while in the SHU under the name of "Ronald Ernst" warning her "not to make him mad" and she feared further retaliation from prison officials. Ms. Guggino spent months in and out of SHU.

73.

Ms. Guggino was eventually given a new job and Urdialez was moved to an adjacent facility on the complex for a short time.  However, FCI Tallahassee management allowed Urdialez to move back to the FCI Tallahassee Woman's Camp and he immediately continued his abuse of Ms. Guggino.  Undeterred by the privacy afforded him when Ms. Gugginio served as his night orderly, Urdialez began following Ms. Guggino around the compound and her unit.  When the

31

opportunity presented, he would force Ms. Guggino into stair wells or closets to continue the sexual abuse and rape.

74.

Ms. Guggino was eventually moved from FCI Tallahassee to a facility in Alabama.  Prior to her departure, Urdialez showed up on his off day in plain clothes and had the on-duty officer call her to the front of her unit.  The on-duty female officer locked the doors to both sides of the units and the door to the officer's station shutting them both inside.  Urdialez gave Ms. Guggino three magazines in a white envelope.  Urdialez reminded Ms. Guggino not to tell anyone about their "relationship" or she would be in trouble and lose any time off privileges she had earned while in prison.  Urdialez let Ms. Guggino know that she was his and he would find a way for them to be together.

75.

When she arrived in Alabama, Ms. Guggino discovered that most of her personal property had been confiscated including clothes, shoes, a bible and a personal journal where she had written about the sexual abuse of Urdialez.  Ms. Guggino took this as a threat not to mention anything about Urdialez.  Immediately upon her arrival in Alabama, the psychology staff began harassing Ms. Guggino, making her feel as if she was being punished by the change in prison facilities and shuttling her in and out of the SHU.  Ms. Guggino continued to lie about the abuse

for her own protection.  Finally, representatives from OIG took over the

interrogations and threatened Ms. Guggino to add five years to her sentence if she

did not tell them about her "relationship" with Urdialez.  As Urdialez told Ms.

Guggino that he had "friends" at the OIG, she provided only limited information to

try and stay out of trouble.

76.

After her meeting with OIG, she was moved yet again to Coleman Prison

Camp in April 2018.  She began working landscaping with Officer Vann.  Officer

Vann began immediately making sexual comments saying he wanted to "fuck" Ms.

Guggino and that she looked like the type of woman that liked to have a good time.

On several occasions Vann followed Ms. Guggino into the tool room grabbing her

breasts, buttocks and genital area penetrating her vagina with his fingers.

77.

On several occasions, Vann picked Ms. Guggino up from a job site in his

vehicle, grabbed her hand and placed it onto his penis.  When other officers

became aware that Ms. Guggino was refusing Vann's sex attempts, they because

hostile with her.  Both Officer Phillips and Officer Cladder verbally abused Ms.

Guggino by calling her a "bitch" for not "playing ball" and removed her from the

landscaping job.  Unbelievably, Urdialez is still employed at FCI Tallahassee and

recently drove a van to Coleman Prison Camp in some sort of prisoner transfer.

Ms. Guggino observed him from a distance but ran the other way when he started walking towards her.

78.

Ms. Guggino did not consent or give permission to Lieutenant Urdialez or Officer Vann to touch her or engage in any sexual activity.  Ms. Guggino did not fully report these incidents of abuse for fear of time being added to her sentence as threatened by Lieutenant Urdialez.  As a result of these sexual assaults and harassment, Ms. Guggino has suffered extensive psychological trauma, physical trauma, depression, pain and suffering and is in constant fear of being trapped along with another abusive officer.  Ms. Guggino demands compensation from the United States of America for this abuse in an amount to be determined at trial.

**SARA HOEHN**

79.

Ms. Hoehn arrived at Coleman Prison Camp in October 2016.  Within a few months of her arrival, Officer Palomares began making sexually explicit comments to Ms. Hoehn asking for sexual favors and discussing various sexual acts inside the housing unit living quarters after the 4:00 pm count.

80.

On one occasion, Palomares suddenly appeared in Ms. Hoehn's cubicle, walked up behind her and pressed his pelvis into her behind.  He began kissing her

behind the ear while rubbing his hands over her breasts and her genital area penetrating her vagina with his fingers.  Ms. Hoehn froze in fear.  He moved away when he heard someone walking down the hallway and told Ms. Hoehn not to be scared of him and not to tell anyone what happened or she would get "locked up." Ms. Hoehn believed that Palomares had the authority to lock her up.

81.

Several weeks later, Palomares again appeared in Ms. Hoehn's room while she was folding clothes on the floor.  He squatted down behind her and began rubbing his hands over her breasts and genital area penetrating her vagina with his fingers.  Ms. Hoehn asked him to stop but he refused saying "I will bring you whatever you want if you let me have this."  Ms. Hoehn tried to push him away but he would not stop until he heard someone walking down the hallway.  These surprise visits in her cubicle continued for several months until Officer Palomares was finally suspended from the Coleman Prison Camp.

82.

In 2018, Palomares called Ms. Hoehn and another inmate to the camp office to fix an air conditioning unit.  Palomares took the inmates to a secure area and locked himself and Ms. Hoehn in one room leaving the other inmate in a separate area.  Palomares told Ms. Hoehn to stop being stubborn and started to touch her breasts and genital area penetrating her vagina with his fingers.  The other inmate

35

began knocking on the door when she heard the struggle and Palomares was forced to stop.

83.

Ms. Hoehn was also the target of sexual assault from Officer Phillips. Phillips began making sexually explicit comments to Ms. Hoehn including repeatedly asking her for sexual favors.  The comments quickly escalated into sexual abuse as Phillips would approach Ms. Hoehn from behind, grab her around the waist and press his penis into her rear end.  He would then grab the front of her pockets and push her against walls, chairs, couches or anything else that might be around.  He would then press his hips into her rear end while grabbing her breasts and would touch her genital area penetrating her vagina with his fingers.  On one occasion while Ms. Hoehn was seated on a couch, Phillips walked out of the bathroom with his penis out of his pants and headed straight for her.  Ms. Hoehn ran outside and got on her lawnmower.

84.

Ms. Hoehn did not give permission or consent to Officers Palomares or Phillips to touch her or engage in any sexual activity. As a result of these sexual assaults and harassment, Ms. Hoehn has suffered extensive psychological trauma, physical trauma, depression, pain and suffering and is in constant fear of being trapped alone with another abusive officer.  Ms. Hoehn demands compensation

from the United States of America for this abuse in an amount to be determined at trial.

## APRIL JOHNSON

85.

Ms. Johnson arrived at Coleman Prison Camp in 2015 and was enrolled in the plumbing apprenticeship program.  Starting in 2016, Officer Palomares began harassing, sexually abusing, and fondling Ms. Johnson without her consent or permission.

86.

Officer Palomares used his position as housing coordinator and ordered Ms. Johnson to work the "shed" on a regular basis.  Palomares was aware that Ms. Johnson knew of his ongoing sexual relationship with her cellmate and he would routinely ask Ms. Johnson to join them in a "threesome."  Palomares would walk by Ms. Johnson's cubicle and shake his work keys at her insinuating that he wanted to meet Ms. Johnson in the work shed for sex (as he explicitly told her on numerous occasions).

87.

Palomares would enter Ms. Johnson's cell and interact with her and her cellmate.  Ms. Johnson would act like she was asleep when he entered as she was scared of him.  On one occasion, Palomares moved over to Ms. Johnson's bunk,

lifted the covers and began rubbing her genital area penetrating her vagina with his

fingers in an attempt to wake her up for sex.  On another occasion, Palomares

entered her cubicle and grabbed Ms. Johnson's hips thrusting himself against her

buttock.

88.

Ms. Johnson did not report these incidents for fear of reprisal and because

she did not want to lose her plumbing apprenticeship.  As a result of these sexual

assaults and harassment, Ms. Johnson has suffered extensive psychological trauma,

physical trauma, depression, and pain and suffering.  Ms. Johnson demands

compensation from the United States of America for this abuse in an amount to be

determined at trial.

**TERRI NAGY-PHILLIPS**

89.

Ms. Phillips arrived at Coleman Prison Camp in December 2012 serving the

remainder of her sentence.  She enrolled in the electrician apprenticeship program

taking advantage of the educational opportunities being offered.

90.

Beginning in 2017, Officer Campbell took an interest in Ms. Phillips and

began trying to engage her in personal conversations.  He sent emails to her prison

account and after review of her personal file, discovered that they were both from

Michigan.  He used this and other information regarding Ms. Phillips to try and gain her trust and manipulate her into believing he controlled her time at Coleman Prison Camp.

91.

In December 2017, Ms. Phillips was ordered to the guard station after hours ("Message Center") by Officer Palomares to inspect a light switch malfunction. While working on the light switch, Officer Campbell came up from behind and very firmly pressed his full body, crotch first, against the backside of Ms. Phillips pinning her between the wall and a trash can.  Ms. Phillips was physically unable to struggle or push back as Campbell overpowered her. After several hard thrusts into her backside, Campbell walked away leaving Ms. Phillips to finish her work. This incident took place in an area of Coleman Prison Camp where there is no video surveillance.

92.

On New Year's Eve 2017, Ms. Phillips was instructed to obtain a microwave for a party that was to occur later that day.  The microwave was located in the electrical work shed. Campbell insisted that he escort Ms. Phillips to the electrical work shed. Campbell followed Ms. Phillips into the electrical work shed, closed the door behind them and ordered Ms. Phillips to take a seat on the couch. Campbell then instructed Ms. Phillips to take off her sweatshirt as he began

removing her pants.  Campbell kissed Ms. Phillips, laid her backwards on the couch, performed oral sex on her and then raped her.  Campbell said he knew Ms. Phillips could not get pregnant by reading her medical file and then proceeded to ejaculate into her vagina.  Campbell grabbed a role of paper towels and ordered Ms. Phillips to "clean up" and throw all of the evidence in the trash.  After they left the electrical work shed, Ms. Phillips carried the microwave while Officer Campbell carried her sweatshirt as if nothing had occurred.

93.

Ms. Phillips was concerned about reporting the rape for fear of reprisal including being removed to a county facility destroying her electrician apprenticeship.  Ms. Phillips did not consent or give permission to Campbell to engage in sexual activity.  As a result of the sexual abuse, Ms. Phillips has suffered extensive psychological trauma, physical trauma, depression, pain and suffering and is fearful of being caught alone by one of the correctional officers again.  Ms. Phillips demands compensation from the United States of America for this abuse in an amount to be determined at trial.

## **ANN URSINY**

94.

Ms. Ursiny arrived at Coleman Prison Camp in July 2012.  Within a few months of her arrival, Officer Palomares began making sexually explicit comments

to Ms. Ursiny asking for sexual favors and discussing various sexual acts.  Ms. Ursiny repeatedly told Palomares she was not interested but he persisted telling her one day "I will have you."

95.

In May 2014, Ms. Ursiny was visited by her husband.  When the visit ended, Ms. Ursiny followed procedure and walked to the bathroom located in the corner that can be accessed from the compound.  Palomares was checking the inmates out from visitation on this particular day.  Ms. Ursiny entered the bathroom with another inmate and waited to be checked out.  Palomares instructed the other inmate to leave the bathroom saying "only one inmate at a time."  Palomares then locked all access to the bathroom leaving him and Ms. Ursiny alone.  He then told Ms. Ursiny "come on party girl you know what to do."  Ms. Ursiny froze in fear as Palomares began patting her down.  He started at her neck and began working his way down her body.  He then began squeezing and fondling her breasts for several minutes.  He stopped only to tell her "your tits feel good party girl."  He then started rubbing her stomach and worked his way down to her pelvis. He started lightly rubbing her vagina before squeezing her butt.  He worked his way down her legs and then returned to rubbing her genital area penetrating her vagina with his fingers.  After several minutes he stopped and said "I told you I would get you."

41

96.

This incident traumatized Ms. Ursiny to the point she was terrified to have any additional visitors for fear of being assaulted after visitation was completed. For over four years, she would not allow any family members or friends to visit her at Coleman Prison Camp.

97.

Ms. Ursiny was also the target of sexual harassment from Officers Campbell and Phillips.  Phillips began making sexually explicit comments to Ms. Ursiny and exposed his penis to her on one occasion.  Campbell constantly asked Ms. Ursiny for sexual favors saying she was "number three on the list of inmates he wanted to fuck."  Campbell would listen to her telephone calls and harass her about personal issues, such as her impending divorce.

98.

Ms. Ursiny did not give any of the officers at Coleman Prison Camp permission or consent to touch her or engage in any sexual activity.  In 2017, Ms. Ursiny began talking to Lieutenant DeCamilla about the ongoing sexual abuse at Coleman Prison Camp.  DeCamilla encouraged Ms. Ursiny to participate in a scheme to trap offending officers by wearing a wire.  Ms. Ursiny was scared and did not trust the intentions of the Coleman Management Team.  She reluctantly agreed to participate but was later informed that the FBI did not approve the

42

operation.  DeCamilla wrote an email to her prosecutor detailing the sexual abuse endured by Ms. Ursiny in an attempt to get her sentence reduced.

99.

As a result of these persistent sexual assaults and harassment, Ms. Ursiny has suffered extensive psychological trauma, physical trauma, depression, pain and suffering and is fearful of being caught alone by one of the correctional officers. Ms. Ursiny demands compensation from the United States of America for this abuse in an amount to be determined at trial.

## **KAREN WATSON**

100.

Ms. Watson arrived at Coleman in March 2017 completing the remainder of her sentence.  Within weeks of her arrival, Officer Palomares began stalking Ms. Watson telling her that they needed to talk privately or she was going to be in trouble.  In August 2017, Palomares told Ms. Watson it was time to have their talk and instructed her to go to his release and detain office near the visitation room. Once in his private office, Palomares told Ms. Watson that it was time to "play nice" or she could lose her camp status.  He then proceeded to show Ms. Watson a google map view of her mother's house in Clairmont, Florida where her 6-year-old son lives.  Palomares explained that he "knew all about" Ms. Watson and

encouraged her to "play nice" or bad things could happen to her family.  Palomares

gave Ms. Watson the google map print out which she possesses to this day.

101.

Ms. Watson was terrified of Palomares and managed to stay clear of him for

several months.  Finally, in October 2017, Palomares caught Ms. Watson in the

hallway between F1 and F2 and pushed her into an open closet.  He placed his

radio and keys on the table and kept the lights off to avoid detection.  Palomares

took his pants down and instructed Ms. Watson to do the same.  He then had

sexual intercourse with her but could not keep or maintain his penis in her vagina.

Palomares became frustrated and instructed Ms. Watson to "suck his dick."  Ms.

Watson then performed oral sex on Palomares in the closet and he ejaculated into

her mouth forcing her to swallow his semen.  Palomares insulted Ms. Watson by

telling her she did not know how to "suck dick" and that Ms. Watson should be

grateful that Palomares was giving her attention.

102.

In January 2018, immigration authorities came to Coleman Prison Camp and

transferred Ms. Watson to a holding facility before she was deported back to her

home country of Panama.  Prior to her transfer, Ms. Watson attempted to give

notice of the rape to officials by placing a hand-written note from "Inmate Karen"

into the grievance box and then delivering a second-handwritten note with her full

name to a female employee in the administrative office.  While in the holding
facility, Ms. Watson was placed in contact with Sergeant Harvey (Florida PREA
Coordinator) and was also interviewed via telephone by Lieutenant DeCamilla.
None of these officials offered Ms. Watson any assistance but Lieutenant
DeCamilla did apologize to her for "what happened" stating that we know there is
a problem with Officer Palomares.

103.

Ms. Watson also began psychological therapy with Dr. Sally Haynes before
being deported back to Panama.  Dr. Haynes concluded that Ms. Watson exhibited
symptoms of trauma, PTSD, and intrusive memories as a result of the rape.  Since
her arrival in Panama, Ms. Watson suffers from extreme depression, PTSD and is
suicidal.

104.

Ms. Watson did not consent or give permission to Palomares to touch her or
engage in any sexual activity.  Ms. Watson demands compensation from the
United States of America for the sexual assault, harassment and rape that occurred
while she was incarcerated at Coleman Prison Camp, including damages for pain
and suffering, psychological trauma, and physical trauma in an amount to be
determined at trial.

## **CARLEANE BERMAN**

### 105.

Ms. Berman arrived at Coleman in March 2017 to complete the remainder of her prison sentence.  Shortly after her arrival, Officers Palomares, Vann and Phillips began making sexually suggestive comments to her and engaged in a pattern of sexual harassment.  The harassment quickly evolved into sexual assault as Officers Palomares, Vann and Phillips coerced, intimated and demanded that Ms. Berman engage in all types of sexual activities with each of them including oral sex, intercourse, and group sex with Ms. Flowers.  These instances of non-consensual, sexual abuse occurred countless times throughout the entirety of her incarceration at Coleman with Officers Palomares, Vann and Phillips taking turns as the lead assailant of the week.

### 106.

Ms. Berman was afraid to report these instances of sexual abuse as Officers Palomares, Vann and Phillips had each threatened her with reprisal, punishment and transfer.  Ms. Berman demands compensation from the United States of America for the sexual assault, harassment and rape that occurred while she was incarcerated at Coleman Prison Camp, including damages for pain and suffering, psychological trauma, and physical trauma in an amount to be determined at trial.

## **MIRANDA FLOWERS**

107.

Ms. Flowers arrived at Coleman in May 2017 to complete the remainder of her prison sentence.  Shortly after her arrival, Officers Palomares, Vann and Phillips began making sexually suggestive comments to her and engaged in a pattern of sexual harassment.  The harassment quickly evolved into sexual assault as Officers Palomares, Vann and Phillips coerced, intimated and demanded that Ms. Flowers engage in all types of sexual activities with each of them including oral sex, intercourse, and group sex with Ms. Berman.  These instances of non-consensual, sexual abuse occurred countless times throughout the entirety of her incarceration at Coleman with Officers Palomares, Vann and Phillips taking turns as the lead assailant of the week.

108.

Ms. Flowers was afraid to report these instances of sexual abuse as Officers Palomares, Vann and Phillips had each threatened her with reprisal, punishment and transfer.  Ms. Flowers demands compensation from the United States of America for the sexual assault, harassment and rape that occurred while she was incarcerated at Coleman Prison Camp, including damages for pain and suffering, psychological trauma, and physical trauma in an amount to be determined at trial.

## JUDI ALOE

### 109.

Ms. Aloe arrived at Coleman in December 2016 to serve out the remainder of her prison sentence.  Beginning in 2017, Officer Campbell began making sexually suggestive comments to Ms. Aloe and engaged in a pattern of sexual harassment.  Over time, the harassment from Officer Campbell evolved into sexual assault and rape as he coerced, intimidated and forced Ms. Aloe to engage in non-consensual sexual intercourse and oral sex while locked alone in storage rooms with no cameras.

### 110.

Ms. Aloe was also sexually harassed and assaulted by Officer Palomares. Officer Palomares began by making sexually suggestive comments to Ms. Aloe including sexual activities that he desired her to perform.  Officer Palomares became more aggressive and groped, grabbed and fondled Ms. Aloe's breasts and genital area on a routine basis.  On more than one occasion, Officer Palomares' fingers penetrated Ms. Aloe's vagina.

### 111.

Ms. Aloe was afraid to report these instances of sexual abuse as Officers Campbell and Palomares had each threatened her with reprisal, punishment and transfer.  Ms. Aloe demands compensation from the United States of America for

the sexual assault, harassment and rape that occurred while she was incarcerated at Coleman Prison Camp, including damages for pain and suffering, psychological trauma, and physical trauma in an amount to be determined at trial.

## COUNT I

## NEGLIGENCE

112.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-111 of this Complaint for Damages as if fully set forth herein.

113.

The Coleman Management Team, the FCI Tallahassee Management Team and the Prison Investigative Agencies owed a duty to Plaintiffs while incarcerated at the Coleman Prison Camp or FCI Tallahassee to "protect public safety by ensuring that federal offenders serve their sentences of imprisonment in facilities that are <u>safe</u>, <u>humane</u>, cost efficient and appropriately <u>secure</u>" as mandated by the BOP.

114.

The Coleman Management Team, the FCI Tallahassee Management Team and the Prison Investigative Agencies breached their duties to Plaintiffs by negligently supervising, managing and retaining the Offending Officers during Plaintiffs' incarceration at the Coleman Prison Camp and FCI Tallahassee.

115.

The Coleman Management Team, the FCI Tallahassee Management Team and the Prison Investigative Agencies breached their duties to Plaintiffs by providing the Offending Officers with <u>unrestricted</u> and <u>unsupervised</u> one-on-one access to Plaintiffs while incarcerated at the Coleman Prison Camp and FCI Tallahassee despite knowledge of the Offending Officers' past sexual abuse and harassment of female inmates.

116.

The Coleman Management Team, the FCI Tallahassee Management Team and the Prison Investigative Agencies breached their duties to Plaintiffs by creating a system where victims of sexual abuse and harassment are punished for reporting the sexual misconduct of prison staff by transfer to more secure facilities, removal from educational and vocational programs, placement in special housing units, loss of early release rights, detrimental write-ups and loss of work privileges.

117.

The Coleman Management Team, the FCI Tallahassee Management Team and the Prison Investigative Agencies breached their duties to Plaintiffs under PREA as follows:

- Section 115.11 – failing to enforce zero tolerance policy
- Section 115.13 – failing to supervise and monitor (video surveillance) one-on-one inmate/officer contact
- Section 115.15 – permitting improper cross-gender pat downs

- Section 115.17 – hiring, promoting and retaining officers who "may" have had improper sexual contact
- Section 115.43 – punishing sex victims with involuntary segregated housing, loss of privileges and work permits
- Section 115.61 – failing to report suspicion of sexual abuse
- Section 115.67 – failing to protect inmates from retaliation after reporting abuse
- Section 115.76 – failing to discipline staff for sexual misconduct

118.

As a direct and proximate cause of the negligence outlined above, the Coleman Management Team, the FCI Tallahassee Management Team and the Prison Investigative Agencies caused damage to Plaintiffs including psychological trauma, emotional distress, depression, physical trauma and pain and suffering.

119.

Plaintiffs are entitled to damages from the United States of America under the Federal Tort Claims Act for the negligence of the Coleman Management Team, the FCI Tallahassee Management Team and the Prison Investigative Agencies in an amount to be determined at trial.

## COUNT II

## ASSAULT AND BATTERY

120.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-119 of this Complaint for Damages as if fully set forth herein.

51

121.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of ***Rachelle Beaubron***, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 51-57 herein. Officer Palomares caused damage to Ms. Beaubron including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

122.

Officer Phillips, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of ***Kristen Goduto***, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 58-63 herein.  Officer Phillips caused damage to Ms. Goduto including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

123.

Officers Urdialez and Vann, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional assault and battery of ***Kara Guggino***, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 64-78 herein. Officers Urdialez and Vann caused damage to Ms. Guggino including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

124.

Officers Palomares and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional assault and battery of ***Sara Hoehn***, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 79-84 herein. Officers Palomares and Phillips caused damage to Ms. Hoehn including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

125.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of *April Johnson*, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 85-88 herein. Officer Palomares caused damage to Ms. Johnson including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

126.

Officers Palomares and Campbell, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional assault and battery of *Terry Nagy-Phillips*, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 89-93 herein. Officers Palomares and Campbell caused damage to Ms. Nagy-Phillips including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

127.

Officers Palomares, Campbell and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional assault and battery of **Ann Ursiny**, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 94-99 herein.  Officers Palomares, Campbell and Phillips caused damage to Ms. Ursiny including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

128.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of **Karen Watson**, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 100-104 herein. Officer Palomares caused damage to Ms. Watson including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

129.

Officers Palomares, Vann and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional assault and battery of **_Carleane Berman_**, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 105-106 herein.  Officers Palomares, Vann and Phillips caused damage to Ms. Berman including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

130.

Officers Palomares, Vann and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional assault and battery of **_Miranda Flowers_**, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 107-108 herein.  Officers Palomares, Vann and Phillips caused damage to Ms. Flowers including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

131.

Officers Campbell and Palomares, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional assault and battery of *Judi Aloe*, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 109-111 herein.  Officers Campbell and Palomares caused damage to Ms. Aloe including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

## COUNT III

## FALSE IMPRISONMENT

132.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-131 of this Complaint for Damages as if fully set forth herein.

133.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, unlawfully detained and deprived *Rachelle Beaubron* of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 51-57

herein.   Officer Palomares caused damage to Ms. Beaubron including

psychological trauma, emotional distress, depression, physical trauma and pain and

suffering for which the United States of America is liable under the Federal Tort

Claims Act in an amount to be determined at trial.

134.

Officer Phillips, acting within the course and scope of his employment with

the BOP as an investigative or law enforcement official, unlawfully detained and

deprived **Kristen Goduto** of her liberty and freedom against her will and consent,

without legal authority or necessity, and for the sole purpose of engaging in non-

consensual sexual abuse and harassment as detailed in paragraphs 58-63 herein.

Officer Phillips caused damage to Ms. Goduto including psychological trauma,

emotional distress, depression, physical trauma and pain and suffering for which

the United States of America is liable under the Federal Tort Claims Act in an

amount to be determined at trial.

135.

Officers Urdialez and Vann, acting within the course and scope of their

employment with the BOP as investigative or law enforcement officials,

unlawfully detained and deprived **Kara Guggino** of her liberty and freedom against

her will and consent, without legal authority or necessity, and for the sole purpose

of engaging in non-consensual sexual abuse and harassment as detailed in

paragraphs 64-78 herein.   Officers Urdialez and Vann caused damage to Ms. Guggino including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

136.

Officers Palomares and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, unlawfully detained and deprived *Sara Hoehn* of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 79-84 herein.   Officers Palomares and Phillips caused damage to Ms. Hoehn including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

137.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, unlawfully detained and deprived *April Johnson* of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 85-88

herein.   Officer Palomares caused damage to Ms. Johnson including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

138.

Officers Palomares and Campbell, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, unlawfully detained and deprived ***Terry Nagy-Phillips*** of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 89-93 herein.   Officers Palomares and Campbell caused damage to Ms. Nagy-Phillips including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

139.

Officers Palomares, Campbell and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, unlawfully detained and deprived ***Ann Ursiny*** of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in

paragraphs 94-99 herein.   Officers Palomares, Campbell and Phillips caused

damage to Ms. Ursiny including psychological trauma, emotional distress,

depression, physical trauma and pain and suffering for which the United States of

America is liable under the Federal Tort Claims Act in an amount to be determined

at trial.

140.

Officer Palomares, acting within the course and scope of his employment

with the BOP as an investigative or law enforcement official, unlawfully detained

and deprived ***Karen Watson*** of her liberty and freedom against her will and

consent, without legal authority or necessity, and for the sole purpose of engaging

in non-consensual sexual abuse and harassment as detailed in paragraphs 100-104

herein.   Officer Palomares caused damage to Ms. Watson including psychological

trauma, emotional distress, depression, physical trauma and pain and suffering for

which the United States of America is liable under the Federal Tort Claims Act in

an amount to be determined at trial.

141.

Officers Palomares, Vann and Phillips, acting within the course and scope of

their employment with the BOP as investigative or law enforcement officials,

unlawfully detained and deprived ***Carleane Berman*** of her liberty and freedom

against her will and consent, without legal authority or necessity, and for the sole

purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 105-106 herein.   Officers Palomares, Vann and Phillips caused damage to Ms. Berman including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

142.

Officers Palomares, Vann and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, unlawfully detained and deprived ***Miranda Flowers*** of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 107-108 herein.   Officers Palomares, Vann and Phillips caused damage to Ms. Flowers including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

143.

Officers Campbell and Palomares, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, unlawfully detained and deprived ***Judi Aloe*** of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of

engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 109-111 herein.   Officers Campbell and Palomares caused damage to Ms. Aloe including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

## COUNT IV

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### 144.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-143 of this Complaint for Damages as if fully set forth herein.

### 145.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional infliction of emotional distress of ***Rachelle Beaubron*** through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 51-57 herein. Officer Palomares' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Beaubron, and

(4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

146.

Officer Phillips, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional infliction of emotional distress of ***Kristen Goduto*** through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 58-63 herein. Officer Phillips' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Goduto, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

147.

Officers Urdialez and Vann, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional infliction of emotional distress of ***Kara Guggino*** through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 64-78 herein. Officer Urdialez' and Officer Vann's conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous

and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Guggino, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

148.

Officers Palomares and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional infliction of emotional distress of *Sara Hoehn* through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 79-84 herein. Officer Palomares' and Officer Phillips' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Hoehn, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

149.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional infliction of emotional distress of *April Johnson* through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 85-88

herein. Officer Palomares' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Johnson, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

150.

Officers Palomares and Campbell, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional infliction of emotional distress of **Terry Nagy-Phillips** through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 89-93 herein. Officer Palomares' and Officer Campbell's conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Nagy-Phillips, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

151.

Officers Palomares, Campbell and Phillips, acting within the course and

scope of their employment with the BOP as investigative or law enforcement

officials, engaged in the intentional infliction of emotional distress of ***Ann Ursiny***

through unwanted, non-consensual sexual abuse and harassment as detailed in

paragraphs 94-99 herein. Officer Palomares', Officer Campbell's and Officer

Phillips' conduct was (1) intentional and reckless with knowledge that emotional

distress would likely result, (2) outrageous and went beyond all bounds of decency

to be tolerated in a civilized community, (3) the direct and proximate cause of the

emotional distress endured by Ms. Ursiny, and (4) severe and damaging for which

the United States of America is liable under the Federal Tort Claims Act in an

amount to be determined at trial.

152.

Officer Palomares, acting within the course and scope of his employment

with the BOP as an investigative or law enforcement official, engaged in the

intentional infliction of emotional distress of ***Karen Watson*** through unwanted,

non-consensual sexual abuse and harassment as detailed in paragraphs 100-104

herein. Officer Palomares' conduct was (1) intentional and reckless with

knowledge that emotional distress would likely result, (2) outrageous and went

beyond all bounds of decency to be tolerated in a civilized community, (3) the

direct and proximate cause of the emotional distress endured by Ms. Watson, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

153.

Officers Palomares, Vann and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional infliction of emotional distress of ***Carleane Berman*** through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 105-106 herein. Officer Palomares', Officer Vann's and Officer Phillips' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Berman, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

154.

Officers Palomares, Vann and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional infliction of emotional distress of ***Miranda Flowers*** through unwanted, non-consensual sexual abuse and harassment as detailed in

68

paragraphs 107-108 herein. Officer Palomares', Officer Vann's and Officer

Phillips' conduct was (1) intentional and reckless with knowledge that emotional

distress would likely result, (2) outrageous and went beyond all bounds of decency

to be tolerated in a civilized community, (3) the direct and proximate cause of the

emotional distress endured by Ms. Berman, and (4) severe and damaging for which

the United States of America is liable under the Federal Tort Claims Act in an

amount to be determined at trial.

155.

Officers Campbell and Palomares, acting within the course and scope of

their employment with the BOP as investigative or law enforcement officials,

engaged in the intentional infliction of emotional distress of **_Judi Aloe_** through

unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs

109-111 herein. Officer Campbell's and Officer Palomares' conduct was (1)

intentional and reckless with knowledge that emotional distress would likely result,

(2) outrageous and went beyond all bounds of decency to be tolerated in a civilized

community, (3) the direct and proximate cause of the emotional distress endured

by Ms. Aloe, and (4) severe and damaging for which the United States of America

is liable under the Federal Tort Claims Act in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs requests that the Court:

1) Grant judgment in favor of Plaintiffs on their claims for Negligence, Assault and Battery, False Imprisonment, and Intentional Infliction of Emotional Distress;

2) Award damages to Plaintiffs in amounts to be determined at trial;

3) Grant Plaintiffs a jury trial on all claims triable by jury; and

4) Grant such other and further relief the Court deems just and proper.

Respectfully submitted this 22nd day of June 2020.

*/s/ Bryan E. Busch*
Bryan E. Busch, Esq. (*Pro Hac Vice*)
bb@bsms.law
BUSCH, SLIPAKOFF, MILLS &
SLOMKA, LLC
Riverwood 100, 21st Floor
3350 Riverwood Parkway
Atlanta, Georgia 30339
(404) 800-4062 (Telephone)
*Attorneys for Defendants*

*/s/ Christopher Y. Mills*
Christopher Y. Mills, Esq.
cm@bsms.law
BUSCH, SLIPAKOFF, MILLS &
SLOMKA, LLC
319 Clematis Street, Suite 109
West Palm Beach, Florida 33401
(561) 408-0019 (Telephone)
*Attorneys for Defendants*

70

# EXHIBIT "A"

March 15, 2019

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Federal Bureau of Prisons
320 First Street, NW
Washington D.C. 20534

     re:     Federal Torts Claim Act (28 USC § 1346 et seq.)

- Beaubrun, Rachelle (Inmate No. 98759004)
- Buchanan, Kayla (Inmate No. 43151074)
- Dimuro, Amanda (Inmate No. 73450004)
- Goduto, Kristen (Inmate No. 62799019)
- Guggino, Kara (Inmate No.53750018)
- Hoehn, Sara (Inmate No. 21278017)
- Johnson, April (Former Inmate No. 18021021)
- Leon, Maggie (Inmate No. 99734004)
- Mora, Rebecca (Former Inmate No. 14860040)
- Nagy-Phillips, Terry (Inmate No. 80019083)
- Reynolds, Lauren (Inmate No. 86893180)
- Ursiny, Ann (Inmate No. 37684013)
- Villalta-Garcia, Cristian (Inmate No. 77171279)
- Watson, Karen (Former Inmate No. 26694180)

To Whom It May Concern:

    This Firm serves as counsel for the above-named federal inmates (collectively "Clients") who were or currently are incarcerated against their will by the United States of America at a female prison camp located within the Coleman Federal Correctional Institution.  The purpose of this letter is to provide notice to the Federal Bureau of Prisons of claims for negligence, assault, battery, false imprisonment and intentional infliction of emotional distress under the Federal Torts Claim Act ("FTCA") (28 USC § 1346 et seq.).  All future communication regarding the claims set forth below or any investigation thereof must be addressed to the undersigned as legal counsel to Clients.

This letter also serves as notice to preserve and protect all evidence related to the claims described herein including, physical/DNA evidence, investigative notes and records, video/audio surveillance, computer records, and electronic communications. Failure to safeguard all evidence related to these actions may result in spoliation claims against the correctional institution, the federal government and its agencies and any individuals involved in the destruction or alteration of evidence.

## Sexual Abuse and Harassment at Federal Prisons

The Federal Bureau of Prisons ("BOP") is a United States federal law enforcement agency responsible for the custody of individuals who have violated federal laws. The BOP's stated mission is to "protect public safety by ensuring that federal offenders serve their sentences of imprisonment in facilities that are safe, humane, cost efficient and appropriately secure." The BOP employs over 35,000 individuals at 122 institutions across the country. The BOP is currently responsible for the custody and care of over 13,000 female inmates incarcerated at 27 separate BOP facilities.

Despite its stated mission, the BOP has created and maintained a sanctuary for male correctional officers to sexually assault and abuse female inmates. The sexual abuse at these female prisons is rampant but goes largely unchecked as a result of cultural tolerance, orchestrated cover-ups and organizational reprisals of inmates who dare to complain or report sexual abuse. This systemic misconduct within the BOP was the subject of a recent U.S. House of Representatives investigation for the Committee on Oversight and Government Report. The nine-page report concluded that misconduct by prison officials is "largely tolerated or ignored altogether" allowing officials to operate outside of the rules. The committee reviewed specific cases where "individuals deemed responsible for misconduct were shuffled around, commended, awarded, promoted or even allowed to retire with a clean record and full benefits before any disciplinary action could apply."

The Prison Rape Elimination Act ("PREA") was signed into law by President Bush in 2003 and applies to all federal facilities managed by the BOP. PREA's goal is to deter the sexual assault of prisoners and to curb prison rape through a zero-tolerance policy. Because the female inmates are fully dependent on the correctional officers for basic necessities and privileges, all sexual contact, with or without the consent of the inmate, is classified as abuse. Sexual abuse and sexual harassment are defined in section 115.6 of the Act as follows:

*Sexual abuse* of an inmate, detainee, or resident by a staff member, contractor, or volunteer includes any of the following acts, <u>with or without consent</u> of the inmate, detainee, or resident:

(1) Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;

(2) Contact between the mouth and the penis, vulva, or anus;

(3) Contact between the mouth and any body part where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(4) Penetration of the anal or genital opening, however slight, by a hand, finger, object, or other instrument, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(5) Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(6) Any attempt, threat, or request by a staff member, contractor, or volunteer to engage in the activities described in paragraphs (1)-(5) of this section;

(7) Any display by a staff member, contractor, or volunteer of his or her uncovered genitalia, buttocks, or breast in the presence of an inmate, detainee, or resident, and

(8) Voyeurism by a staff member, contractor, or volunteer.

<u>Sexual harassment</u> includes

(1) Repeated and unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a derogatory or offensive sexual nature by one inmate, detainee, or resident directed toward another; and

*(2) Repeated verbal comments or gestures of a sexual nature to an inmate, detainee, or resident by a staff member, contractor, or volunteer, including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures.*

## Coleman Federal Correctional Institution

The Coleman Federal Correctional Institution ("Coleman") located in Sumter County, Florida houses approximately 6,000 federal inmates in both low and medium security facilities. The campus includes a minimum-security satellite prison camp housing approximately 500 female inmates. Coleman is operated by the BOP through the United States Department of Justice.

Female inmates at the Coleman female prison camp ("Coleman Prison Camp") are segregated into distinct housing units with dormitory style cubicles for each inmate. The Coleman Prison Camp is operated under a work/camp model where non-violent inmates are afforded work privileges within the Coleman complex. Inmates are subject to daily "counts" but are otherwise free to move around the Coleman Prison Camp subject to specified rules and regulations.[1]

## Correctional Officers

The Coleman Prison Camp employs correctional officers, facilities staff and management to oversee and operate the prison facility. The correctional officers are trained, managed, overseen and paid by the BOP through the United States Department of Justice. The correctional officers are federal employees subjecting the United States of America to liability for improper actions committed within the course and scope of their employment.

The Coleman Prison Camp employed no less than six (6) male correctional officers that routinely sexually abused and harassed our Clients. These individuals included Officers Palomaris, Kuilan, Phillips, Vann, Gonzalez and Laudenstager (collectively "Offending Officers").

- Officer Palomaris
  Age – late 30s
  Race - Hispanic

---

[1] This demand also encompasses instances of abuse at FCI Tallahassee, Florida, a low security federal prison for female inmates operated by the BOP.

Position – Officer in charge of housing unit
Removed from Coleman in 2018

- Officer Kuilan
  Age – unknown
  Race – Hispanic
  Position – Officer in charge of commissary warehouse
  Currently employed at Coleman

- Officer Phillips
  Age – late 40s
  Race - Caucasian
  Position – Officer in charge of general maintenance
  Currently employed at Coleman

- Officer Vann
  Age – late 40s
  Race - Caucasian
  Position – Officer in charge of landscape
  Currently employed at Coleman

- Officer Gonzalez
  Age – unknown
  Race – Hispanic
  Position – Front lobby officer in charge of pen II
  Currently employed at Coleman

- Officer Laudenstager
  Age – late 50s
  Race – Caucasian
  Position – Officer in charge of kitchen
  Retired from Coleman in 2018

The Offending Officers were known sexual predators to the administration at the Prison Camp, including Warden O'Cassio, Investigator DeCamilla and Dr. Ojeda. The Offending Officers have been investigated on numerous occasions for sex crimes against female inmates and the administration is well aware of the female inmates' reluctance to come forward with information for fear of reprisal including transfer to a different facility, disciplinary segregation, loss of early

release rights, detrimental write-ups and loss of work privileges. In fact, the administration instituted a strict policy whereby inmates complaining of mistreatment by prison officials were automatically removed to a local county detention center. This relocation policy <u>intentionally</u> suppressed complaints of misconduct as the county facilities are higher levels of security and do not permit the work details allowed at the Coleman Prison Camp.

Despite the known issues of abuse, the Coleman Prison Camp granted the Offending Officers direct contact with female inmates including supervising work details which granted them one on one access. The Offending Officers used their position of authority to threaten and coerce the female inmates into engaging in sexual activities and keep the abuse quiet for fear of immediate retaliation. The Offending Officers also used their access to personal history files, telephone call recordings, and personal emails giving them additional leverage to extract sexual favors and threaten the safety of the inmates.[2]

## PREA Annual Audits

As mandated by PREA, the BOP conducts annual PREA audits ("Audits") at each federal prison facility. The annual Audits for Coleman are <u>materially</u> incomplete as the auditors failed to interview any female inmates that were involved in or witness to PREA violations. The reports suggest that these female inmates were not available for interview as they had been transferred to another prison facility. The failure to interview victims of PREA violations undermines the Audit results and incentives Coleman to transfer victims of sexual abuse rather than cooperate with a thorough PREA investigation. By transferring victims of sexual abuse, Coleman shields itself from legitimate investigation and suppresses complaints by punishing the victims.

The Coleman transfer policy also demonstrates the BOP's failure to put the rights of the victims ahead of its own economic interest. Before any BOP employee can be punished, transferred or reassigned for sexual abuse, administrators must carefully navigate the collective bargaining agreement. In almost every instance, the collective bargaining rights of the employees outweigh the rights of the victim and it is the victim that receives the full weight of punishment by the transfer. In no other context are the rights of the sexually abused subordinated to the economic interests of the institution.

---

[2] This demand also includes details of sexual abuse by Lieutenant Urdialez at FCI Tallahassee who is included as an Offending Officer as defined above.

## Causes of Action

The BOP, Warden O'Cassio, Lieutenant DeCamilla, Dr. Ojeda and many other Coleman administrators are directly responsible for the <u>negligent</u> hiring, retention, training, reporting and supervision of the Offending Officers including failure to follow and enforce the following PREA regulations:

- Section 115.11 - failing to enforce zero tolerance policy
- Section 115.13 - failing to supervise and monitor (video surveillance) one-on-one inmate/officer contact
- Section 115.15 - permitting improper cross-gender pat downs
- Section 115.17 - hiring, promoting and retaining officers who "may" have had improper sexual contact
- Section 115.43 - punishing sex victims with involuntary segregated housing, loss of privileges and work permits
- Section 115.61 - failing to report suspicion of sexual abuse
- Section 115.67 - failing to protect inmates from retaliation after reporting abuse
- Section 115.76 - failing to discipline staff for sexual misconduct

The Offending Officers, acting within the course and scope of their employment with the BOP, engaged in sexual abuse and harassment of the female inmates as prohibited and defined by PREA.  The intentional misconduct detailed below gives rise to Florida state law claims for assault and battery, false imprisonment and intentional infliction of emotional distress.

## Equitable Tolling

The FTCA provides for a two-year statute of limitation in which to initiate proceedings against the United States from the date the alleged wrong occurred. Federal courts interpreting this statute of limitations debated whether this was a complete jurisdictional limitation or was subject to traditional rules of tolling such as fraud, discovery of new evidence, discovery of wrongdoing, discovery of damages, capacity or access to legal representation.  In 2015, the United States Supreme Court in <u>United States vs. June</u> (135 S. Ct. 1625) settled the debate and concluded that the FTCA's limitation period may be tolled based on the traditional principles of equitable extensions accepted by federal and state courts.

A few of the instances of abuse detailed below began prior to the two-year window contemplated by the FTCA.  In those instances, however, the principles of equitable tolling will apply as the abuse continued up through and including the present date, the inmates were not given the opportunity to seek legal counsel, the inmates were in fear of reprisal from the prison for any reported instances of sexual abuse, and the inmates were wards of the federal government and were fully dependent on the prison officers for basic necessities and privileges.

We look forward to your timely response.

Sincerely,

Bryan E. Busch

### BEAUBRUN, RACHELLE

(Inmate No. 98759004)

| | |
|---|---|
| Date of Birth | June 1, 1971 |
| Race | African American |
| Hair | Black |
| Home | Florida |
| Family | Adult Children in Florida |
| Education | GED |
| Location | Coleman Federal Prison |
| Conviction | Conspiracy to Commit Wire Fraud and Identity Theft |
| Sentence Length | 8.5 years |
| Release Date | June 2019 |
| Coleman Arrival | September 2013 |

Ms. Beaubrun arrived at Coleman in September 2013 after stays at three other institutions. She is serving her 8.5 year sentence for conspiracy to commit wire fraud and identity theft. Ms. Beaubrun is scheduled to go to the half-way house in Fort Lauderdale, Florida in June 2018.

Shortly after her arrival at Coleman in September 2013, Officer Palomaris began sexually harassing Ms. Beaubrun. Palomaris began making comments to her about her body and described sex acts he wanted her to perform. Palomaris then moved into grabbing and fondling her for brief moments when he was able to find her alone in certain areas of the compound that are not under surveillance. Palomaris would threaten her by saying that he could make her time at Coleman easy or hard depending on how she responded to his advances.

Ms. Beaubrun also became aware that other female inmates were subjects of officer abuse and when any formal complaints were made with the administration the complaining inmates were immediately sent to the county jail. All of the inmates feared going to the county jail because it was a higher security prison with no educational or work opportunities. Ms. Beaubrun tried to avoid Palomaris as much as possible and tried never to be alone around him. She was able to keep her distance for several months until 2014 when Palomaris was on duty for visitation. As Ms. Beaubron was being checked back in from visitation, Palomaris ordered her into the "search room" off of the visitation area. Once inside, he closed all of the doors and began kissing her mouth and neck. He then lifted up her shirt and began fondling her breasts. He then put his hands down her pants and put his fingers inside her vagina. After several minutes he pulled his penis out and told Ms. Beaubrun to "suck my dick." She then proceeded to give Palomaris oral sex and as he was about to ejaculate, she tried to pull her mouth away from his penis. He forced her head down on his penis and ejaculated into her mouth forcing her to swallow his semen.

This incident terrified Ms. Beaubron and she managed to stay clear of Palomaris for several months. Then again in 2016, Palomaris found her alone near the staff rest room between F1 and F2. He pushed her inside the rest room and told her not to make a sound. He then touched her breasts, inserted his fingers into her vagina and demanded that she perform oral sex on him again. Ms. Beaubron reluctantly followed his instructions and he once again ejaculated in her mouth forcing her to swallow his semen.

Thereafter, Palomaris was either suspended or relocated to another area of Coleman away from the female inmates. Then in 2017, Ms. Beaubron was transferred to Illinois for the residual drug program. She returned to Coleman in 2018 and was once again sexually abused by Palomaris in the staff rest room between F1 and F2. Again, he touched her breasts and vagina and required her to perform oral sex. This was the third incident of sexual abuse suffered by Ms. Beaubron. Palomaris was removed from Coleman shortly thereafter and Ms. Beaubron reports no further incidents.

Ms. Beaubron did not report these incidents because it is common knowledge among the inmate population that when you report an incident, the reporting inmate is removed from Coleman and transferred to county jail while an investigation takes place. As a result of these sexual assaults and harassment, Ms. Beaubron has suffered extensive psychological trauma, depression, pain and

suffering and is in constant fear of being trapped alone with another abusive officer.  Ms. Beaubron demands compensation from the federal government for this abuse in an amount of **$1,425,000**.

## GODUTO, KRISTEN

(Inmate No. 62799019)

| | |
|---|---|
| Date of Birth | 10/09/1983 |
| Race | Caucasian |
| Hair | Brown |
| Home | Georgia |
| Family | Parents in Georgia |
| Education | High School |
| Location | Coleman Federal Prison |
| Conviction | Conspiracy to Distribute Oxycodone |
| Sentence Length | 10 years |
| Release Date | 08/01/2020 |
| Coleman Arrival | August 2015 |

---

    Ms. Goduto pleaded guilty to Conspiracy to Distribute Oxycodone and was sentenced to 10 years in federal prison beginning in 2011. She was sent to several different detention centers before arriving at Coleman in August 2015. Shortly after her arrival, she began working in general maintenance under the direction and supervision of Officer Phillips. Ms. Goduto was approached by another inmate at the direction of Officer Phillips to gauge her interest in a sexual relationship with Officer Phillips. She declined and Officer Phillips began speaking directly to Ms. Goduto. At first he spoke generally about sex saying that it must be really hard for her to go without sex for so long and that he could help her with her sexual urges. Towards the end of 2015, his sexual advances intensified and he forced Ms. Goduto to show him her breasts behind his office at facilities by threatening to kick

her out of the maintenance group unless she showed him whether they were "real of fake."

Thereafter, Officer Phillips began stalking Ms. Goduto by showing up in her unit unannounced and pushing his way into her actual room.  Officer Phillips starting bringing her small gifts such as lotions and face creams always saying that Ms. Goduto would "pay him back."  On one occasion while she was exercising, Officer Phillips demanded that she get in his truck and drove her to the edge of the campus.  He pulled out his penis and asked Ms. Goduto to "suck his dick."  When another vehicle approached, he put his pants back on and drove her back to the main unit.

In 2016, the maintenance team was painting the parking lot at the low FCI when Officer Phillips against asked Ms. Goduto to get into his truck.  This time, he drove her to the back of the facility where a semi-truck was parked.  He ordered her to get out and go inside.  He forced her onto a mattress in the back of the truck and told her to get undressed.  He took all of his clothes off and pulled out a condom placing it on his penis.  He removed Ms. Goduto's bra and began kissing on her breasts.  When he tried to remove her panties, she told him she was on her "period" and begged him not to rape her.  Officer Phillips stopped but said next time she "better be ready."

Officer Phillips continued his sexual advances towards Ms. Goduto but she had wised up to his games and refused to go anywhere alone with him.  She lives in fear that she will be trapped alone with him or some other guard.

In 2017, Ms. Goduto was approached by Dr. Ojeda and Lieutenant DeCamilla about wearing a wire and trying to entrap some of the male officers at Coleman that were sexually assaulting the female inmates.  Ms. Goduto agree to cooperate but was informed that the FBI did not approve the operation.

Ms. Goduto did not fully report these incidents of abuse for fear of reprisal.  As a result of these sexual assaults and harassment, Ms. Goduto has suffered extensive psychological trauma, depression, pain and suffering and is in constant fear of being trapped alone with another abusive officer.  Ms. Goduto demands compensation from the federal government for this abuse in an amount of **$425,000**.

## GUGGINO, KARA

(Inmate No.53750018)

Age            35

Race           Caucasian/Italian

Hair           Black

Home           Florida

Family         Parents in Florida

Education      USF Criminology Degree (1 semester remaining)

Location       Coleman Federal Prison

Conviction     Armed Robbery

Sentence Length  10 years

Release Date   2-2-21

Coleman Arrival  April 2018

---

Ms. Guggino pleaded guilty to armed robbery and was sentenced to 10 years in federal prison beginning in 2012. She was initially sent to the federal prison in Tallahassee, Florida known as FCI Tallahassee. Several years into her sentence, Ms. Guggino started a job in the kitchen at FCI Tallahassee. After a few months, she noticed that a Lieutenant Urdialez began following her to work in the early morning hours. After several weeks, Urdialez started making comments to her about her private phone calls and emails with her family and admitted he had been "checking up" on her. One morning while Ms. Guggino was walking to work, Urdialez noticed that she was sick and offered to walk her to the medical office so he could get her out of work for the day. While at the medical office, Urdialez told her he would get her out of the kitchen job and she could work with him as an

orderly.  Urdialez told her there was a long wait list for the job but that he would move her to the top.

Several days later, Urdialez barged into Ms. Guggino's room without knocking while she was getting dressed and informed her he had been in an email battle with the captain's secretary, Daisy Solado, about the open position as his orderly.  Urdialez showed Ms. Guggino the emails and said she could start working for him the next week.  Ms. Guggino started immediately working as Urdialez's night orderly, after the 9:00 pm count along with another inmate, Kathy Navarro who is still housed at FCI Tallahassee.  After several weeks at the new job, Urdialez began making sexual comments about things he would like to do to Ms. Guggino and referred to her as "forbidden fruit."  One day he called all of the day and nighttime orderlies into his office and explained that one of them had leaked confidential information and he had to interview each one of them individually. He called Ms. Guggino into his office for the interview and when she arrived the lights were turned off.  Urdialez asked Ms. Guggino if she know why she had been called to his office.  When she answered no, Urdialez walked over to Ms. Guggino and began kissing her.  He then put his hands under her shirt and started fondling her breasts.  He then reached his hand into her pants and inserted his fingers into her vagina.  When he removed his fingers, he licked them and told Ms. Guggino not to tell anyone what happened.  He went on to say that he could make her life "easy or hard" depending on her cooperation with his sexual advances and instructed her not to wear panties to work.  This first sexual encounter ended with Urdialez threatening Ms. Guggino "not to do or say anything to make me mad."

Several days after this first encounter, Urdialez ushered Ms. Guggino upstairs to a conference room above his office.  When they walked in, Urdialez spread a blanket on the floor and ordered Ms. Guggino to undress.  After removing her clothes, he instructed her to lie down on the blanket and spread her legs.  He then proceeded to perform oral sex on Ms. Guggino.  After several minutes his name was called over his prison radio and he instructed Ms. Guggino not to leave the room while he was gone.  Before leaving the room, Urdialez pulled out his handcuffs and attempted to handcuff her to the table but could not see in the dark. He then left the room carrying Ms. Guggino's clothes and locked the door behind him.  Ms. Guggino waited naked in the conference room for his return.  When

Urdialez finally returned, he removed his belt and pants, got on top of Ms. Guggino and raped her without the use of a condom.

Urdialez then began bringing food, treats, alcohol and sleeping pills for both Ms. Guggino and Ms. Navarro in exchange for the sexual abuse of Ms. Guggino and the silence of Ms. Navarro. Urdialez began putting money on Ms. Guggino's books and sending her emails under the name of Ronald Enrst. After the initial sexual assault, Urdialez forced Ms. Guggino to engage in sexual intercourse or oral sex at least one time per week.

On most occasions, Urdialez asked Ms. Guggino to remove her pants and bend over items such as tables, chairs etc.. so he could rape her from behind. On one Halloween night, Urzialez took Ms. Guggino to an upstairs room in G-Unit. Urdialez removed Ms. Guggino's clothes and demanded that she bend over a table. He then raped her from behind and on this particular occasion ejaculated into her vagina. When Ms. Guggino went to the bathroom to clean up, she noticed semen in her panties and dripping out of her vagina. Urdialez barged into the women's bathroom and observed Ms. Guggino cleaning semen out of her vagina. The next day, Urdialez showed up in Ms. Guggino's unit and saw her and her roommate, Inmate Leya Stapleton, across the compound. He ran to meet them and handed Ms. Guggino the "morning after pill" right in front of Inmate Stapleton.

Urdialez became increasingly more controlling of Ms. Guggino and her movements within the prison. He would show up at odd times, odd places and even on his days off to monitor her behavior and to make sure she did not disclose his misconduct to anyone. One night in his office, Urdialez showed Ms. Guggino her home residence on Google Maps. Urdialez reminded Ms. Guggino not to tell anyone about their "relationship" and even suggested he would buy a house in her parents' neighborhood to be with her. The rape became more violent and Urdialez attempted on several occasions to handcuff Ms. Guggino to various items. Ms. Guggino became terrified by the abuse and believed Urdialez would physically harm her if she upset him in any way. Urdialez also began reading her personal emails and listening to her phone calls and became enraged when he realized she had communications with other men.

When prison administrators heard rumors about Ms. Guggino and Urdialez, they punished Ms. Guggino instead of terminating Urdialez' employment. Prison officials placed Ms. Guggino into the special housing unit ("SHU") as punishment for the alleged involvement with Urdialez on three separate occasions. While in the SHU, Ms. Guggino was under 23 hour lock down with no phone, no email and no work privileges. Ms. Guggino was questioned repeatedly about her "relationship" with Urdialez but was too scared to report the abuse as Urdialez was sending her cards and emails while in the SHU under the name of Ronald Ernst warning her "not to make him mad" and she feared further retaliation from prison officials. Ms. Guggino spent months in and out of SHU.

After her release from SPU, Ms. Guggino was given a new job and Urdialez was moved to an adjacent facility on the complex. Urdialez was eventually moved back to FCI and he immediately continued his abuse of Ms. Guggino. Undeterred by the privacy afforded him when Ms. Gugginio served as his night orderly, Urdialez began following Ms. Guggino around the compound and her unit. When the opportunity presented, he would force Ms. Guggino into stair wells or closets to continue the sexual abuse and rape.

Ms. Guggino was eventually moved from FCI Tallahassee to a facility in Alabama. Prior to her departure, Urdialez showed up on his off day in plain clothes and had the on-duty officer call her to the front of her unit. The on-duty female officer locked the doors to both sides of the units and the door to the officer's station shutting them both inside. Urdialez gave Ms. Guggino three magazines in a white envelope. Urdialez reminded Ms. Guggino not to tell anyone about their "relationship" or she would be in trouble and lose any time off privileges she had earned while in prison. Urdialez let Ms. Guggino know that she was his and he would find a way for them to be together.

When she arrived in Alabama, Ms. Guggino discovered that most of her personal property had been confiscated including clothes, shoes, a bible and a personal journal where she had written about the sexual abuse of Urdialez. Ms. Guggino took this as a threat not to mention anything about Urdialez. Immediately upon her arrival in Alabama, the psychology staff began harassing Ms. Guggino, making her feel as if she was being punished by the change in prison facilities and shuttling her in and out of SPU. Ms. Guggino continued to lie for her own

protection. Finally, representatives from OIG took over the interrogations and threatened Ms. Guggino to add five years to her sentence if she did not tell them about her "relationship" with Urdialez. As Urdialez told Ms. Guggino that he had "friends" at the OIG, she provided only limited information to try and stay out of trouble.

After her meeting with OIG, she was moved yet again to Coleman in April 2018. She began working landscaping with Officer Vann. Officer Vann began immediately making sexual comments saying he wanted to "fuck" Ms. Guggino and that she looked like the type of woman that liked to have a good time. On several occasions Officer Vann followed Ms. Guggino into the tool room grabbing her breasts, buttocks and vagina on the outside of her clothes and rubbing his body against her body pushing his penis into her. On two separate occasions, Officer Vann picked Ms. Guggino up from a job site in his vehicle, grabbed her hand and placed it onto his penis. When other officers became aware that Ms. Guggino was refusing Officer Vann's sex attempts, they because hostile with her. Both Officer Phillips and Officer Cladder verbally abused Ms. Guggino by calling her a "bitch" for not "playing ball." Ms. Guggino was recently removed from the landscaping job. Unbelievably, Urdialez is still employed at FCI and recently drove a van to Coleman in some sort of prisoner transfer. Ms. Guggino observed him from a distance but ran the other way when he started walking towards her.

Ms. Guggino did not fully report these incidents of abuse for fear of reprisal. As a result of these sexual assaults and harassment, Ms. Guggino has suffered extensive psychological trauma, depression, pain and suffering and is in constant fear of being trapped along with another abusive officer. Ms. Guggino demands compensation from the federal government for this abuse in an amount of **$5,250,000**.

### HOEHN, SARA

(Inmate No. 21278017)

| | |
|---|---|
| Age | 30 |
| Race | Caucasian |
| Hair | Black |
| Home | Panama City, Florida |
| Family | 3 minor children |
| Education | High School |
| Location | Coleman Federal Prison |
| Conviction | Conspiracy to Possess and Distribute Methamphetamine |
| Sentence Length | 27 years |
| Release Date | 11/12/2032 |
| Coleman Arrival | October 2016 |

Ms. Hoehn was convicted by a federal jury in 2012 of conspiracy to possess and distribute methamphetamine and was sentenced to 27 years in federal prison. She arrived at Coleman in October 2016. Within a few months of her arrival, Officer Palomaris began making sexually explicit comments to Ms. Hoehn asking for sexual favors and discussing various sexual acts. In April 2017, Palomaris suddenly appeared in Ms. Hoehn's cubicle, walked up behind her and pressed his pelvis into her behind. He began kissing her behind the ear while rubbing his hands over her breasts and her vagina. Ms. Hoehn froze in fear. He moved away

when he heard someone walking down the hall way and told Ms. Hoehn not to be scared of him and not to tell anyone what happened or she would get "locked up."

Several weeks later, Palomaris again appeared in Ms. Hoehn's room while she was folding clothes on the floor. He squatted down behind her and began rubbing his hands over her breasts and vagina. Ms. Hoehn asked him to stop but he refused saying "I will bring you whatever you want if you let me have this." Ms. Hoehn tried to push him away but he would not stop until he heard someone walking down the hallway. These surprise visits in her cubicle continued for several months until Officer Palomaris was suspended from the Coleman facility.

Ms. Hoehn was also the target of sexual assault from Officer Phillips. Phillips began making sexually explicit comments to Ms. Hoehn including repeatedly asking her for sexual favors. The comments quickly escalated into sexual abuse as Phillips would approach Ms. Hoehn from behind, grab her around the waist and press his penis into her rear end. He would then grab the front of her pockets and push her against walls, chairs, couches or anything else that might be around. He would then press his hips into her rear end while grabbing her breasts. On one occasion while Ms. Hoehn was seated on a couch, Phillips walked out of the bathroom with his penis out of his pants and headed straight for her. Ms. Hoehn ran outside and got on her lawnmower. Phillips ran after her and pretended to start the mower while he was rubbing her body over her clothes. Officer Phillips would threaten Ms. Hoehn not to make any sounds and would only stop if he heard someone entering the hallway.

Ms. Hoehn did not report these incidents for fear of reprisal. As a result of these sexual assaults and harassment, Ms. Hoehn has suffered extensive psychological trauma, depression, pain and suffering and is in constant fear of being trapped along with another abusive officer. Ms. Hoehn demands compensation from the federal government for this abuse in an amount of **$375,000**.

### JOHNSON, APRIL

(Former Inmate No. 18021021)

| | |
|---|---|
| Date of Birth | January 1979 |
| Race | Caucasian |
| Hair Color | Brown |
| Home State | Georgia |
| Family | Three Children |
| Education | High school |
| Location | Recently Released to Georgia on "hardship exemption" |
| Conviction | Conspiracy to Manufacture Methamphetamines |
| Sentence Length | 8 years |
| Release Date | Released |
| Coleman Arrival | 2015 |

Ms. Johnson arrived at Coleman in 2015 serving the remainder of her 8-year sentence for a conviction on Conspiracy to Manufacture Methamphetamines. While at Coleman, Ms. Johnson was enrolled in the plumbing apprenticeship program.

Starting in 2016, Officer Palomaris began harassing, sexually abusing, and physically fondling Ms. Johnson. Officer Palomaris would use his position as housing coordinator and order Ms. Johnson to work the "shed" on a regular basis. Palomaris was aware that Ms. Johnson knew of his ongoing sexual relationship

with her then cellmate and he would routinely ask Ms. Johnson to join them in a "threesome." Palomaris would walk by her cubicle and shake his work shed keys at her insinuating that he would meet Ms. Johnson in the work shed for sex (as he explicitly told her on numerous occasions). Palomaris used the shaking of his keys to symbolize "meet me in the work shed for sex."

Palomaris would come into Ms. Johnson's cell and interact with Ms. Johnson and her then cellmate (she now has a different cellmate). Ms. Johnson would act like she was asleep when he entered her cell so she would not have to interact with him as he made her feel uncomfortable. One time, Palomaris begin touching Ms. Johnson's vagina through her clothes in an attempt to wake her up for sex. On one occasion, Palomaris entered her cubicle and grabbed Ms. Johnson's hips in a very sexually aggressive manner and thrust himself against her backside. On a regular basis, Palomoris had physical and sexual contact with Ms. Johnson's then cellmate while she was in the cell.

Ms. Johnson did not report these incidents for fear of reprisal and because she did not want to lose her plumbing apprenticeship. As a result of these sexual assaults and harassment, Ms. Johnson has suffered extensive psychological trauma, depression, and pain and suffering. Ms. Johnson demands compensation from the federal government for this abuse in an amount of **$225,000**.

## NAGGY-PHILLIPS, TERRI LYNN

### (Inmate No. 80019083)

Date of Birth          12/1970

Race                   Caucasian

Hair Color             Blonde

Home State             Michigan

Family                 Husband Craig Phillips incarcerated in West Virginia

Education              GED

Location               FCC Coleman Federal Camp

Conviction             Wire fraud and conspiracy

Sentence Length        12 years

Release Date           03/17/2022

Coleman Arrival    December 2012

---

Ms. Phillips arrived at Coleman in December 2012 serving the remainder of a 12 year sentence for wire fraud and conspiracy to commit wire fraud.  Ms. Phillips is currently enrolled in the electrician apprenticeship program at Coleman.

Beginning in 2017, Officer Campbell took an interest in Ms. Phillips and began trying to engage her in personal conversations.  He sent emails to her prison account and after review of her personal file, discovered that they were both from

Michigan. He used this and other information regarding Ms. Phillips to try and gain her trust and manipulate her into believing he controlled her time at Coleman. In December 2017, Ms. Phillips was ordered to the guard station after hours ("Message Center") by Officer Campbell to inspect a light switch malfunction. While working on the light switch, Officer Campbell came up from behind and very firmly pressed his full body, crotch first, against the backside of Ms. Phillips pinning her between the wall and a trash can. Ms. Phillips was physically unable to struggle or push back as Campbell over powered her. After several hard thrusts into her backside, Campbell walked away leaving Ms. Phillips to finish her work. This incident took place in an area of Coleman where there is no video surveillance.

On New Year's Eve 2017, Ms. Phillips was instructed to obtain a microwave for a party that was to occur later that day. The microwave was located in the electrical work shed. Campbell insisted that he escort Ms. Phillips to the electrical work shed. Officer Campbell followed Ms. Phillips into the electrical work shed, closed the door behind them and ordered Ms. Phillips to take a seat on the couch. Officer Campbell then instructed Ms. Phillips to take off her sweatshirt as he began removing her pants. Officer Campbell kissed Ms. Phillips, laid her backwards on the couch, straddled her horizontally, and pushed his penis inside of her. He then proceeded to have sexual intercourse with Ms. Phillips. Officer Campbell asked Ms. Phillips if she could get pregnant and after she said "no" he proceeded to ejaculate into her vagina. After they left the electrical work shed, Ms. Phillips carried the Microwave while Officer Campbell carried her sweatshirt as if nothing had occurred.

Ms. Phillips was concerned about reporting the rape for fear of reprisal including being removed to a county facility. As a result of the sexual abuse of Ms. Phillips at the hands of Officer Campbell, Ms. Phillips has suffered extensive psychological trauma, depression, pain and suffering and is fearful of being caught alone by one of the correctional officers again. Ms. Phillips demands compensation from the federal government for this abuse in an amount of **$2,750,000**.

## URSINY, ANN ELIZABETH

(Inmate No.37684013)

| | |
|---|---|
| DOB | 10/01/1963 |
| Race | Caucasian |
| Hair | Black |
| Home | Richmond, Indiana |
| Family | 5 adult children |
| Location | Coleman Federal Prison |
| Conviction | Mortgage Fraud |
| Sentence Length | 15 years |
| Release Date | 04/24/2021 |
| Coleman Arrival | 2012 |

Ms. Ursiny pled guilty to mortgage fraud and was sentenced to 15 years in a federal penitentiary. She arrived at Coleman in July 2012. Within a few months of her arrival, Officer Palomaris began making sexually explicit comments to Ms. Ursiny asking for sexual favors and discussing various sexual acts. Ms. Ursiny repeatedly told Palomaris she was not interested but he persisted telling her one day "I will have you." In May 2014, Ms. Ursiny was visited by her husband. When the visit ended, Ms. Ursiny followed procedure and walked to the bathroom located in the corner that can be accessed from the compound. Officer Palomaris

was checking the inmates out from visitation on this particular day. Ms. Ursiny entered the bathroom with another inmate, Larue Terry, and waited to be checked out. Officer Palomaris instructed Ms. Terry to leave the bathroom saying "only one inmate at a time." Palomaris then locked all access to the bathroom leaving him and Ms. Ursiny alone. He then told Ms. Ursiny "come on party girl you know what to do." Ms. Ursiny froze in fear as Officer Palomaris began patting her down. He started at her neck and began working his way down her body. He then began squeezing and fondling her breasts for several minutes. He stopped only to tell her "your tits feel good party girl." He then started rubbing her stomach and worked his way down to her pelvis. He started lightly rubbing her vagina and then began squeezing her butt. He worked his way down her legs and then returned to rubbing her vagina. After several minutes he stopped and said "I told you I would get you."

This incident traumatized Ms. Ursiny to the point she was terrified to have any additional visitors for fear of being assaulted after visitation was completed. For over four years she did not have one visitor come to Coleman to see her.

Ms. Ursiny was also the target of sexual harassment from Officers Campbell and Phillips. Mr. Phillips began making sexually explicit comments to Ms. Ursiny and exposed his penis to her on several occasions. Mr. Campbell constantly asked Ms. Ursiny for sexual favors saying she was "number three on the list of inmates he wanted to fuck." Officer Campbell would listen to her telephone calls and harass her about personal issues, such as her impending divorce.

As a result of these persistent sexual assaults and harassment, Ms. Ursiny has suffered extensive psychological trauma, depression, pain and suffering and is fearful of being caught alone by one of the correctional officers. Ms. Ursiny demands compensation from the federal government for this abuse in an amount of **$425,000**.

## WATSON, KAREN

(Former Inmate No. 26694180)

| | |
|---|---|
| DOB | 5/24/82 |
| Race | Hispanic |
| Hair | Black |
| Home | Clairmont, Florida |
| Family | Mother and minor son in Florida |
| Education | University of Phoenix |
| Location | Republic of Panama |
| Conviction | Bank Fraud |
| Sentence Length | 5 years |
| Release Date | Released |
| Coleman Arrival | March 2017 |

Ms. Watson arrived at Coleman in March 2017 serving the remainder of a 5 year sentence for bank fraud. Within weeks of her arrival, Officer Palomaris began stalking Ms. Watson telling her that they needed to talk privately or she was going to be in trouble. In August 2017, Palomaris told Ms. Watson it was time to have their talk and instructed her to go to his release and detain office near the visitation room. Once in his private office, Palomaris told Ms. Watson that it was time to "play nice" or she could lose her camp status. He then proceeded to show Ms.

Watson a google map view of her mother's house in Clairmont, Florida where her 6 year old son lives. Palomaris explained that he "knew all about" Ms. Watson and encouraged her to "play nice" or bad things could happen to her family. Palomaris gave Ms. Watson the google map print out which she has provided to counsel for safe keeping.

Ms. Watson was terrified of Palomaris and managed to stay clear of him for several months. Finally, in October 2017, Palomaris caught Ms. Watson in the hallway between F1 and F2 and pushed her into an open closet. He placed his radio and keys on the table and kept the lights off to avoid detection. Palomaris took his pants down and instructed Ms. Watson to do the same. He then had sexual intercourse with her but could not keep or maintain his penis in her vagina. Palomaris became frustrated and instructed Ms. Watson to "suck his dick." Ms. Watson then performed oral sex on Palomaris in the closet and he ejaculated into her mouth forcing her to swallow his semen. Palomaris insulted Ms. Watson by telling her she did not know how to "suck dick" and that Ms. Watson should be grateful that Palomaris was giving her attention.

In January 2018, immigration authorities came to Coleman and transferred Ms. Watson to a holding facility before she was deported back to her home country of Panama. Prior to her transfer from Coleman, Ms. Watson attempted to give notice of the rape to officials by placing a hand-written note from "Inmate Karen" into the grievance box and then delivering a second-hand written note with her full name to a female employee in the administrative office. While in the holding facility, Ms. Watson was placed in contact with Sergeant Harvey (Florida PREA Coordinator) and was also interviewed via telephone by SIS Lieutenant DeCamilla from Coleman. None of these officials offered Ms. Watson any assistance but Lieutenant DeCamilla did apologize to her for "what happened" stating that we know there is a problem with Officer Palomaris.

Ms. Watson also began psychological therapy with Dr. Sally I Haynes before being deported back to Panama. Dr. Haynes concluded that Ms. Watson exhibited symptoms of trauma, PTSD, and intrusive memories as a result of the rape. Since her arrival in Panama, Ms. Watson suffers from extreme depression, PTSD and is suicidal.

Ms. Watson demands compensation from the federal government for the sexual assault, harassment and rape that occurred while she was incarcerated at Coleman, including damages for pain and suffering and psychological trauma.  Ms. Watson demands payment in the amount of **$2,750,000** for her injuries.



**BSMS**
Busch, Slipakoff, Mills & Slomka, LLC

Atlanta, GA | West Palm Beach, FL
www.bsms.law

**December 20, 2019**

<u>**VIA CERTIFIED MAIL**</u>
<u>**RETURN RECEIPT REQUESTED**</u>
Federal Bureau of Prisons
320 First Street, NW
Washington D.C. 20534

      re:   Federal Torts Claim Act (28 USC § 1346 et seq.)

          • Carleane Berman

To Whom It May Concern:

     This Firm serves as counsel for the above-named individual (hereafter "Client") who was incarcerated against her will by the United States of America at a female prison camp located within the Coleman Federal Correctional Institution in Sumter County, Florida (hereafter "Coleman"). The purpose of this letter is to provide notice to the Federal Bureau of Prisons of claims for negligence, assault, battery, false imprisonment and intentional infliction of emotional distress under the Federal Torts Claim Act ("FTCA") (28 USC § 1346 et seq.). All future communication regarding the claims set forth below or any investigation thereof must be addressed to the undersigned as legal counsel to Client.

     This letter also serves as notice to preserve and protect all evidence related to the claims described herein including, physical/DNA evidence, investigative notes and records, video/audio surveillance, computer records, and electronic communications. Failure to safeguard all evidence related to these actions may result in spoliation claims against the correctional institution, the federal government and its agencies and any individuals involved in the destruction or alteration of evidence.

**Atlanta, GA Office**
3350 Riverwood Pkwy. Ste. 2100
Atlanta, GA 30339

**West Palm Beach, FL Office**
319 Clematis Street, Suite 109
West Palm Beach, FL 33401

Coleman is operated by the BOP through the United States Department of Justice. Coleman employs correctional officers, facilities staff and management to oversee and operate the prison facility. The correctional officers are trained, managed, overseen and paid by the BOP. The correctional officers are federal employees subjecting the United States of America to liability for improper actions committed within the course and scope of their employment.

Coleman employed three (3) male correctional officers (Palomaris, Vann and Phillips) (hereafter "Offending Officers") that routinely sexually abused and harassed our Client during the time she was incarcerated at Coleman. The Offending Officers were known sexual predators and had been investigated on numerous occasions for sex crimes against female inmates. The administration was well aware that the victims of sexual abuse were reluctant to report this misconduct for fear of reprisal including transfer to a different facility, disciplinary segregation, loss of early release rights, detrimental write-ups and loss of work privileges. In fact, the administration instituted a strict policy whereby inmates complaining of mistreatment by prison officials were automatically removed to a local county detention center. This relocation policy intentionally suppressed complaints of sexual abuse as the county facilities are higher levels of security and do not permit the work details allowed at the Coleman women's camp.

Despite the known issues of abuse, Coleman granted the Offending Officers direct contact with our Client including supervising work details which granted them one on one access. The Offending Officers used their position of authority to threaten, intimidate and coerce our Client into engaging in unwanted, non-consensual, sexual activities in direct violation of the Prison Rape Elimination Act ("PREA"). Coleman administrators were directly responsible for the negligent hiring, retention, training, reporting and supervision of the Offending Officers including failure to follow and enforce the following PREA regulations:

- Section 115.11 - failing to enforce zero tolerance policy
- Section 115.13 - failing to supervise and monitor (video surveillance) one-on-one inmate/officer contact
- Section 115.15 - permitting improper cross-gender pat downs
- Section 115.17 - hiring, promoting and retaining officers who "may" have had improper sexual contact
- Section 115.43 - punishing sex victims with involuntary segregated housing, loss of privileges and work permits
- Section 115.61 - failing to report suspicion of sexual abuse

- Section 115.67 - failing to protect inmates from retaliation after reporting abuse
- Section 115.76 - failing to discipline staff for sexual misconduct

The Offending Officers, acting within the course and scope of their employment with the BOP, engaged in sexual abuse and harassment of our Client as prohibited and defined by PREA. This sexual abuse gives rise to Florida state law claims for assault and battery, false imprisonment and intentional infliction of emotional distress.

Our Client was incarcerated at Coleman beginning in March 2017 through December 2017. Shortly after her arrival, the Offending Officers began making sexually suggestive comments to her and engaged in a pattern of sexual harassment. The harassment quickly evolved into sexual assault as the Offending Officers coerced, intimidated and demanded that our Client engage in all types of sexual activities including oral sex, intercourse and group sex with other inmates. These instances of sexual abuse occurred countless times throughout the entirety of her incarceration at Coleman with each of the Offending Officers taking turns as the lead assailant of the week.

Our Client was scared to report these instances of sexual abuse for fear of reprisal, punishment and transfer. As a result of these sexual assaults and harassment, our Client has suffered extensive pain and suffering, psychological trauma, physical trauma, emotional distress and depression. Our Client demands compensation from the federal government for this abuse in an amount of **$1,425,000**.

We look forward to your timely response.

Sincerely,

Bryan E. Busch



Bryan E. Busch, Esq.
Adam M. Slipakoff, Esq.*
Christopher Y. Mills, Esq.**
Howard P. Slomka, Esq.**
Laura H. Mirmelli, Esq. **
Clive N. Morgan, Esq.**
Margaret E. Kepler, Esq.***
Brett C. Morgan, Esq.****

* Licensed in GA
** Licensed in GA and FL
*** Licensed in FL
**** Licensed in VA

**BSMS**
Busch, Slipakoff, Mills & Slomka, LLC

Atlanta, GA | West Palm Beach, FL
www.bsms.law

Contact Information:

Bryan E. Busch, Esq.
Email: bb@bsms.law
Phone: (404) 800-4062

Atlanta, GA Office
3350 Riverwood Pkwy.
Ste. 2100
Atlanta, GA 30339

**January 14, 2019**

<u>**VIA CERTIFIED MAIL**</u>
<u>**RETURN RECEIPT REQUESTED**</u>
Federal Bureau of Prisons
320 First Street, NW
Washington D.C. 20534

  re:  Federal Torts Claim Act (28 USC § 1346 et seq.)

    •   Miranda Flowers

To Whom It May Concern:

  This Firm serves as counsel for the above-named individual (hereafter "Client") who was incarcerated against her will by the United States of America at a female prison camp located within the Coleman Federal Correctional Institution in Sumter County, Florida (hereafter "Coleman"). The purpose of this letter is to provide notice to the Federal Bureau of Prisons of claims for negligence, assault, battery, false imprisonment and intentional infliction of emotional distress under the Federal Torts Claim Act ("FTCA") (28 USC § 1346 et seq.). All future communication regarding the claims set forth below or any investigation thereof must be addressed to the undersigned as legal counsel to Client.

  This letter also serves as notice to preserve and protect all evidence related to the claims described herein including, physical/DNA evidence, investigative notes and records, video/audio surveillance, computer records, and electronic communications. Failure to safeguard all evidence related to these actions may result in spoliation claims against the correctional institution, the federal government and its agencies and any individuals involved in the destruction or alteration of evidence.

---

**lanta, GA Office**
50 Riverwood Pkwy. Ste. 2100
lanta, GA 30339

**West Palm Beach, FL Office**
319 Clematis Street, Suite 109
West Palm Beach, FL 33401

Coleman is operated by the BOP through the United States Department of Justice. Coleman employs correctional officers, facilities staff and management to oversee and operate the prison facility. The correctional officers are trained, managed, overseen and paid by the BOP. The correctional officers are federal employees subjecting the United States of America to liability for improper actions committed within the course and scope of their employment.

Coleman employed three (3) male correctional officers (Palomaris, Vann and Phillips) (hereafter "Offending Officers") that routinely sexually abused and harassed our Client during the time she was incarcerated at Coleman. The Offending Officers were known sexual predators and had been investigated on numerous occasions for sex crimes against female inmates. The administration was well aware that the victims of sexual abuse were reluctant to report this misconduct for fear of reprisal including transfer to a different facility, disciplinary segregation, loss of early release rights, detrimental write-ups and loss of work privileges. In fact, the administration instituted a strict policy whereby inmates complaining of mistreatment by prison officials were automatically removed to a local county detention center. This relocation policy intentionally suppressed complaints of sexual abuse as the county facilities are higher levels of security and do not permit the work details allowed at the Coleman women's camp.

Despite the known issues of abuse, Coleman granted the Offending Officers direct contact with our Client including supervising work details which granted them one on one access. The Offending Officers used their position of authority to threaten, intimidate and coerce our Client into engaging in unwanted, non-consensual, sexual activities in direct violation of the Prison Rape Elimination Act ("PREA"). Coleman administrators were directly responsible for the negligent hiring, retention, training, reporting and supervision of the Offending Officers including failure to follow and enforce the following PREA regulations:

- Section 115.11 - failing to enforce zero tolerance policy
- Section 115.13 - failing to supervise and monitor (video surveillance) one-on-one inmate/officer contact
- Section 115.15 - permitting improper cross-gender pat downs
- Section 115.17 - hiring, promoting and retaining officers who "may" have had improper sexual contact
- Section 115.43 - punishing sex victims with involuntary segregated housing, loss of privileges and work permits
- Section 115.61 - failing to report suspicion of sexual abuse

- Section 115.67 - failing to protect inmates from retaliation after reporting abuse
- Section 115.76 - failing to discipline staff for sexual misconduct

The Offending Officers, acting within the course and scope of their employment with the BOP, engaged in sexual abuse and harassment of our Client as prohibited and defined by PREA. This sexual abuse gives rise to Florida state law claims for assault and battery, false imprisonment and intentional infliction of emotional distress.

Our Client was incarcerated at Coleman beginning in March 2017 through December 2017. Shortly after her arrival, the Offending Officers began making sexually suggestive comments to her and engaged in a pattern of sexual harassment. The harassment quickly evolved into sexual assault as the Offending Officers coerced, intimidated and demanded that our Client engage in all types of sexual activities including oral sex, intercourse and group sex with other inmates. These instances of sexual abuse occurred countless times throughout the entirety of her incarceration at Coleman with each of the Offending Officers taking turns as the lead assailant of the week.

Our Client was scared to report these instances of sexual abuse for fear of reprisal, punishment and transfer. As a result of these sexual assaults and harassment, our Client has suffered extensive pain and suffering, psychological trauma, physical trauma, emotional distress and depression. Our Client demands compensation from the federal government for this abuse in an amount of **$1,425,000**.

We look forward to your timely response.

Sincerely,

Bryan E. Busch

Bryan E. Busch, Esq.*
Adam M. Slipakoff, Esq.*
Christopher Y. Mills, Esq.**
Howard P. Slomka, Esq.*
Laura H. Mirmelli, Esq. **
Clive N. Morgan, Esq.**
Margaret E. Kepler, Esq.***
Brett C. Morgan, Esq.****

* Licensed in GA
** Licensed in GA and FL
*** Licensed in FL
**** Licensed in VA

**BSMS**
Busch, Slipakoff, Mills & Slomka, LLC

Atlanta, GA | West Palm Beach, FL
www.bsms.law

Contact Information:

Bryan E. Busch, Esq.
Email: bb@bsms.law
Phone: (404) 800-4062

Atlanta, GA Office
3350 Riverwood Pkwy.
Ste. 2100
Atlanta, GA 30339

**January 21, 2019**

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Federal Bureau of Prisons
320 First Street, NW
Washington D.C. 20534

re:   Federal Torts Claim Act (28 USC § 1346 et seq.)

- Judith Aloe

To Whom It May Concern:

This Firm serves as counsel for the above-named individual (hereafter "Client") who was incarcerated against her will by the United States of America at a female prison camp located within the Coleman Federal Correctional Institution in Sumter County, Florida (hereafter "Coleman"). The purpose of this letter is to provide notice to the Federal Bureau of Prisons of claims for negligence, assault, battery, false imprisonment and intentional infliction of emotional distress under the Federal Torts Claim Act ("FTCA") (28 USC § 1346 et seq.). All future communication regarding the claims set forth below or any investigation thereof must be addressed to the undersigned as legal counsel to Client.

This letter also serves as notice to preserve and protect all evidence related to the claims described herein including, physical/DNA evidence, investigative notes and records, video/audio surveillance, computer records, and electronic communications. Failure to safeguard all evidence related to these actions may result in spoliation claims against the correctional institution, the federal government and its agencies and any individuals involved in the destruction or alteration of evidence.

**Ilanta, GA Office**
350 Riverwood Pkwy. Ste. 2100
Ilanta, GA 30339

**West Palm Beach, FL Office**
319 Clematis Street, Suite 109
West Palm Beach, FL 33401

Coleman is operated by the BOP through the United States Department of Justice. Coleman employs correctional officers, facilities staff and management to oversee and operate the prison facility. The correctional officers are trained, managed, overseen and paid by the BOP. The correctional officers are federal employees subjecting the United States of America to liability for improper actions committed within the course and scope of their employment.

Coleman employed two (2) male correctional officers (Palomaris and Campbell) (hereafter "Offending Officers") that routinely sexually abused and harassed our Client during the time she was incarcerated at Coleman. The Offending Officers were known sexual predators and had been investigated on numerous occasions for sex crimes against female inmates. The administration was well aware that the victims of sexual abuse were reluctant to report this misconduct for fear of reprisal including transfer to a different facility, disciplinary segregation, loss of early release rights, detrimental write-ups and loss of work privileges. In fact, the administration instituted a strict policy whereby inmates complaining of mistreatment by prison officials were automatically removed to a local county detention center. This relocation policy intentionally suppressed complaints of sexual abuse as the county facilities are higher levels of security and do not permit the work details allowed at the Coleman women's camp.

Despite the known issues of abuse, Coleman granted the Offending Officers direct contact with our Client including supervising work details which granted them one on one access. The Offending Officers used their position of authority to threaten, intimidate and coerce our Client into engaging in unwanted, non-consensual, sexual activities in direct violation of the Prison Rape Elimination Act ("PREA"). Coleman administrators were directly responsible for the negligent hiring, retention, training, reporting and supervision of the Offending Officers including failure to follow and enforce the following PREA regulations:

- Section 115.11 - failing to enforce zero tolerance policy
- Section 115.13 - failing to supervise and monitor (video surveillance) one-on-one inmate/officer contact
- Section 115.15 - permitting improper cross-gender pat downs
- Section 115.17 - hiring, promoting and retaining officers who "may" have had improper sexual contact
- Section 115.43 - punishing sex victims with involuntary segregated housing, loss of privileges and work permits
- Section 115.61 - failing to report suspicion of sexual abuse

- Section 115.67 - failing to protect inmates from retaliation after reporting abuse
- Section 115.76 - failing to discipline staff for sexual misconduct

The Offending Officers, acting within the course and scope of their employment with the BOP, engaged in sexual abuse and harassment of our Client as prohibited and defined by PREA. This sexual abuse gives rise to Florida state law claims for assault and battery, false imprisonment and intentional infliction of emotional distress.

Our Client was incarcerated at Coleman beginning in December 2016 through July 2019. Shortly after her arrival, the Offending Officers began making sexually suggestive comments to her and engaged in a pattern of sexual harassment. The harassment from Officer Coleman quickly evolved into sexual assault as he forced our Client to engage in non-consensual intercourse and oral sex while locked alone in a storage room with no cameras. The harassment from Officer Palomaris involved routine and non-consensual groping, grabbing and fondling.

Our Client was scared to report these instances of sexual abuse for fear of reprisal, punishment and transfer. As a result of these sexual assaults and harassment, our Client has suffered extensive pain and suffering, psychological trauma, physical trauma, emotional distress and depression. Our Client demands compensation from the federal government for this abuse in an amount of **$1,425,000**.

We look forward to your timely response.

Sincerely,

Bryan E. Busch