## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

RACHELLE BEAUBRUN, :
KRISTEN GODUTO, :
KARA GUGGINO, :
SARA HOEHN, : Civil Action File
APRIL JOHNSON, :
TERRY NAGY-PHILIPS, : No. 5:19-cv-00615-TJC-PRL
ANN URSINY, :
KAREN WATSON, :
CARLEANE BERMAN, :
MIRANDA FLOWERS, :
JUDI ALOE,
MAGGIE LEON,
LAUREN REYNOLDS,
AMANDA DIMURO, and
REBECA MORA :
 :
  Plaintiffs, :
 :
vs. :
 :
UNITED STATES OF AMERICA, :
 :
  Defendant. :
_____ :

## FIRST AMENDED COMPLAINT FOR DAMAGES

NOW COMES Rachelle Beaubrun, Kristen Goduto, Kara Guggino, Sara

Hoehn, April Johnson, Terry Nagy-Philips, Ann Ursiny, Karen Watson, Carleane

Berman, Miranda Flowers, Judi Aloe, Maggie Leon, Lauren Reynolds, Amanda

DiMuro, and Rebeca Mora (collectively "Plaintiffs") and file this Complaint for

Damages against Defendant United States of America (hereafter "United States" or

1

"Defendant") on claims of negligence, assault, battery, false imprisonment, and intentional infliction of emotional distress pursuant to 28 U.S.C. § 1346 et seq. (Federal Torts Claim Act) as follows:

## **PARTIES**

### *Plaintiffs*

1.

Rachelle Beaubrun ("Ms. Beaubrun") is a 48-year-old female who was remanded into the custody of the Federal Bureau of Prisons (hereafter "BOP") for 8.5 years on charges of conspiracy to commit wire fraud and identity theft.  Ms. Beaubrun was a non-violent, first time offender who served her prison sentence at the Coleman Federal Correctional Institution in Sumpter County, Florida (hereafter "Coleman Federal Prison") from 2013 to 2019.

2.

Kristen Goduto ("Ms. Goduto") is a 36-year old female remanded into the custody of the BOP for 10 years on charges of drug possession.  Ms. Goduto was a non-violent, first time offender who served her prison sentence at Coleman Federal Prison from 2015 to 2019 before transfer to the Tallahassee Federal Prison.

3.

Kara Guggino ("Ms. Guggino") is a 35-year old female remanded into the custody of the BOP for 10 years on charges of armed robbery.  Ms. Guggino was a

first-time offender who served her prison sentence at FCI Tallahassee from 2012-2015 and Coleman Federal Prison from 2016 to 2019.

4.

Sara Hoehn ("Ms. Hoehn") is a 30-year old female remanded into the custody of the BOP for 27 years on charges of conspiracy to possess and distribute drugs.  Ms. Hoehn was a non-violent, first time offender who is currently serving her prison sentence at Coleman Federal Prison beginning in 2016.

5.

April Johnson ("Ms. Johnson") is a 40-year old female remanded into the custody of the BOP for 8 years on charges of conspiracy to manufacture drugs. Ms. Johnson was a non-violent, first time offender who served her prison sentence at Coleman Federal Prison from 2015 to 2019.

6.

Terry Nagy-Phillips ("Ms. Nagy-Phillips") is a 49-year old female remanded into the custody of the BOP for 12 years on charges of conspiracy to commit wire fraud.  Ms. Nagy-Phillips was a non-violent, first time offender who served her prison sentence at Coleman Federal Prison from 2012 to 2020.

7.

Ann Ursiny ("Ms. Ursiny") is a 56-year old female remanded into the custody of the BOP for 15 years on charges of mortgage fraud.  Ms. Ursiny was a

non-violent, first time offender who served her prison sentence at Coleman Federal

Prison from 2012 to 2020.

8.

Karen Watson ("Ms. Watson") is a 37-year old female remanded into the

custody of the BOP for 5 years on charges of bank fraud.  Ms. Watson was a non-

violent, first time offender who served her prison sentence at Coleman Federal

Prison from 2017 to 2018.

9.

Carleane Berman ("Ms. Berman") is a 26-year-old female remanded into the

custody of the BOP for 3 years on charges of conspiracy to possess and distribute

drugs.  Ms. Berman served part of her sentence at Coleman Federal Prison from

2017 to 2018.

10.

Miranda Flowers ("Ms. Flowers") is a 35-year-old female remanded into the

custody of the BOP for 2 years on charges of wire fraud.  Ms. Flowers was a non-

violent, first time offender serving part of her sentence at Coleman Federal Prison

from 2017 to 2018.

11.

Judi Aloe ("Ms. Aloe") is a 60-year-old female remanded into the custody of

the BOP for 4 years on charges of odometer tampering.  Ms. Aloe was a non-

violent, first time offender serving part of her sentence at Coleman Federal Prison from 2016 to 2019.

<div align="center">12.</div>

Amanda DiMuro ("Ms. DiMuro") is a 32-year old female remanded into the custody of the BOP for 10 years on charges of drug and firearm possession.  Ms. DiMuro was a non-violent, first time offender who served her prison sentence at Coleman Federal Prison from 2016 to 2019.

<div align="center">13.</div>

Rebeca Mora ("Ms. Mora") is a 43-year old female remanded into the custody of the BOP for 10 years on charges of drug and weapon possession.  Ms. Mora was a non-violent, first time offender who served her prison sentence at Coleman Federal Prison from 2016 to 2018.

<div align="center">14.</div>

Lauren Reynolds ("Ms. Reynolds") is a 33-year old female remanded into the custody of the BOP for 12 years on charges of fire-arm possession.  Ms. Reynolds was a non-violent offender who served her prison sentence at Coleman Federal Prison from 2018 to 2019.

<div align="center">15.</div>

Maggie Leon arrived at United States  Coleman Prison Camp in 2013 and became the immediate target of sexual harassment and assault by multiple

correctional officers.  Maggie Leon did not consent or give permission to any

Coleman staff member to touch her or to engage in any sexual activity.

### *Defendant*

16.

Defendant United States of America is a sovereign country subject to

liability and damages for the wrongful conduct of its employees and agencies

under the Federal Torts Claim Act.  The United States may be served with process

pursuant to Fed. R. Civ. Pro. 4(i)(1) as follows:

> Ms. Maria Chapa Lopez or designee
> United States Attorney, Middle District of Florida
> 400 North Tampa Street, Suite 3200
> Tampa, FL 33602
>
> *Certified mail copy to*:
>
> United States Attorney, Middle District of Florida
> c/o Civil Process Clerk
> Middle District of Florida, Ocala Division
> 35 S.E. 1st Avenue, Suite 300
> Ocala, FL 34471
>
> Mr. William Barr
> Attorney General of the United States
> U.S. Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, D.C. 20530

### *Immune Individual Employees*

17.

The Federal Employee Liability Reform and Tort Compensation Act ("FELRTCA") was passed into law in 1988 and extended absolute immunity for common law torts to all federal employees regardless of whether the conduct at issue was discretionary or intentional.  But for the immunity protections afforded federal employees under FELRTCA, the individuals identified below would be liable to Plaintiffs for monetary damages for their misconduct.

18.

Wardens Manuel "Manny" Ocasio, R.C. Cheatham, Charles L. Lockett, Shannon D. Withers and various other associate wardens, executive staff, department heads, supervisors and prison management (hereafter "Coleman Management Team") were grossly negligent in the management, supervision and retention of male correctional officers at Coleman Federal Prison engaged in the sexual harassment and abuse of female inmates.  As a result of these failures, and upon information and belief, Warden Ocasio was forced into an early retirement.

19.

Lieutenants Kajander and David DeCamilla worked for the Special Investigative Services Unit ("SIS") assigned to Coleman Federal Prison and were responsible to investigate any alleged criminal activity involving staff members or inmates.  Lieutenants Kajander and DeCamilla were grossly negligent and derelict in their duties to manage, supervise and retain male officers at Coleman Federal

Prison engaged in the sexual harassment and abuse of female inmates.  As a result of these failures, and upon information and belief, Lieutenant DeCamilla was demoted and forced into early retirement.

<div align="center">20.</div>

Dr. Ojeda and other professional service providers at Coleman Federal Prison directly employed by the BOP were negligent in managing, supervising and retaining male officers at Coleman Federal Prison engaged in the sexual harassment and abuse of female inmates.  As a result of these failures, and upon information and belief, Dr. Ojeda was disciplined and demoted.  (Dr. Ojeda and the other professional service providers at Coleman Federal Prison are included hereafter in the "Coleman Management Team").

<div align="center">21.</div>

The Office of Internal Affairs ("OIA"), the Office of Inspector General ("OIG"), the U.S. Department of Justice ("DOJ") and many other special agents and supervisory attorneys were responsible for the investigation and prosecution of male correctional officers sexually abusing female inmates at Coleman Federal Prison.  These agencies failed to timely investigate and prosecute the criminal activity perpetrated by the male correctional officers identified below.  (SIS, OIA, OIG and DOJ are collectively referred to herein as the "Prison Investigative Agencies").

8

22.

Officer Palomares served as a correctional officer at Coleman Federal Prison until his resignation in 2018 stemming from years of unchecked sexual misconduct with female inmates.  Officer Palomares was a known sexual predator by the Coleman Management Team and the Prison Investigative Agencies but was allowed <u>unrestricted</u> and <u>unsupervised</u> access to female inmates.  Officer Palomares engaged in the systematic sexual abuse and harassment of Plaintiffs Ms. Beaubrun, Ms. Hoehn, Ms. Johnson, Ms. Ursiny, Ms. Watson, Ms. Bearman, Ms. Flowers,  Ms. Aloe, Ms. Mora, and Ms. Leon as admitted in recent interviews with the Prison Investigative Agencies.  Officer Palomares faced no criminal prosecution for his admitted sexual abuse of female inmates and was permitted to retire with full benefits from the BOP.

23.

Officer Phillips served as a correctional officer at Coleman Federal Prison until his recent resignation in 2019 stemming from unchecked sexual misconduct with female inmates.  Officer Phillips was a known sexual offender to the Coleman Management Team and the Prison Investigative Agencies but was allowed <u>unrestricted</u> and <u>unsupervised</u> access to female inmates.  Officer Phillips engaged in sexual abuse and harassment of Plaintiffs Ms. Goduto, Ms. Guggino, Ms. Hoehn, Ms. Ursiny, Ms. Bearman and Ms. Flowers as admitted in interviews with

the Prison Investigative Agencies.  Officer Phillips faced no criminal prosecution for his admitted sexual abuse of female inmates and was permitted to retire with full benefits from the BOP.

24.

Officer Campbell served as a correctional officer at Coleman Federal Prison until his recent resignation in 2019 stemming from unchecked sexual misconduct with female inmates.  Officer Campbell was a known sexual offender to the Coleman Management Team and the Prison Investigative Agencies but was allowed <u>unrestricted</u> and <u>unsupervised</u> access to female inmates.  Officer Campbell engaged in sexual abuse and harassment of Plaintiffs Ms. Nagy-Phillips, Ms. Ursiny, Ms. Aloe, and Ms. Leon.   Campbell as admitted in interviews with the Prison Investigative Agencies. Officer Campbell faced no criminal prosecution for his admitted sexual abuse of female inmates and was permitted to retire with full benefits from the BOP.

25.

Officer Vann served as a correctional officer at Coleman Federal Prison until his suspension in 2019 stemming from unchecked sexual misconduct with female inmates.  Officer Vann was a known sexual offender to the Coleman Management Team and the Prison Investigative Agencies but was allowed <u>unrestricted</u> and <u>unsupervised</u> access to female inmates.  Officer Vann engaged in sexual abuse and

harassment of Plaintiff Ms. Guggino, Ms. Bearman, Ms. Flowers and Ms. DiMuro. Officer Vann faced no criminal prosecution for his sexual abuse of female inmates and continues to receive full benefits and pay from the BOP.

<div align="center">26.</div>

Officer Urdialez served as a correctional officer at FCI Tallahassee until his recent resignation in 2019 stemming from unchecked sexual misconduct with female inmates.  Officer Urdialez was a known sexual offender to the wardens, executive staff, department heads, supervisors and prison management at FCI Tallahassee (hereafter "FCI Tallahassee Management Team") and the Prison Investigative Agencies but was allowed unrestricted and unsupervised access to female inmates.  Officer Urdialez engaged in sexual abuse and harassment of Plaintiff Ms. Guggino as admitted in interviews with the Prison Investigative Agencies.  Officer Urdialez faced no criminal prosecution for his admitted sexual abuse of female inmates and was permitted to retire with full benefits from the BOP.

<div align="center">27.</div>

Officer Kuilan served as a correctional officer at Coleman Federal Prison until his recent resignation in 2019 stemming from unchecked sexual misconduct with female inmates.  Officer Kuilan was a known sexual offender to the Coleman Management Team and the Prison Investigative Agencies but was allowed

11

unrestricted and unsupervised access to female inmates. Officer Kuilan engaged in sexual abuse and harassment of Plaintiff Ms. Reynolds as admitted in recent interviews with the Prison Investigative Agencies.  Officer Kuilan faced no criminal prosecution for his admitted sexual abuse of female inmates and was permitted to retire with full benefits from the BOP.

28.

Officer Gonzalez currently serves as a correctional officer at Coleman Federal Prison but was moved to a different location in 2019 stemming from unchecked sexual misconduct with female inmates.  Officer Gonzalez was a known sexual offender to the Coleman Management Team and the Prison Investigative Agencies but was allowed unrestricted and unsupervised access to female inmates.  Officer Gonzalez engaged in sexual abuse and harassment of Plaintiffs Ms. Mora and Ms. DiMuro.  Officer Gonzalez faced no criminal prosecution for his sexual abuse of female inmates and has been permitted to continue working at the Coleman Federal Prison with full benefits and pay.

29.

Officer Laudenstager served as a correctional officer at Coleman Federal Prison until his resignation in 2018 stemming from unchecked sexual misconduct

with female inmates.  Officer Laudenstager was a known sexual offender to the Coleman Management Team and the Prison Investigative Agencies but was allowed <u>unrestricted</u> and <u>unsupervised</u> access to female inmates.  Officer Laudenstager engaged in sexual abuse and harassment of Plaintiff Maggie Leon as admitted in interviews with the Prison Investigative Agencies.  Officer Laudenstager faced no criminal prosecution for his admitted sexual abuse of female inmates and was permitted to retire with full benefits from the BOP.

## JURISDICTION AND VENUE

30.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1346 et seq. (Federal Torts Claim Act) as it involves liability of the United States of America reserved to federal courts.

31.

This Court has personal jurisdiction over Defendant United States of America pursuant to 28 U.S.C. § 1346 et seq. (Federal Torts Claim Act).

32.

Venue is proper in this Court pursuant to 28 U.S.C. § 1402(b) as the acts and omissions set forth herein occurred within this federal judicial district.

## FEDERAL BUREAU OF PRISONS

33.

The Federal Bureau of Prisons ("BOP") is a United States federal law enforcement agency responsible for the custody of individuals who have violated federal laws.  The BOP's stated mission is to "protect public safety by ensuring that federal offenders serve their sentences of imprisonment in facilities that are safe, humane, cost efficient and appropriately secure."  The BOP employs over 35,000 individuals at 122 institutions across the country.  The BOP is currently responsible for the custody and care of over 13,000 female inmates incarcerated at 27 separate BOP facilities.

34.

Despite its stated mission, the BOP has created and maintained a sanctuary for male correctional officers to sexually assault and abuse female inmates. The sexual abuse at these female prisons is rampant but goes largely unchecked as a result of cultural tolerance, orchestrated cover-ups and organizational reprisals of inmates who dare to complain or report sexual abuse.

35.

This systemic misconduct within the BOP was the subject of a recent U.S. House of Representatives investigation for the Committee on Oversight and Government Report.  The nine-page report concluded that misconduct by prison officials is "largely tolerated or ignored altogether" allowing officials to operate

outside of the rules.  The committee reviewed specific cases where "individuals deemed responsible for misconduct were shuffled around, commended, awarded, promoted or even allowed to retire with a clean record and full benefits before any disciplinary action could apply."

## PRISON RAPE ELIMINATION ACT

36.

The Prison Rape Elimination Act ("PREA") was signed into law by President Bush in 2003 and applies to all federal facilities managed by the BOP. PREA's goal is to deter the sexual assault of prisoners and to curb prison rape through a zero-tolerance policy.

37.

Because the female inmates are fully dependent on the correctional officers for basic necessities and privileges, all sexual contact, with or without the consent of the inmate, is classified as abuse.  Sexual abuse and sexual harassment are defined in section 115.6 of the Act as follows:

> _Sexual abuse_ of an inmate, detainee, or resident by a staff member, contractor, or volunteer includes any of the following acts, _with or without consent_ of the inmate, detainee, or resident:
>
> _(1) Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;_
>
> _(2) Contact between the mouth and the penis, vulva, or anus;_

15

*(3) Contact between the mouth and any body part where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;*

*(4) Penetration of the anal or genital opening, however slight, by a hand, finger, object, or other instrument, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;*

*(5) Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;*

*(6) Any attempt, threat, or request by a staff member, contractor, or volunteer to engage in the activities described in paragraphs (1)-(5) of this section;*

*(7) Any display by a staff member, contractor, or volunteer of his or her uncovered genitalia, buttocks, or breast in the presence of an inmate, detainee, or resident, and*

*(8) Voyeurism by a staff member, contractor, or volunteer.*

*Sexual harassment includes*

*(1) Repeated and unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a derogatory or offensive sexual nature by one inmate, detainee, or resident directed toward another; and*

*(2) Repeated verbal comments or gestures of a sexual nature to an inmate, detainee, or resident by a staff member, contractor, or volunteer, including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures.*

38.

As mandated by PREA, the BOP conducts annual PREA audits ("Audits") at each federal prison facility. The annual Audits for Coleman Federal Prison are

<u>materially</u> incomplete as the auditors failed to interview any female inmates that were involved in or witness to PREA violations.

<div align="center">39.</div>

The reports suggest that these female inmates were not available for interview as they had been transferred to another prison facility.  The failure to interview victims of PREA violations undermines the Audit results and incentivizes Coleman Federal Prison to transfer victims of sexual abuse rather than cooperate with a thorough PREA investigation.  By transferring victims of sexual abuse, Coleman Federal Prison shields itself from legitimate investigation and suppresses complaints by punishing the victims.

<div align="center">40.</div>

The Coleman Federal Prison transfer policy also demonstrates the BOP's failure to put the rights of the victims ahead of its own economic interest.  Before any BOP employee can be punished, transferred or reassigned for sexual abuse, administrators must carefully navigate the collective bargaining agreement.  In almost every instance, the collective bargaining rights of the employees outweigh the rights of the victim and it is the victim that receives the full weight of punishment by transfer to another facility or other punitive measures.  In no other context are the rights of the sexually abused subordinated to the economic interests of the institution and the collective bargaining rights of the abusers.

## COLEMAN FEDERAL PRISON

41.

The Coleman Federal Prison located in Sumter County, Florida houses approximately 6,000 federal inmates in both low and medium security facilities. The campus includes a minimum-security satellite prison camp housing approximately 500 female inmates ("Coleman Prison Camp").  Coleman Federal Prison is operated by the BOP through the United States Department of Justice.

42.

Female inmates at the Coleman Prison Camp are segregated into distinct housing units with dormitory style cubicles for each inmate.  The Coleman Prison Camp is operated under a work/camp model where non-violent inmates are afforded work privileges within the Coleman complex.  Inmates are subject to daily "counts" but are otherwise free to move around the Coleman Prison Camp subject to specified rules and regulations.[1]

43.

The Coleman Prison Camp employs correctional officers, facilities staff and management to oversee and operate the prison facility.  The correctional officers are trained, managed, overseen and paid by the BOP through the United States

---

[1] This Complaint for Damages also encompasses instances of abuse at FCI Tallahassee, Florida, a low security federal prison for female inmates operated by the BOP which utilized the same model, systems, procedures and punishments as Coleman.

Department of Justice serving "investigative or law enforcement" functions.  The correctional officers are federal employees subjecting the United States of America to liability for improper actions committed within the course and scope of their employment.

44.

The Coleman Prison Camp and FCI Tallahassee employed no less than five (5) male correctional officers that sexually abused and harassed Plaintiffs.  These individuals included Officers Palomares, Campbell, Phillips, Vann and Urdialez (collectively "Offending Officers").

45.

The Offending Officers were known sexual predators to the Coleman Management Team and the Prison Investigative Agencies.  The Offending Officers had been investigated on numerous occasions for sex crimes against female inmates.  The Coleman Management Team and Prison Investigative Agencies were well aware of the female inmates' reluctance to come forward with information on sexual abuse for fear of reprisal, including, but not limited to, transfer to a different facility, disciplinary segregation, loss of early release rights, detrimental write-ups loss of work privileges, and interference with vocational skills programs.

46.

In fact, the Coleman Management Team instituted a strict policy whereby inmates complaining of mistreatment by prison officials were automatically removed to a local county detention center. This relocation policy intentionally suppressed complaints of misconduct as the county facilities are higher levels of security and do not permit the work details or vocational training offered at the Coleman Prison Camp.

47.

Despite the known issues of abuse, the Coleman Prison Camp granted the Offending Officers unrestricted and unsupervised contact with Plaintiffs including work details, bed checks, visitation, etc… which granted them one on one access. The Offending Officers used their position of authority to threaten and coerce Plaintiffs into engaging in sexual activities and keep the abuse quiet for fear of immediate retaliation. The Offending Officers also used their access to personal history files, telephone call recordings, and personal emails giving them additional leverage to extract sexual favors and threaten the safety of Plaintiffs.

**ACCESS TO COUNSEL**

48.

Coleman Prison Camp maintains a system of checks and balances that makes access to competent counsel virtually impossible for female inmates that are victims of sexual abuse.

49.

First, the Offending Officers threatened Plaintiffs with direct and immediate retaliation in the event Plaintiffs reported any instances of sexual abuse including time in the Special Housing Unit ("SHU"), loss of privileges, removal from work detail, and write "ups."   The Offending Officers reviewed Plaintiffs' confidential prison files, emails and recorded telephone conversations to intimidate Plaintiffs as part of their psychological coercion.  Additionally, Plaintiffs observed many examples of punishments handed out to other inmates that challenged or reported abuse by the Offending Officers.  Because of the dependency of the officer/inmate relationship for basic necessities and privileges as identified in PREA, any threats of retaliation were magnified and Plaintiffs were unable to safely report the sexual abuse to potential legal counsel.

50.

Second, the Prison Management Team introduced a policy of removal of the female inmates to a medium security county prison for any victim reporting allegations of sexual abuse.  Plaintiffs observed this policy enforced by the Prison

Management Team on countless occasions making reporting instances of abuse to any Coleman employee or counselor a significant safety risk.

51.

Third, the Prison Management Team monitored all of Plaintiffs' telephone and email communications with their friends and families and any mention of sexual abuse was flagged and immediately stamped out.  On several occasions, Plaintiffs were confronted by the Offending Officers who said they were aware of communications to family members regarding issues of sexual misconduct at Coleman and were threatened never to mention those problems again or there would be "serious" consequences.

52.

Fourth, the Prison Management Team refused to give Plaintiffs access to a secure telephone line to discuss their legal rights with competent legal counsel requiring Plaintiffs to use the "open" lines for initial attorney/client interviews that were monitored by the Offending Officers.

53.

Unable to report instances of sexual abuse to Coleman staff for fear of immediate retaliation, unable to discuss instances of sexual abuse with family/friends over email or telephone that were constantly monitored, and unable to utilize a secure phone line to speak with potential counsel, Plaintiffs were

effectively cut off from the outside world and unable to procure legal
representation to protect their rights.

<div align="center">54.</div>

Through a series of chance encounters, impromptu meetings, and cryptic
messaging, the undersigned learned of a group of female inmates at Coleman
Prison Camp that were in desperate need of legal assistance.  Undersigned counsel
arranged for visitation on November 10, 2018 during regularly scheduled visitation
hours but had to have a visitation form approved/signed by a staff counselor before
gaining access to the facility.

<div align="center">55.</div>

Visitation on November 10, 2018 was scheduled to begin at 8:30 am,
however, the Coleman Management Team initiated an emergency "fog" delay.
Despite the absence of any "fog", the visitation was delayed for over two hours
limiting counsel's opportunity to conduct full interviews.  Once inside the
Coleman Prison Camp, the undersigned was forced to meet with Plaintiffs one at a
time in a small, storage closet.

<div align="center">56.</div>

With counsel engaged and the limited protection of a larger group, Plaintiffs
courageously came forward to tell their story in hopes of facilitating change at
Coleman Prison Camp and submitted a demand letter to the BOP on March 15,

2019 in compliance with the Federal Tort Claims Act.  A true and accurate copy of the March 15, 2019 demand letter is attached hereto as Exhibit "A."[2]

<center>57.</center>

Even after formally engaging counsel, the Coleman Management Team made communication difficult by reviewing attorney client privileged emails, listening to attorney client privileged phone calls, refusing to deliver attorney client privileged letters and refusing to allow for secure counsel phone calls by insisting that Coleman staff be present in the rooms where the calls took place.

<center>**RACHELLE BEAUBRUN**</center>

<center>58.</center>

Ms. Beaubrun arrived at Coleman Prison Camp in September 2013 after serving parts of her prison sentence at three (3) other institutions.  Shortly after her arrival, Officer Palomares began sexually harassing Ms. Beaubrun.

<center>59.</center>

Palomares began making comments to her about her body and described sex acts he wanted her to perform.  Palomares then moved into grabbing and fondling her for brief moments when he was able to find her alone in certain areas of the compound that were not under surveillance.  Palomares would threaten her by

---

[2] While not part of the original March 15, 2019 demand letter, Plaintiffs Ms. Berman, Ms. Flowers and Ms. Aloe also filed notices to the BOP which are included in Exhibit A.

saying that he could make her time at Coleman Prison Camp "easy or hard" depending on how she responded to his advances.

60.

Ms. Beaubrun tried to avoid Palomares as much as possible and tried never to be alone around him.  She was able to keep her distance for several months until 2014 when Palomares was on duty for visitation.  As Ms. Beaubrun was being checked back in from visitation, Palomares ordered her into the "search room" adjacent to the visitation area.

61.

Once inside, he closed all of the doors and began kissing her mouth and neck.  He then lifted up her shirt and began fondling her breasts.  He put his hands down her pants and put his fingers inside her vagina.  After several minutes he pulled his penis out and told Ms. Beaubrun to "suck my dick."  She then proceeded to give Palomares oral sex and as he was about to ejaculate, she tried to pull her mouth away from his penis.  He forced her head down on his penis and ejaculated into her mouth forcing her to swallow his semen.

62.

This incident terrified Ms. Beaubrun and she managed to stay clear of Palomares for several years.  Then, on two separate occasions in 2016 and 2017, Palomares came to her room after the 10:00 pm count and demanded she follow

25

him to the staff rest room between F1 and F2.  He pushed her inside the rest room and told her not to make a sound.  He then touched her breasts, inserted his fingers into her vagina and demanded that she perform oral sex on him.  Ms. Beaubrun reluctantly followed his instructions and he once again ejaculated in her mouth forcing her to swallow his semen.  At no time did Ms. Beaubrun consent to giving Palomares oral sex or give him permission to touch her.

63.

Ms. Beaubrun did not report these incidents immediately because it is common knowledge among the inmate population that upon reporting sexual abuse the victim is removed from Coleman Prison Camp and transferred to the county jail, a higher security prison with no educational or work opportunities.  Ms. Beaubrun witnessed other victims of sexual abuse being transferred to the county jail and feared if she reported the instances of abuse with Officer Palomares she would receive the same punishment.

64.

As a result of these sexual assaults and harassment from Officer Palomares, Ms. Beaubrun has suffered extensive psychological trauma, depression, pain and suffering, physical trauma and is in constant fear of being trapped alone with another abusive man.  Ms. Beaubrun demands compensation from the United States of America for this abuse in an amount to be determined at trial.

26

## KRISTEN GODUTO

### 65.

Ms. Goduto arrived at Coleman Prison Camp in August 2015.  Shortly after her arrival, she began working in general maintenance under the direction and supervision of Officer Phillips.  Ms. Goduto was approached by another inmate at the direction of Officer Phillips to gage her interest in a sexual relationship.  She declined and Officer Phillips began speaking directly to Ms. Goduto.

### 66.

At first, he spoke generally about sex saying that it must be really hard for her to go without sex for so long and that he could help her with her sexual urges. Towards the end of 2015, his sexual advances intensified and he forced Ms. Goduto to show him her breasts behind his office at facilities by threatening to kick her out of the maintenance group unless she showed him whether they were "real of fake."  He also mentioned on several occasions that he would "listen" to Ms. Goduto's phone calls and repeated information he learned from listening to these private phone calls.

### 67.

Thereafter, Officer Phillips began stalking Ms. Goduto by showing up in her unit unannounced and pushing his way into her actual room.  Officer Phillips brought her small gifts such as lotions and face creams always saying that Ms.

27

Goduto would "pay him back."  On one occasion while she was exercising, Officer

Phillips demanded that she get in his truck and drove her to the edge of the

campus.  He pulled out his penis and asked Ms. Goduto to "suck his dick."  When

another vehicle approached, he put his pants back on and drove her back to the

main unit.

<p style="text-align:center">68.</p>

In 2016, the maintenance team was painting the parking lot at the low

facility when Officer Phillips against asked Ms. Goduto to get into his truck.  This

time, he drove her to the back of the facility where a semi-truck was parked.  He

ordered her to get out and go inside.  He forced her onto a mattress in the back of

the truck and told her to get undressed.  He took all of his clothes off and pulled

out a condom placing it on his penis.  He removed Ms. Goduto's bra and began

kissing on her breasts.  He grabbed her genital area inserting his fingers into her

vagina.  When he tried to remove her panties, she told him she was on her "period"

and begged him not to rape her.  Officer Phillips stopped but insisted she start

taking birth control.

<p style="text-align:center">69.</p>

In 2017, Ms. Goduto was approached by Dr. Ojeda and Lieutenant

DeCamilla about wearing a wire and trying to entrap some of the male officers at

Coleman Prison Camp that were sexually assaulting the female inmates.  Ms.

Goduto was scared and did understand or trust the intentions of the Coleman

Management Team but was offered "time off" if the operation was successful.  She

reluctantly agreed to participate but was later informed that the FBI did not

approve the operation.

<div align="center">70.</div>

Ms. Goduto did not consent or give permission to Officer Phillips to touch

her or engage in any sexual activity.  Ms. Goduto did not fully report these

incidents of abuse for fear of reprisal.  As a result of these sexual assaults and

harassment, Ms. Goduto has suffered extensive psychological trauma, physical

trauma, depression, pain and suffering and is in constant fear of being trapped

alone with another abusive officer.  Ms. Goduto demands compensation from the

United States of America for this abuse in an amount to be determined at trial.

<div align="center">**KARA GUGGINO**</div>

<div align="center">71.</div>

Ms. Guggino was initially sent to the federal prison in Tallahassee, Florida

known as "FCI Tallahassee" beginning in 2012.  Several years into her sentence,

Ms. Guggino started a job in the kitchen at FCI Tallahassee.  After a few months,

she noticed that a Lieutenant Urdialez began following her to work in the early

morning hours.  Weeks later, Urdialez started making comments to her about her

private phone calls and emails with her family and admitted he had been "checking up" on her.

72.

One morning while Ms. Guggino was walking to work, Urdialez noticed that she was sick and offered to walk her to the medical office so he could get her out of work for the day. While at the medical office, Urdialez told her he would get her out of the kitchen job and she could work with him as an orderly.  Urdialez told her there was a long wait list for the job but that he would move her to the top.

73.

Several days later, Urdialez barged into Ms. Guggino's room without knocking while she was getting dressed and informed her he had been in an email battle with the captain's secretary, Daisy Solado, about the open position as his orderly.  Urdialez showed Ms. Guggino the emails and said she could start working for him the next week.  Ms. Guggino started immediately working as Urdialez's night orderly, after the 9:00 pm count along with another inmate, Kathy Navarro.

74.

After several weeks at the new job, Urdialez began making sexual comments about things he would like to do to Ms. Guggino and referred to her as "forbidden fruit."  One day he called all of the day and night orderlies into his office and explained that one of them had leaked confidential information and he had to

30

interview each one of them individually.  He called Ms. Guggino into his office for

the interview and when she arrived the lights were turned off.  Urdialez asked Ms.

Guggino if she know why she had been called to his office.  When she answered

no, Urdialez walked over to Ms. Guggino and began kissing her.  He then put his

hands under her shirt and started fondling her breasts.  He reached his hand into

her pants and inserted his fingers into her vagina.  When he removed his fingers, he

licked them and told Ms. Guggino not to tell anyone what happened.  He went on

to say that he could make her life "easy or hard" depending on her cooperation

with his sexual advances and instructed her not to wear panties to work.  This first

sexual encounter ended with Urdialez threatening Ms. Guggino "not to do or say

anything to make me mad."

<div align="center">75.</div>

Several days after this first encounter, Urdialez ushered Ms. Guggino

upstairs to a conference room above his office.  When they walked in, Urdialez

spread a blanket on the floor and ordered Ms. Guggino to undress.  After removing

her clothes, he instructed her to lie down on the blanket and spread her legs.  He

then proceeded to perform oral sex on Ms. Guggino.  After several minutes his

name was called over his prison radio and he instructed Ms. Guggino not to leave

the room while he was gone.  Before leaving the room, Urdialez pulled out his

handcuffs and attempted to handcuff her to the table but could not see in the dark.

He then left the room carrying Ms. Guggino's clothes and locked the door behind him.  Ms. Guggino waited naked in the conference room for his return.  When Urdialez finally returned, he removed his belt and pants, got on top of Ms. Guggino and raped her without the use of a condom.

76.

Urdialez then began bringing food, treats, alcohol and sleeping pills for both Ms. Guggino and Ms. Navarro in exchange for the sexual abuse of Ms. Guggino and the silence of Ms. Navarro.  Urdialez began putting money on Ms. Guggino's books and sending her emails under the name of "Ronald Ernst."  After these initial sexual assaults, Urdialez forced Ms. Guggino to engage in sexual intercourse or oral sex at least one time per week for several years while she worked as his nighttime orderly.

77.

On most occasions, Urdialez asked Ms. Guggino to remove her pants and bend over items such as tables, chairs etc.. so he could rape her from behind.  On one Halloween night, Urzialez took Ms. Guggino to an upstairs room in G-Unit. Urdialez removed Ms. Guggino's clothes and demanded that she bend over a table. He then raped her from behind and on this particular occasion ejaculated into her vagina.  When Ms. Guggino went to the bathroom to clean up, she noticed semen in her panties dripping out of her vagina.  Urdialez barged into the women's

bathroom and observed Ms. Guggino cleaning semen out of her vagina.  The next day, Urdialez showed up in Ms. Guggino's unit and saw her and her roommate, Inmate Leya Stapleton, across the compound.  He ran to meet them and handed Ms. Guggino the "morning after pill" right in front of Inmate Stapleton.

<div align="center">78.</div>

Urdialez became increasingly more controlling of Ms. Guggino and her movements within the prison.  He would show up at odd times, odd places and even on his days off to monitor her behavior and to make sure she did not disclose his misconduct to anyone.  One night in his office, Urdialez showed Ms. Guggino her home residence on Google Maps.  Urdialez reminded Ms. Guggino not to tell anyone about their "relationship" and even suggested he would buy a house in her parents' neighborhood to be with her.  The rape became more violent and Urdialez attempted on several occasions to handcuff Ms. Guggino to various items.  Ms. Guggino became terrified by the abuse and believed Urdialez would physically harm her if she upset him in any way.  Urdialez also began reading her personal emails and listening to her phone calls and became enraged when he realized she had communications with other men.

<div align="center">79.</div>

When FCI Tallahassee administrators heard rumors about Ms. Guggino and Urdialez, they punished Ms. Guggino instead of terminating Urdialez'

33

employment.  Prison officials placed Ms. Guggino into the special housing unit

("SHU") as punishment for the alleged involvement with Urdialez on three

separate occasions.  While in the SHU, Ms. Guggino was under 23 hour lock down

with no phone, no email and no work privileges.  Ms. Guggino was questioned

repeatedly about her "relationship" with Urdialez but was too scared to report the

abuse as Urdialez was sending her cards and emails while in the SHU under the

name of "Ronald Ernst" warning her "not to make him mad" and she feared further

retaliation from prison officials. Ms. Guggino spent months in and out of SHU.

80.

Ms. Guggino was eventually given a new job and Urdialez was moved to an

adjacent facility on the complex for a short time.  However, FCI Tallahassee

management allowed Urdialez to move back to the FCI Tallahassee Woman's

Camp and he immediately continued his abuse of Ms. Guggino.  Undeterred by the

privacy afforded him when Ms. Guggino served as his night orderly, Urdialez

began following Ms. Guggino around the compound and her unit.  When the

opportunity presented, he would force Ms. Guggino into stair wells or closets to

continue the sexual abuse and rape.

81.

Ms. Guggino was eventually moved from FCI Tallahassee to a facility in

Alabama.  Prior to her departure, Urdialez showed up on his off day in plain

clothes and had the on-duty officer call her to the front of her unit.  The on-duty female officer locked the doors to both sides of the units and the door to the officer's station shutting them both inside.  Urdialez gave Ms. Guggino three magazines in a white envelope.  Urdialez reminded Ms. Guggino not to tell anyone about their "relationship" or she would be in trouble and lose any time off privileges she had earned while in prison.  Urdialez let Ms. Guggino know that she was his and he would find a way for them to be together.

<div align="center">82.</div>

When she arrived in Alabama, Ms. Guggino discovered that most of her personal property had been confiscated including clothes, shoes, a bible and a personal journal where she had written about the sexual abuse of Urdialez.  Ms. Guggino took this as a threat not to mention anything about Urdialez.  Immediately upon her arrival in Alabama, the psychology staff began harassing Ms. Guggino, making her feel as if she was being punished by the change in prison facilities and shuttling her in and out of the SHU.  Ms. Guggino continued to lie about the abuse for her own protection.  Finally, representatives from OIG took over the interrogations and threatened Ms. Guggino to add five years to her sentence if she did not tell them about her "relationship" with Urdialez.  As Urdialez told Ms. Guggino that he had "friends" at the OIG, she provided only limited information to try and stay out of trouble.

83.

After her meeting with OIG, she was moved yet again to Coleman Prison Camp in April 2018.  She began working landscaping with Officer Vann.  Officer Vann began immediately making sexual comments saying he wanted to "fuck" Ms. Guggino and that she looked like the type of woman that liked to have a good time. On several occasions Vann followed Ms. Guggino into the tool room grabbing her breasts, buttocks and genital area penetrating her vagina with his fingers.

84.

On several occasions, Vann picked Ms. Guggino up from a job site in his vehicle, grabbed her hand and placed it onto his penis.  When other officers became aware that Ms. Guggino was refusing Vann's sex attempts, they because hostile with her.  Both Officer Phillips and Officer Cladder verbally abused Ms. Guggino by calling her a "bitch" for not "playing ball" and removed her from the landscaping job.  Unbelievably, Urdialez is still employed at FCI Tallahassee and recently drove a van to Coleman Prison Camp in some sort of prisoner transfer. Ms. Guggino observed him from a distance but ran the other way when he started walking towards her.

85.

Ms. Guggino did not consent or give permission to Lieutenant Urdialez or Officer Vann to touch her or engage in any sexual activity.  Ms. Guggino did not

fully report these incidents of abuse for fear of time being added to her sentence as threatened by Lieutenant Urdialez.  As a result of these sexual assaults and harassment, Ms. Guggino has suffered extensive psychological trauma, physical trauma, depression, pain and suffering and is in constant fear of being trapped along with another abusive officer.  Ms. Guggino demands compensation from the United States of America for this abuse in an amount to be determined at trial.

## SARA HOEHN

86.

Ms. Hoehn arrived at Coleman Prison Camp in October 2016.  Within a few months of her arrival, Officer Palomares began making sexually explicit comments to Ms. Hoehn asking for sexual favors and discussing various sexual acts inside the housing unit living quarters after the 4:00 pm count.

87.

On one occasion, Palomares suddenly appeared in Ms. Hoehn's cubicle, walked up behind her and pressed his pelvis into her behind.  He began kissing her behind the ear while rubbing his hands over her breasts and her genital area penetrating her vagina with his fingers.  Ms. Hoehn froze in fear.  He moved away when he heard someone walking down the hallway and told Ms. Hoehn not to be scared of him and not to tell anyone what happened or she would get "locked up." Ms. Hoehn believed that Palomares had the authority to lock her up.

88.

Several weeks later, Palomares again appeared in Ms. Hoehn's room while she was folding clothes on the floor.  He squatted down behind her and began rubbing his hands over her breasts and genital area penetrating her vagina with his fingers.  Ms. Hoehn asked him to stop but he refused saying "I will bring you whatever you want if you let me have this."  Ms. Hoehn tried to push him away but he would not stop until he heard someone walking down the hallway.  These surprise visits in her cubicle continued for several months until Officer Palomares was finally suspended from the Coleman Prison Camp.

89.

In 2018, Palomares called Ms. Hoehn and another inmate to the camp office to fix an air conditioning unit.  Palomares took the inmates to a secure area and locked himself and Ms. Hoehn in one room leaving the other inmate in a separate area.  Palomares told Ms. Hoehn to stop being stubborn and started to touch her breasts and genital area penetrating her vagina with his fingers.  The other inmate began knocking on the door when she heard the struggle and Palomares was forced to stop.

90.

Ms. Hoehn was also the target of sexual assault from Officer Phillips. Phillips began making sexually explicit comments to Ms. Hoehn including

repeatedly asking her for sexual favors.  The comments quickly escalated into sexual abuse as Phillips would approach Ms. Hoehn from behind, grab her around the waist and press his penis into her rear end.  He would then grab the front of her pockets and push her against walls, chairs, couches or anything else that might be around.  He would then press his hips into her rear end while grabbing her breasts and would touch her genital area penetrating her vagina with his fingers.  On one occasion while Ms. Hoehn was seated on a couch, Phillips walked out of the bathroom with his penis out of his pants and headed straight for her.  Ms. Hoehn ran outside and got on her lawnmower.

<div align="center">91.</div>

Ms. Hoehn did not give permission or consent to Officers Palomares or Phillips to touch her or engage in any sexual activity. As a result of these sexual assaults and harassment, Ms. Hoehn has suffered extensive psychological trauma, physical trauma, depression, pain and suffering and is in constant fear of being trapped alone with another abusive officer.  Ms. Hoehn demands compensation from the United States of America for this abuse in an amount to be determined at trial.

<div align="center">**APRIL JOHNSON**</div>

<div align="center">92.</div>

Ms. Johnson arrived at Coleman Prison Camp in 2015 and was enrolled in the plumbing apprenticeship program.  Starting in 2016, Officer Palomares began harassing, sexually abusing, and fondling Ms. Johnson without her consent or permission.

93.

Officer Palomares used his position as housing coordinator and ordered Ms. Johnson to work the "shed" on a regular basis.  Palomares was aware that Ms. Johnson knew of his ongoing sexual relationship with her cellmate and he would routinely ask Ms. Johnson to join them in a "threesome."  Palomares would walk by Ms. Johnson's cubicle and shake his work keys at her insinuating that he wanted to meet Ms. Johnson in the work shed for sex (as he explicitly told her on numerous occasions).

94.

Palomares would enter Ms. Johnson's cell and interact with her and her cellmate.  Ms. Johnson would act like she was asleep when he entered as she was scared of him.  On one occasion, Palomares moved over to Ms. Johnson's bunk, lifted the covers and began rubbing her genital area penetrating her vagina with his fingers in an attempt to wake her up for sex.  On another occasion, Palomares entered her cubicle and grabbed Ms. Johnson's hips thrusting himself against her buttock.

95.

Ms. Johnson did not report these incidents for fear of reprisal and because she did not want to lose her plumbing apprenticeship.  As a result of these sexual assaults and harassment, Ms. Johnson has suffered extensive psychological trauma, physical trauma, depression, and pain and suffering.  Ms. Johnson demands compensation from the United States of America for this abuse in an amount to be determined at trial.

## **TERRI NAGY-PHILLIPS**

96.

Ms. Phillips arrived at Coleman Prison Camp in December 2012 serving the remainder of her sentence.  She enrolled in the electrician apprenticeship program taking advantage of the educational opportunities being offered.

97.

Beginning in 2017, Officer Campbell took an interest in Ms. Phillips and began trying to engage her in personal conversations.  He sent emails to her prison account and after review of her personal file, discovered that they were both from Michigan.  He used this and other information regarding Ms. Phillips to try and gain her trust and manipulate her into believing he controlled her time at Coleman Prison Camp.

98.

In December 2017, Ms. Phillips was ordered to the guard station after hours ("Message Center") by Officer Palomares to inspect a light switch malfunction. While working on the light switch, Officer Campbell came up from behind and very firmly pressed his full body, crotch first, against the backside of Ms. Phillips pinning her between the wall and a trash can.  Ms. Phillips was physically unable to struggle or push back as Campbell overpowered her. After several hard thrusts into her backside, Campbell walked away leaving Ms. Phillips to finish her work. This incident took place in an area of Coleman Prison Camp where there is no video surveillance.

99.

On New Year's Eve 2017, Ms. Phillips was instructed to obtain a microwave for a party that was to occur later that day.  The microwave was located in the electrical work shed. Campbell insisted that he escort Ms. Phillips to the electrical work shed. Campbell followed Ms. Phillips into the electrical work shed, closed the door behind them and ordered Ms. Phillips to take a seat on the couch. Campbell then instructed Ms. Phillips to take off her sweatshirt as he began removing her pants.  Campbell kissed Ms. Phillips, laid her backwards on the couch, performed oral sex on her and then raped her.  Campbell said he knew Ms. Phillips could not get pregnant by reading her medical file and then proceeded to ejaculate into her vagina.  Campbell grabbed a role of paper towels and ordered

42

Ms. Phillips to "clean up" and throw all of the evidence in the trash. After they left the electrical work shed, Ms. Phillips carried the microwave while Officer Campbell carried her sweatshirt as if nothing had occurred.

<div align="center">100.</div>

Ms. Phillips was concerned about reporting the rape for fear of reprisal including being removed to a county facility destroying her electrician apprenticeship. Ms. Phillips did not consent or give permission to Campbell to engage in sexual activity. As a result of the sexual abuse, Ms. Phillips has suffered extensive psychological trauma, physical trauma, depression, pain and suffering and is fearful of being caught alone by one of the correctional officers again. Ms. Phillips demands compensation from the United States of America for this abuse in an amount to be determined at trial.

<div align="center">**ANN URSINY**</div>

<div align="center">101.</div>

Ms. Ursiny arrived at Coleman Prison Camp in July 2012. Within a few months of her arrival, Officer Palomares began making sexually explicit comments to Ms. Ursiny asking for sexual favors and discussing various sexual acts. Ms. Ursiny repeatedly told Palomares she was not interested but he persisted telling her one day "I will have you."

<div align="center">102.</div>

43

In May 2014, Ms. Ursiny was visited by her husband.  When the visit ended, Ms. Ursiny followed procedure and walked to the bathroom located in the corner that can be accessed from the compound.  Palomares was checking the inmates out from visitation on this particular day.  Ms. Ursiny entered the bathroom with another inmate and waited to be checked out.  Palomares instructed the other inmate to leave the bathroom saying "only one inmate at a time."  Palomares then locked all access to the bathroom leaving him and Ms. Ursiny alone.  He then told Ms. Ursiny "come on party girl you know what to do."  Ms. Ursiny froze in fear as Palomares began patting her down.  He started at her neck and began working his way down her body.  He then began squeezing and fondling her breasts for several minutes.  He stopped only to tell her "your tits feel good party girl."  He then started rubbing her stomach and worked his way down to her pelvis. He started lightly rubbing her vagina before squeezing her butt.  He worked his way down her legs and then returned to rubbing her genital area penetrating her vagina with his fingers.  After several minutes he stopped and said "I told you I would get you."


103.

This incident traumatized Ms. Ursiny to the point she was terrified to have any additional visitors for fear of being assaulted after visitation was completed.

For over four years, she would not allow any family members or friends to visit her at Coleman Prison Camp.

<div align="center">104.</div>

Ms. Ursiny was also the target of sexual harassment from Officers Campbell and Phillips.  Phillips began making sexually explicit comments to Ms. Ursiny and exposed his penis to her on one occasion.  Campbell constantly asked Ms. Ursiny for sexual favors saying she was "number three on the list of inmates he wanted to fuck."  Campbell would listen to her telephone calls and harass her about personal issues, such as her impending divorce.

<div align="center">105.</div>

Ms. Ursiny did not give any of the officers at Coleman Prison Camp permission or consent to touch her or engage in any sexual activity.  In 2017, Ms. Ursiny began talking to Lieutenant DeCamilla about the ongoing sexual abuse at Coleman Prison Camp.  DeCamilla encouraged Ms. Ursiny to participate in a scheme to trap offending officers by wearing a wire.  Ms. Ursiny was scared and did not trust the intentions of the Coleman Management Team.  She reluctantly agreed to participate but was later informed that the FBI did not approve the operation.  DeCamilla wrote an email to her prosecutor detailing the sexual abuse endured by Ms. Ursiny in an attempt to get her sentence reduced.

<div align="center">106.</div>

As a result of these persistent sexual assaults and harassment, Ms. Ursiny has suffered extensive psychological trauma, physical trauma, depression, pain and suffering and is fearful of being caught alone by one of the correctional officers. Ms. Ursiny demands compensation from the United States of America for this abuse in an amount to be determined at trial.

## <u>KAREN WATSON</u>

### 107.

Ms. Watson arrived at Coleman in March 2017 completing the remainder of her sentence.  Within weeks of her arrival, Officer Palomares began stalking Ms. Watson telling her that they needed to talk privately or she was going to be in trouble.  In August 2017, Palomares told Ms. Watson it was time to have their talk and instructed her to go to his release and detain office near the visitation room. Once in his private office, Palomares told Ms. Watson that it was time to "play nice" or she could lose her camp status.  He then proceeded to show Ms. Watson a google map view of her mother's house in Clairmont, Florida where her 6-year-old son lives.  Palomares explained that he "knew all about" Ms. Watson and encouraged her to "play nice" or bad things could happen to her family.  Palomares gave Ms. Watson the google map print out which she possesses to this day.

### 108.

Ms. Watson was terrified of Palomares and managed to stay clear of him for several months.  Finally, in October 2017, Palomares caught Ms. Watson in the hallway between F1 and F2 and pushed her into an open closet.  He placed his radio and keys on the table and kept the lights off to avoid detection.  Palomares took his pants down and instructed Ms. Watson to do the same.  He then had sexual intercourse with her but could not keep or maintain his penis in her vagina.  Palomares became frustrated and instructed Ms. Watson to "suck his dick."  Ms. Watson then performed oral sex on Palomares in the closet and he ejaculated into her mouth forcing her to swallow his semen.  Palomares insulted Ms. Watson by telling her she did not know how to "suck dick" and that Ms. Watson should be grateful that Palomares was giving her attention.

109.

In January 2018, immigration authorities came to Coleman Prison Camp and transferred Ms. Watson to a holding facility before she was deported back to her home country of Panama.  Prior to her transfer, Ms. Watson attempted to give notice of the rape to officials by placing a hand-written note from "Inmate Karen" into the grievance box and then delivering a second-handwritten note with her full name to a female employee in the administrative office.  While in the holding facility, Ms. Watson was placed in contact with Sergeant Harvey (Florida PREA Coordinator) and was also interviewed via telephone by Lieutenant DeCamilla.

None of these officials offered Ms. Watson any assistance but Lieutenant DeCamilla did apologize to her for "what happened" stating that we know there is a problem with Officer Palomares.

### 110.

Ms. Watson also began psychological therapy with Dr. Sally Haynes before being deported back to Panama.  Dr. Haynes concluded that Ms. Watson exhibited symptoms of trauma, PTSD, and intrusive memories as a result of the rape.  Since her arrival in Panama, Ms. Watson suffers from extreme depression, PTSD and is suicidal.

### 111.

Ms. Watson did not consent or give permission to Palomares to touch her or engage in any sexual activity.  Ms. Watson demands compensation from the United States of America for the sexual assault, harassment and rape that occurred while she was incarcerated at Coleman Prison Camp, including damages for pain and suffering, psychological trauma, and physical trauma in an amount to be determined at trial.

### **CARLEANE BERMAN**

### 112.

Ms. Berman arrived at Coleman in March 2017 to complete the remainder of her prison sentence.  Shortly after her arrival, Officers Palomares, Vann and Phillips began making sexually suggestive comments to her and engaged in a pattern of sexual harassment.  The harassment quickly evolved into sexual assault as Officers Palomares, Vann and Phillips coerced, intimated and demanded that Ms. Berman engage in all types of sexual activities with each of them including oral sex, intercourse, and group sex with Ms. Flowers.  These instances of non-consensual, sexual abuse occurred countless times throughout the entirety of her incarceration at Coleman with Officers Palomares, Vann and Phillips taking turns as the lead assailant of the week.

<div align="center">113.</div>

Ms. Berman was afraid to report these instances of sexual abuse as Officers Palomares, Vann and Phillips had each threatened her with reprisal, punishment and transfer.  Ms. Berman demands compensation from the United States of America for the sexual assault, harassment and rape that occurred while she was incarcerated at Coleman Prison Camp, including damages for pain and suffering, psychological trauma, and physical trauma in an amount to be determined at trial.

<div align="center">

**MIRANDA FLOWERS**

114.

</div>

Ms. Flowers arrived at Coleman in May 2017 to complete the remainder of her prison sentence.  Shortly after her arrival, Officers Palomares, Vann and Phillips began making sexually suggestive comments to her and engaged in a pattern of sexual harassment.  The harassment quickly evolved into sexual assault as Officers Palomares, Vann and Phillips coerced, intimated and demanded that Ms. Flowers engage in all types of sexual activities with each of them including oral sex, intercourse, and group sex with Ms. Berman.  These instances of non-consensual, sexual abuse occurred countless times throughout the entirety of her incarceration at Coleman with Officers Palomares, Vann and Phillips taking turns as the lead assailant of the week.

<div align="center">115.</div>

Ms. Flowers was afraid to report these instances of sexual abuse as Officers Palomares, Vann and Phillips had each threatened her with reprisal, punishment and transfer.  Ms. Flowers demands compensation from the United States of America for the sexual assault, harassment and rape that occurred while she was incarcerated at Coleman Prison Camp, including damages for pain and suffering, psychological trauma, and physical trauma in an amount to be determined at trial.

<div align="center">**JUDI ALOE**</div>

<div align="center">116.</div>

Ms. Aloe arrived at Coleman in December 2016 to serve out the remainder of her prison sentence.  Beginning in 2017, Officer Campbell began making sexually suggestive comments to Ms. Aloe and engaged in a pattern of sexual harassment.  Over time, the harassment from Officer Campbell evolved into sexual assault and rape as he coerced, intimidated and forced Ms. Aloe to engage in non-consensual sexual intercourse and oral sex while locked alone in storage rooms with no cameras.

<center>117.</center>

Ms. Aloe was also sexually harassed and assaulted by Officer Palomares. Officer Palomares began by making sexually suggestive comments to Ms. Aloe including sexual activities that he desired her to perform.  Officer Palomares became more aggressive and groped, grabbed and fondled Ms. Aloe's breasts and genital area on a routine basis.  On more than one occasion, Officer Palomares' fingers penetrated Ms. Aloe's vagina.

<center>118.</center>

Ms. Aloe was afraid to report these instances of sexual abuse as Officers Campbell and Palomares had each threatened her with reprisal, punishment and transfer.  Ms. Aloe demands compensation from the United States of America for the sexual assault, harassment and rape that occurred while she was incarcerated at

Coleman Prison Camp, including damages for pain and suffering, psychological trauma, and physical trauma in an amount to be determined at trial.

## **AMANDA DIMURO**

### 119.

Ms. DiMuro arrived at Coleman Prison Camp after being transferred from Tallahassee, Florida.  Upon her arrival at Coleman, Ms. DiMuro was sent to work in the landscape group for Officer Vann.  Ms. DiMuro observed Officer Vann having sexual intercourse with another inmate and was asked on multiple occasions to be a "lookout" while he had sex on the "Back 40" or on the bush hog tractors while on landscaping duty.

### 120.

While performing landscaping tasks and riding in the truck with Officer Vann, he put his hands between Ms. DiMuro's legs and touched her vagina outside her clothes.  Vann would rub and stroke Ms. DiMuro almost every time he saw her.  Officer Vann would also encourage Ms. DiMuro to sunbathe topless while on landscaping duty on the "Back 40".

### 121.

Ms. DiMuro was asked to work as a front lobby custodian at Pen II for Officer Gonzalez.  Her work included sweeping, mopping and waxing the floors in

the front lobby, visitors' room and the visitors' wait room.  According to Ms. DiMuro, there are no cameras in the visitors' wait room.

122.

Gonzalez became very friendly with Ms. DiMuro talking to her about her family and acting as if he was her friend.  One evening while she was sweeping in the visitors' wait room, Gonzalez came up behind her and put his arms around her. He started rubbing her body and then put his hands down the front of her pants under her panties. He then proceeded to put several fingers inside her vagina and told her to relax. After several minutes, he pulled his fingers out and started smelling them. He then sucked his fingers and told Ms. DiMuro she "tasted good."

123.

Several weeks later while Ms. DiMuro was cleaning the front desk, Gonzalez ordered her to go to the visitors' wait room again.  Once inside, he instructed her to pull her pants and panties down.  Gonzalez again inserted his fingers into Ms. DiMuro's vagina but was very aggressive and rough.  When she told him he was hurting her, Gonzalez bent down and started giving Ms. DiMuro oral sex.  After several minutes he stopped and said he was worried "control" would notice they were both out of camera range.

124.

The abuse continued again weeks later in a hallway in Pen II that was also not monitored by surveillance cameras.  This time, Gonzalez pulled his pants down and asked Ms. DiMuro to touch his penis.  He instructed her to stroke it hard and after a few minutes he ejaculated into her hand.

125.

Several days later, Gonzalez sent Ms. DiMuro into an SIS office to clean. When she arrived, there was a dessert on the table that Gonzalez said he made for her which was also seen by another inmate.  He then said he needed to do a "pat search" on Ms. DiMuro.  He began grabbing her on the outside of her clothes and pushed her up against the wall.  He then pulled her shirt and bra up and began kissing and sucking on her exposed breasts.  Ms. DiMuro became so scared with anxiety she started gasping for air and could not breathe.  After she calmed down, Gonzalez pulled his penis out and said do you want to "suck my dick."  She begged him to let her go because she was still unable to breathe.

126.

On another occasion, Gonzalez again approached Ms. DiMuro and asked her to help him spray a beehive just outside the back door.  Ms. DiMuro started following him down the hallway with no camera and he immediately grabbed and started kissing her.  He kissed her neck and breasts.  He pulled his penis out and

once again asked Ms. DiMuro to "stroke it hard."  While she was rubbing his

penis, he pulled her pants down and once again put his fingers inside her vagina.

He ejaculated into her hand but became very angry when Ms. DiMuro was unable

to climax with his fingers.  After this incident, Ms. DiMuro asked for a job transfer

because she was so scared of Gonzalez.

<p style="text-align:center">127.</p>

One occasion, after Ms. DiMuro returned from being transferred to county

jail, Ms. DiMuro awoke to Officer Gonzalez sticking his hands down her pants and

touching her vagina under the blanket.  He started rubbing her breasts and vagina

and said, "good morning beautiful."  He left when he heard another inmate walking

down the hall.  Gonzalez would also watch Ms. DiMuro when she worked for

landscaping from the training center parking lot.  On a few occasions, he would

run over and ask her to walk into the woods with him. When Ms. DiMuro refused,

he became very angry.  On several other occasions he came to the front of the

Coleman Prison Camp and had Ms. DiMuro called to the message center.  He

would tell her how beautiful she was and would bring her homemade lollipops.

<p style="text-align:center">128.</p>

Ms. DiMuro did not give consent or give permission to any of the

corrections officers at Coleman Prison Camp to engage in sexual acts with her.

Ms. DiMuro did not report these incidents because it is common knowledge among

the inmate population that when you report an incident, the reporting inmate is

removed from Coleman Prison Camp and transferred to county jail while an

investigation takes place.  As a result of these sexual assaults and harassment, Ms.

DiMuro has suffered extensive psychological trauma, physical trauma, depression,

pain and suffering and is in constant fear of being trapped alone with another

abusive officer.  Ms. DiMuro demands compensation from the United States of

America for this abuse in an amount to be determined by a jury.

### **REBECA MORA**

129.

While incarcerated at Coleman Prison Camp, Ms. Mora was sexually

assaulted by three different correctional officers.  Ms. Mora did not give

permission or consent for any of these correctional officers to touch her or

participate in any sexual activity.

130.

Officer Palomares began sexually harassing Ms. Mora by making suggestive

sexual comments including (1) "Oh is that all yours" during one of her workouts,

(2) "come on let me do you a favor," (3) "you know you want it"  and (4) grabbing

her butt as she walked to her job in the laundry room.  He would also threaten Ms.

Mora and say, "Don't forget, it's your word against mine and they will always

believe me." He also reminded her that he knew where all the video surveillance cameras were located and could take her into a private location whenever he wanted.

131.

On one occasion, Officer Palomares called Ms. Mora over the loud speaker to the front of the administrative building and told her to go through the visitor room door. He then pulled down his pants and exposed his penis to her. He grabbed her, fondled her, and pulled her hand toward his penis in an attempt to have her touch it. Ms. Mora was able to break away when another inmate entered the same building.

132.

On another occasion, Officer Palomares enlisted female inmates for maintenance help. Ms. Mora tried not to go; however, he said it was a direct order. He controlled the situation and made it so that she was alone with him in the mailroom. He again pulled out his penis and tried to pull up Ms. Mora's shirt. He asked her to "suck his dick." Ms. Mora backed away and asked to be taken back to the dorms. Officer Palomares refused and stated, "come on and let me do you a favor, you know you want it." Ms. Mora was once again able to get away when another inmate was heard outside the mailroom.

133.

A third time occurred in the chapel at Coleman Prison Camp. Ms. Mora was part of the choir.  After she left the chapel, Officer Palomares stopped her and told her that inmates had left belongings in the chapel that needed to be retrieved. Ms. Mora returned to the chapel and was shocked when Palomares showed up.  He grabbed her in the dark and started kissing her. She was only able to break away when other inmates began talking loudly outside the chapel.

134.

On another occasion, Officer Palomares brought Ms. Mora to a trailer containing recyclable material and forced her to perform oral sex on him.

135.

On another occasion, Officer Palomares brought Ms. Mora into a work out room and penetrated her vagina with his fingers and groped her breasts.

136.

Officer Palomares behavior was such that he would constantly harass and molest Ms. Mora at every available opportunity and did so multiple times.

137.

Ms. Mora was also raped by Officer Phillips who was in charge of the maintenance crew where Ms. Mora worked and directly supervised her. On the date of the incident, Phillips claimed he needed help in landscaping and chose Ms. Mora to help him. He took Ms. Mora to a trailer in the rear parking area. The trailer was in a remote area and no-one else was around.  Phillips locked the door to the trailer once they were inside and proceeded to pull down his pants.  He then pulled down Ms. Mora's pants, turned her around and began having sexual intercourse with her from behind. He finished by ejaculating directly into her vagina.  When he was finished he said something to the effect, "you know they've accused me before of rape, but they're never going to believe you."

138.

On two other occasions, Officer Phillips called Ms. Mora into his office and molested her by touching her vagina and her breasts.

139.

On two other occasions, Officer Philips arranged to have Ms. Mora alone with him in his work truck where he molested her by touching her vagina and her breasts.

140.

On another occasion, Officer Phillips brought Ms. Mora to the "woods" which were located in or near the camp and molested her by touching her vagina and her breasts.

141.

Ms. Mora was also sexually assaulted by Officer Gonzalez who took advantage of Ms. Mora's friendship with Amanda DiMuro. Ms. DiMuro had been suddenly removed to a county facility and Ms. Mora did not know why. She would constantly ask Gonzalez for information about Amanda.  Ms. Mora believed her interactions with Gonzalez were due to a common interest in the well-being of Ms. DiMuro. Then, one morning, Gonzalez came to her room and woke her up at 5:30 am claiming to have information about Ms. DiMuro.  Ms. Mora had no reason to doubt Gonzalez because of their past discussions.  Gonzalez took Ms. Mora to the administration building where the counselor offices are located. They went into one of the offices and Gonzalez began kissing Ms. Mora, pulled her pants down and penetrated her vagina with his fingers.   Two times he actually battered her.

142.

Ms. Mora never reported any of these instances of sexual abuse for fear of reprisal.  Sixteen days before she was to be transferred to the half-way house, Lieutenant DeCamilla asked her about sexual abuse at Coleman. However, Ms.

Mora did not believe it was safe to answer because Mr. DeCamilla's tone was

threatening and he made her believe that she was the one in trouble and her release

could be jeopardized.

143.

As a result of these persistent sexual assaults and harassment, Ms. Mora has

suffered extensive psychological trauma, physical trauma, depression, pain and

suffering and remains fearful of retaliation even from the outside.  Palomares

continues to try and contact Ms. Mora through a messenger app and she lives in

fear for her safety.  Ms. Mora demands compensation from the United States of

America for this abuse in an amount to be determined at trial.

## LAUREN REYNOLDS

144.

Ms. Reynolds arrived at Coleman Prison Camp in March 2018 serving the

remainder of her prison sentence.  Within a month of her arrival, Officer Kuilan

began sexually harassing her and making suggestive sexual comments while she

worked for him at the outside warehouse.  Officer Kuilan had previously been

investigated for improper sexual conduct with female inmates yet was still

permitted to have unrestricted and unsupervised access to female inmates.

Kuilan's comments to Ms. Reynolds included statements such as "I can make you

hot and sticky," "I can show you what it's like to be with a man again", and I can keep you out of "trouble" and "protect" you if you give me what I want.

145.

Ms. Reynolds first sexual abuse took place in late April 2018 when Kuilan instructed her to go into the commissary cage to see if a freezer door was closed. Kuilan locked the door to the cage behind them and pushed Ms. Reynolds up against the freezer.  Kuilan began kissing Ms. Reynolds, jerked her head back and said he wanted to "bite her fucking tongue out of her mouth."  Kuilan then started touching her breasts and inserted his fingers in her vagina under her pants.  Kuilan grabbed her hand and forced her to touch his penis.  Kuilan then instructed Ms. Reynolds to "suck his dick" and forced her head down towards his penis.  Kuilan ejaculated in her mouth and asked her to "swallow the evidence."

146.

Kuilan instructed Ms. Reynolds not to tell anyone what happened or she would be in "trouble" and be removed to the local county jail.  Kuilan then demanded that Ms. Reynolds report to the "hot room" in the commissary warehouse every Wednesday at 6:45 am so they could have some "private" time before everyone else came to work at 7:00 am.  Ms. Reynolds did as instructed and every Wednesday morning for six months was forced to give Kuilan oral sex and

"swallow the evidence" while he inserted his fingers into her vagina and touched her breasts.

147.

On occasional Thursdays during this time period, Kuilan instructed Ms. Reynolds to accompany him in a vehicle to make deliveries for work.  Kuilan would drive to the tree line before Pen 2 where there were no cameras and instruct Ms. Reynolds to perform oral sex on him while he inserted his fingers into her vagina.

148.

On August 23, 2018, Kuilan performed oral sex on Ms. Reynolds in the "hot room" telling her it was her "birthday present."  In October 2018, USP1 Dana Gonzalez had a couch delivered to a warehouse.  Kuilan took Ms. Reynolds to the warehouse and instructed her to take her clothes off and lay on the couch.  Kuilan made Ms. Reynolds spread her legs so he could inspect her "fat pussy."  Kuilan asked Ms. Reynolds to stop wearing panties to the "hot room" on Wednesdays and to cut a small hole in her pants so he could insert his fingers in her vagina without her having to take her pants down.

149.

On October 4, 2018, while in Kuilan's office, he pulled his penis out and asked Ms. Reynolds to sit on him.  Ms. Reynolds said she was scared and asked

him not to have sexual intercourse with her.  Kuilan said the first time they had sex

he is going to "fuck me" and the second time he is going to let Ms. Reynolds enjoy

it.  On October 9, 2018, Ms. Reynolds informed Kuilan that other inmates were

talking about their "relationship" and she was worried about getting in trouble.  On

October 10, 2018, Ms. Reynolds put in a job transfer to the Powerhouse in an

attempt to get away from Kuilan.  On October 18, 2018 Ms. Reynolds was

interviewed by SIS about her involvement with Kuilan.  Ms. Reynolds initially

denied any involvement out of fear for her safety.  Ms. Reynolds had a second

interview with SIS on October 25, 2018 where she informed SIS of the issues with

Kuilan.

150.

Kuilan told Ms. Reynolds personal information about his vasectomy, his

wife and 5 children living in Kissimmee, Florida, his involvement in selling drugs

in Puerto Rico, his PTSD psychological issues, his counseling sessions every

Friday, his use of medication for paranoia and that he planned to keep the

"relationship" going after she was released by visiting her at a relative's house in

Lake Wales, Florida. Ms. Reynolds can identify Kuilan's uncircumcised penis and

his tattoos on his left arm of Chinese symbols and cherry blossoms.

151.

Kuilan began his sexual abuse of Ms. Reynolds by using his position of authority to threaten her into giving him sexual favors and then kept the abuse going by manipulating her into believing she would be in trouble if the abuse was reported.  Ms. Reynolds never consented or gave Kuilan permission to engage in sexual activity.

<p style="text-align:center">152.</p>

As a result of the continuous sexual assaults perpetrated by Officer Kuilan on Ms. Reynolds she has suffered extensive psychological trauma, physical trauma, depression, pain and suffering and is fearful for her safety.  Ms. Reynolds demands compensation from the United States of America for this abuse in an amount to be determined at trial.

<p style="text-align:center"><strong><u>MAGGIE LEON</u></strong></p>

<p style="text-align:center">153.</p>

Officer Palomares began sexually harassing ***Maggie Leon*** by making suggestive sexual comments and detailing sexual acts he wanted ***Maggie Leon*** to perform on him.  ***Maggie Leon*** was checking out after visitation, Officer Palomares locked her in the checkout area and pushed her up against the wall.  He started kissing her and rubbing his hands on her breasts.  He pulled his erect penis out and said "look what you did to me, now you have to fix it."  While pinned against the wall, Officer Palomares asked ***Maggie Leon*** if she "swallows" and can she get

"pregnant." When **Maggie Leon** answered that she could in fact get pregnant, Officer Palomares responded "you will suck my dick" and if you tell anyone I will make sure you are immediately transferred to county. Officer Palomares pushed **Maggie Leon's** head down on his erect penis and forced her to give him oral sex, ejaculating in her mouth and forcing her to swallow his semen.

154.

Over the next five years between 2013 and 2018, Officer Palomares took advantage of his unrestricted and unsupervised access to **Maggie Leon** and would commit sexual assault and sexual battery upon **Maggie Leon** by forcing her to perform oral sex on him whenever he isolated her in a private area hidden from video surveillance (upstairs staff bathroom between F3 and F4, upstairs supply closet, VR restroom, VR storage room etc...). The acts of sexual assault and sexual battery, through non-consensual oral sex, occurred no less than 2-4 times per month until Officer Palomares was finally removed from Coleman Prison Camp. Officer Palomares began referring to **Maggie Leon** as his "Mama Leche" and gave her his personal email address (latinoparati79@gmail.com) which he instructed her to use if any prison administrative officials investigated his misconduct. Officer Palomares threatened to send **Maggie Leon** to the county jail if she reported this abuse and **Maggie Leon** believed that Officer Palomares had the authority to remove inmates that disobeyed his orders.

66

155.

Officer Campbell tried to befriend *Maggie Leon* and often talked to her about his family and asked questions about her family. *Maggie Leon* believed Officer Campbell was a good man that truly wanted to be her friend.  In June 2017, Officer Campbell took *Maggie Leon* to the R&D closet.  He pulled out his penis and demanded *Maggie Leon* perform oral sex on him. *Maggie Leon* was shocked and felt betrayed but was too scared to refuse.  Two weeks later, Officer Campbell returned and took *Maggie Leon* to the storage closet in the VR.  *Maggie Leon*  which ended with him  ejaculating in her mouth.  These acts of sexual assault and sexual battery continued for several months and included both sexual intercourse and oral sex in the R&D closet, VR bathroom, and VR storage room.  In December 2017, a female officer at the Coleman Prison Camp observed Officer Campbell and Ms. Leon coming out of a restricted area in the administrative building. Out of fear of being reported, Officer Campbell left *Maggie Leon* alone from this time forward.

156.

In 2014, *Maggie Leon*  started working in the kitchen area with Officer Laudenstager.  Officer Laudenstager had a meeting with the inmates working the kitchen and informed everyone that he suffered from PTSD and if he acted weird it was because he probably forgot to take his medication.  Officer Laudenstager began assigning special cleaning tasks to *Maggie Leon* that would take long enough so that

the other kitchen inmates would leave.  Officer Laudenstager used this alone time to commit acts of sexual assault and sexual battery upon *Maggie Leon*. The sexual abuse started late one afternoon in the kitchen chemical room when Officer Laudenstager pulled out his penis and forced *Maggie Leon's* head down to initiate oral sex. The next occasion occurred in the kitchen storage room where Officer Laudenstager bent *Maggie Leon*  over some canned goods and had sexual intercourse with her from behind.  Officer Laudenstager ejaculated inside *Maggie Leon***'s** vagina and said that he had been "fixed" so she did not need to worry about getting pregnant.  These acts of sexual assault and sexual battery continued at least once a week for several months until the Department of Justice came to Coleman Prison Camp and interviewed *Maggie Leon.* During the interview *Maggie Leon* denied any sexual abuse because Officer Laudenstager had threatened to transfer her to a different federal facility out of state and  away from her family if she made any complaints.  *Maggie Leon* believed it was possible as another inmate had informed the administration of sexual abuse by Officer Palomares and that inmate was immediately removed from Coleman Prison Camp.

157.

*Maggie Leon* can identify personal characteristics of the bodies and genitalia of each of her three assailants.  *Maggie Leon* also detailed information about the assaults and other issues at the Coleman Prison Camp in a journal that was recently

confiscated by Lieutenant DeCamilla.  As a result of the numerous instances of sexual assault and sexual battery *Maggie Leon* suffered at the hands of Officers Palomares, Campbell and Laudenstager, *Maggie Leon* has suffered extensive psychological trauma, physical trauma, depression, pain and suffering and is fearful of being caught alone by another man.  *Maggie Leon* demands compensation from the United States of America for this abuse in an amount to be determined.

## COUNT I
## NEGLIGENCE AS TO PLAINTIFFS BEAUBRUN, GODUTO, GUGGINO, HOEHN, JOHNSON, PHILLIPS, URSINY, WATSON, BERMAN, FLOWERS, AND ALOE

158.

Plaintiffs Beaubrun, Goduto, Guggino, Hoehn, Johnson, Phillips, Ursiny, Watson, Berman, Flowers, and Aloe incorporate by reference the allegations set forth in paragraphs 1-26 and 30-118 of this Complaint for Damages as if fully set forth herein.

159.

The Coleman Management Team, the FCI Tallahassee Management Team and the Prison Investigative Agencies owed a duty to Plaintiffs while incarcerated at the Coleman Prison Camp or FCI Tallahassee to "protect public safety by

ensuring that federal offenders serve their sentences of imprisonment in facilities that are <u>safe</u>, <u>humane</u>, cost efficient and appropriately <u>secure</u>" as mandated by the BOP.

<div align="center">160.</div>

The Coleman Management Team, the FCI Tallahassee Management Team and the Prison Investigative Agencies breached their duties to Plaintiffs by negligently supervising, managing and retaining the Offending Officers during Plaintiffs' incarceration at the Coleman Prison Camp and FCI Tallahassee.

<div align="center">161.</div>

The Coleman Management Team, the FCI Tallahassee Management Team and the Prison Investigative Agencies breached their duties to Plaintiffs by providing the Offending Officers with <u>unrestricted</u> and <u>unsupervised</u> one-on-one access to Plaintiffs while incarcerated at the Coleman Prison Camp and FCI Tallahassee despite knowledge of the Offending Officers' past sexual abuse and harassment of female inmates.

<div align="center">162.</div>

The Coleman Management Team, the FCI Tallahassee Management Team and the Prison Investigative Agencies breached their duties to Plaintiffs by creating a system where victims of sexual abuse and harassment are punished for reporting the sexual misconduct of prison staff by transfer to more secure facilities, removal

from educational and vocational programs, placement in special housing units, loss of early release rights, detrimental write-ups and loss of work privileges.

163.

The Coleman Management Team, the FCI Tallahassee Management Team and the Prison Investigative Agencies breached their duties to Plaintiffs under PREA as follows:

- Section 115.11 – failing to enforce zero tolerance policy
- Section 115.13 – failing to supervise and monitor (video surveillance) one-on-one inmate/officer contact
- Section 115.15 – permitting improper cross-gender pat downs
- Section 115.17 – hiring, promoting and retaining officers who "may" have had improper sexual contact
- Section 115.43 – punishing sex victims with involuntary segregated housing, loss of privileges and work permits
- Section 115.61 – failing to report suspicion of sexual abuse
- Section 115.67 – failing to protect inmates from retaliation after reporting abuse
- Section 115.76 – failing to discipline staff for sexual misconduct

164.

As a direct and proximate cause of the negligence outlined above, the Coleman Management Team, the FCI Tallahassee Management Team and the Prison Investigative Agencies caused damage to Plaintiffs including psychological trauma, emotional distress, depression, physical trauma and pain and suffering.

165.

Plaintiffs are entitled to damages from the United States of America under the Federal Tort Claims Act for the negligence of the Coleman Management Team, the FCI Tallahassee Management Team and the Prison Investigative Agencies in an amount to be determined at trial.

## COUNT II

### ASSAULT AND BATTERY AS TO PLAINTIFFS BEABRUN, GODUTO, GUGGINO, HOEHN, JOHNSON, PHILLIPS, URSINY, WATSON, BERMAN, FLOWERS, AND ALOE

166.

Plaintiffs Beaubrun, Goduto, Guggino, Hoehn, Johnson, Phillips, Ursiny, Watson, Berman, Flowers, and Aloe incorporate by reference the allegations set forth in paragraphs 1-26 and 30-118 of this Complaint for Damages as if fully set forth herein.

167.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of **_Rachelle Beaubrun_**, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 58-64 herein. Officer Palomares caused damage to Ms. Beaubrun including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for

which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

<div align="center">168.</div>

Officer Phillips, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of ***Kristen Goduto***, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 65-70 herein.  Officer Phillips caused damage to Ms. Goduto including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

<div align="center">169.</div>

Officers Urdialez and Vann, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional assault and battery of ***Kara Guggino***, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 71-85 herein. Officers Urdialez and Vann caused damage to Ms. Guggino including psychological trauma, emotional distress, depression, physical trauma and pain and

suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

170.

Officers Palomares and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional assault and battery of **_Sara Hoehn_**, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 86-91 herein. Officers Palomares and Phillips caused damage to Ms. Hoehn including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

171.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of **_April Johnson_**, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 92-95 herein. Officer Palomares caused damage to Ms. Johnson including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

172.

Officers Palomares and Campbell, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional assault and battery of *Terry Nagy-Phillips*, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 96-100 herein.  Officers Palomares and Campbell caused damage to Ms. Nagy-Phillips including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

173.

Officers Palomares, Campbell and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional assault and battery of *Ann Ursiny*, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 101-106 herein.  Officers Palomares, Campbell and Phillips caused damage to Ms. Ursiny including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

174.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of **Karen Watson**, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 107-111 herein. Officer Palomares caused damage to Ms. Watson including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

175.

Officers Palomares, Vann and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional assault and battery of **Carleane Berman**, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 112-113 herein.  Officers Palomares, Vann and Phillips caused damage to Ms. Berman including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

176.

Officers Palomares, Vann and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials,

engaged in the intentional assault and battery of ***Miranda Flowers***, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 114-115 herein.  Officers Palomares, Vann and Phillips caused damage to Ms. Flowers including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

<div align="center">177.</div>

Officers Campbell and Palomares, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional assault and battery of ***Judi Aloe***, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 116-118 herein.  Officers Campbell and Palomares caused damage to Ms. Aloe including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

<div align="center">

**<u>COUNT III</u>**

**<u>FALSE IMPRISONMENT AS TO PLAINTIFFS BEAUBRUN,
GODUTO, GUGGINO, HOEHN, JOHNSON, PHILLIPS,
URSINY, WATSON, BERMAN, FLOWERS, AND ALOE</u>**

178.

</div>

Plaintiffs Beaubrun, Goduto, Guggino, Hoehn, Johnson, Phillips, Ursiny, Watson, Berman, Flowers, and Aloe incorporate by reference the allegations set forth in paragraphs 1-26 and 30-118 of this Complaint for Damages as if fully set forth herein.

179.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, unlawfully detained and deprived **Rachelle Beaubrun** of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 58-64 herein.   Officer Palomares caused damage to Ms. Beaubrun including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

180.

Officer Phillips, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, unlawfully detained and deprived **Kristen Goduto** of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 65-70 herein.

Officer Phillips caused damage to Ms. Goduto including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

<div align="center">181.</div>

Officers Urdialez and Vann, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, unlawfully detained and deprived **_Kara Guggino_** of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 71-85 herein.   Officers Urdialez and Vann caused damage to Ms. Guggino including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

<div align="center">182.</div>

Officers Palomares and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, unlawfully detained and deprived **_Sara Hoehn_** of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in

paragraphs 86-91 herein.   Officers Palomares and Phillips caused damage to Ms. Hoehn including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

<div align="center">183.</div>

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, unlawfully detained and deprived **April Johnson** of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 92-95 herein.   Officer Palomares caused damage to Ms. Johnson including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

<div align="center">184.</div>

Officers Palomares and Campbell, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, unlawfully detained and deprived **Terry Nagy-Phillips** of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in

paragraphs 96-100 herein.   Officers Palomares and Campbell caused damage to
Ms. Nagy-Phillips including psychological trauma, emotional distress, depression,
physical trauma and pain and suffering for which the United States of America is
liable under the Federal Tort Claims Act in an amount to be determined at trial.

185.

Officers Palomares, Campbell and Phillips, acting within the course and
scope of their employment with the BOP as investigative or law enforcement
officials, unlawfully detained and deprived *Ann Ursiny* of her liberty and freedom
against her will and consent, without legal authority or necessity, and for the sole
purpose of engaging in non-consensual sexual abuse and harassment as detailed in
paragraphs 101-106 herein.   Officers Palomares, Campbell and Phillips caused
damage to Ms. Ursiny including psychological trauma, emotional distress,
depression, physical trauma and pain and suffering for which the United States of
America is liable under the Federal Tort Claims Act in an amount to be determined
at trial.

186.

Officer Palomares, acting within the course and scope of his employment
with the BOP as an investigative or law enforcement official, unlawfully detained
and deprived *Karen Watson* of her liberty and freedom against her will and
consent, without legal authority or necessity, and for the sole purpose of engaging

81

in non-consensual sexual abuse and harassment as detailed in paragraphs 107-111 herein.   Officer Palomares caused damage to Ms. Watson including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

187.

Officers Palomares, Vann and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, unlawfully detained and deprived ***Carleane Berman*** of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 112-113 herein.   Officers Palomares, Vann and Phillips caused damage to Ms. Berman including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

188.

Officers Palomares, Vann and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, unlawfully detained and deprived ***Miranda Flowers*** of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole

purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 114-115 herein.   Officers Palomares, Vann and Phillips caused damage to Ms. Flowers including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

189.

Officers Campbell and Palomares, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, unlawfully detained and deprived ***Judi Aloe*** of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 116-118 herein.   Officers Campbell and Palomares caused damage to Ms. Aloe including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

## COUNT IV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS TO PLAINTIFFS BEAUBRUN, GODUTO, GUGGINO, HOEHN, JOHNSON, PHILLIPS, URSINY, WATSON, BERMAN, FLOWERS, AND ALOE

190.

83

Plaintiffs Beaubrun, Goduto, Guggino, Hoehn, Johnson, Phillips, Ursiny, Watson, Berman, Flowers, and Aloe incorporate by reference the allegations set forth in paragraphs 1-26 and 30-118 of this Complaint for Damages as if fully set forth herein.

191.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional infliction of emotional distress of **Rachelle Beaubrun** through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 58-64 herein. Officer Palomares' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Beaubrun, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

192.

Officer Phillips, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional infliction of emotional distress of **Kristen Goduto** through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 65-70 herein.

84

Officer Phillips' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Goduto, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

193.

Officers Urdialez and Vann, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional infliction of emotional distress of *Kara Guggino* through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 71-85 herein. Officer Urdialez' and Officer Vann's conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Guggino, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

194.

Officers Palomares and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged

in the intentional infliction of emotional distress of **Sara Hoehn** through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 86-91 herein. Officer Palomares' and Officer Phillips' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Hoehn, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

195.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional infliction of emotional distress of **April Johnson** through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 92-95 herein. Officer Palomares' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Johnson, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

196.

Officers Palomares and Campbell, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional infliction of emotional distress of **Terry Nagy-Phillips** through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 96-100 herein. Officer Palomares' and Officer Campbell's conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Nagy-Phillips, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

197.

Officers Palomares, Campbell and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional infliction of emotional distress of **Ann Ursiny** through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 101-106 herein. Officer Palomares', Officer Campbell's and Officer Phillips' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the

emotional distress endured by Ms. Ursiny, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

198.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional infliction of emotional distress of **Karen Watson** through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 107-111 herein. Officer Palomares' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Watson, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

199.

Officers Palomares, Vann and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional infliction of emotional distress of **Carleane Berman** through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 112-113 herein. Officer Palomares', Officer Vann's and Officer

Phillips' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Berman, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

<div align="center">200.</div>

Officers Palomares, Vann and Phillips, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional infliction of emotional distress of ***Miranda Flowers*** through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 114-115 herein. Officer Palomares', Officer Vann's and Officer Phillips' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Berman, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

<div align="center">201.</div>

Officers Campbell and Palomares, acting within the course and scope of their employment with the BOP as investigative or law enforcement officials, engaged in the intentional infliction of emotional distress of ***Judi Aloe*** through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 116-118 herein. Officer Campbell's and Officer Palomares' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Aloe, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs requests that the Court:

1) Grant judgment in favor of Plaintiffs on their claims for Negligence, Assault and Battery, False Imprisonment, and Intentional Infliction of Emotional Distress;

2) Award damages to Plaintiffs in amounts to be determined at trial;

3) Grant Plaintiffs a jury trial on all claims triable by jury; and

4) Grant such other and further relief the Court deems just and proper.

## COUNT V – PLAINTIFF AMANDA DIMURO'S
## CLAIM FOR NEGLIGENCE

### 202.

Ms. DiMuro incorporates by reference the allegations set forth in paragraphs 1-157 of this Complaint for Damages as if fully set forth herein.

### 203.

The Coleman Management Team and the Prison Investigative Agencies owed a duty to Ms. DiMuro while incarcerated at the Coleman Prison Camp to "protect public safety by ensuring that federal offenders serve their sentences of imprisonment in facilities that are <u>safe</u>, <u>humane</u>, cost efficient and appropriately <u>secure</u>" as mandated by the BOP.

### 204.

The Coleman Management Team and the Prison Investigative Agencies breached their duties to Ms. DiMuro by negligently supervising, managing and retaining Officers Vann and Gonzalez during Ms. DiMuro's incarceration at the Coleman Prison Camp.

### 205.

The Coleman Management Team and the Prison Investigative Agencies breached their duties to Ms. DiMuro by creating a system where victims of sexual abuse and harassment are punished for reporting the sexual misconduct of prison

staff by transfer to more secure facilities, removal from educational and vocational

programs, placement in special housing units, loss of early release rights,

detrimental write-ups and loss of work privileges.

<div align="center">206.</div>

The Coleman Management Team and the Prison Investigative Agencies

breached their duties to Ms. DiMuro under PREA as follows:

- Section 115.11 – failing to enforce zero tolerance policy
- Section 115.13 – failing to supervise and monitor (video surveillance) one-on-one inmate/officer contact
- Section 115.15 – permitting improper cross-gender pat downs
- Section 115.17 – hiring, promoting and retaining officers who "may" have had improper sexual contact
- Section 115.43 – punishing sex victims with involuntary segregated housing, loss of privileges and work permits
- Section 115.61 – failing to report suspicion of sexual abuse
- Section 115.67 – failing to protect inmates from retaliation after reporting abuse
- Section 115.76 – failing to discipline staff for sexual misconduct

<div align="center">207.</div>

As a direct and proximate cause of the negligence outlined above, the

Coleman Management Team and the Prison Investigative Agencies caused damage

to Ms. DiMuro including psychological trauma, emotional distress, depression,

physical trauma and pain and suffering.

<div align="center">208.</div>

Ms. DiMuro is entitled to damages from the United States of America under the Federal Tort Claims Act for the negligence of the Coleman Management Team and the Prison Investigative Agencies in an amount to be determined at trial.

## COUNT VI – PLAINTIFF AMANDA DIMURO'S CLAIM FOR ASSAULT AND BATTERY AS IT RELATES TO ACTIONS BY OFFICER VANN

209.

Plaintiff Amanda DiMuro reincorporates paragraphs 12; 16-57; and 119–128 as if fully set forth herein.

210.

Officer Vann, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of Plaintiff Amanda DiMuro through unwanted, non-consensual touching and sexual abuse and harassment as detailed in paragraphs 119-120 above.  Officer Vann's actions caused damages to Ms. DiMuro including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act.

**WHEREFORE,** Plaintiff Amanda DiMuro seeks entry of judgement against Defendant the United States of America for damages and any further relief the Court deems just and necessary.

## COUNT VII – PLAINTIFF AMANDA DIMURO'S

93

## CLAIM FOR ASSAULT AND BATTERY AS IT
## RELATES TO ACTIONS BY OFFICER GONZALEZ

### 211.

Plaintiff Amanda DiMuro reasserts and realleges paragraphs 12; 16-57; and 119– 128 as if fully set forth herein. as if fully set forth herein.

### 212.

Officer Gonzalez, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of Plaintiff Amanda DiMuro through unwanted, non-consensual touching and sexual abuse and harassment as detailed in paragraphs 121-127 above.  Officer Gonzalez' actions caused damages to Ms. DiMuro including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act.

**WHEREFORE,** Plaintiff Amanda DiMuro seeks entry of judgement against Defendant the United States of America for damages and any further relief the Court deems just and necessary.

## COUNT VIII – PLAINTIFF AMANDA DIMURO'S
## CLAIM FOR FALSE IMPRISONMENT AS IT
## RELATES TO ACTIONS BY OFFICER VANN

### 213.

94

Plaintiff Amanda DiMuro reincorporates paragraphs 12; 16-57; and 119–128 as if fully set forth herein.

214.

Officer Vann, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, unlawfully detained and deprived Plaintiff Amanda DiMuro of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 119-120 herein. Officer Vann's actions caused damages to Ms. DiMuro including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act.

**WHEREFORE,** Plaintiff Amanda DiMuro seeks entry of judgement against Defendant the United States of America for damages and any further relief the Court deems just and necessary.

### COUNT IX – PLAINTIFF AMANDA DIMURO'S CLAIM FOR FALSE IMPRISONMENT AS IT RELATES TO ACTIONS BY OFFICER GONZALEZ

215.

Plaintiff Amanda DiMuro reincorporates paragraphs 12; 16-57; and 119–128 as if fully set forth herein.

216.

Officer Gonzalez, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, unlawfully detained and deprived Plaintiff Amanda DiMuro of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 121-127 herein.   Officer Gonzalez' actions caused damage to Ms. DiMuro including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act.

**WHEREFORE,** Plaintiff Amanda DiMuro seeks entry of judgement against Defendant the United States of America for damages and any further relief the Court deems just and necessary.

### COUNT X – PLAINTIFF AMANDA DIMURO'S CLAIM FOR EMOTIONAL DISTRESS AS IT RELATES TO ACTIONS BY OFFICER VANN

217.

Plaintiff Amanda DiMuro reincorporates paragraphs 12; 16-57; and 119–128 as if fully set forth herein.

218.

Officer Vann, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional infliction of emotional distress of Plaintiff Amanda DiMuro through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 119-120 herein. Officer Vann's conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. DiMuro, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act.

**WHEREFORE,** Plaintiff Amanda DiMuro seeks entry of judgement against Defendant the United States of America for damages and any further relief the Court deems just and necessary.

## COUNT XI – PLAINTIFF AMANDA DIMURO'S CLAIM FOR EMOTIONAL DISTRESS AS IT RELATES TO ACTIONS BY OFFICER GONZALEZ

219.

Plaintiff Amanda DiMuro reincorporates paragraphs 12; 16-57; and 119–128 as if fully set forth herein.

220.

Officer Gonzalez, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional infliction of emotional distress of Plaintiff Amanda DiMuro through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 121-127 herein. Officer Gonzalez' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. DiMuro, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act.

**WHEREFORE,** Plaintiff Amanda DiMuro seeks entry of judgement against Defendant the United States of America for damages and any further relief the Court deems just and necessary.

## <u>COUNT XII – PLAINTIFF REBECA MORA'S CLAIM FOR NEGLIGENCE</u>

221.

Rebeca Mora incorporates by reference the allegations set forth in paragraphs 157 as if fully set forth herein.

222.

The Coleman Management Team and the Prison Investigative Agencies owed a duty to Ms. Mora while incarcerated at the Coleman Prison Camp to "protect public safety by ensuring that federal offenders serve their sentences of imprisonment in facilities that are <u>safe</u>, <u>humane</u>, cost efficient and appropriately <u>secure</u>" as mandated by the BOP.

223.

The Coleman Management Team and the Prison Investigative Agencies breached their duties to Ms. Mora by negligently supervising, managing and retaining Officers Palomares, Gonzalez, and Phillips during Ms. Mora's incarceration at the Coleman Prison Camp.

224.

The Coleman Management Team and the Prison Investigative Agencies breached their duties to Ms. Mora by creating a system where victims of sexual abuse and harassment are punished for reporting the sexual misconduct of prison staff by transfer to more secure facilities, removal from educational and vocational programs, placement in special housing units, loss of early release rights, detrimental write-ups and loss of work privileges.

225.

The Coleman Management Team and the Prison Investigative Agencies breached their duties to Ms. Mora under PREA as follows:

- Section 115.11 – failing to enforce zero tolerance policy
- Section 115.13 – failing to supervise and monitor (video surveillance) one-on-one inmate/officer contact
- Section 115.15 – permitting improper cross-gender pat downs
- Section 115.17 – hiring, promoting and retaining officers who "may" have had improper sexual contact
- Section 115.43 – punishing sex victims with involuntary segregated housing, loss of privileges and work permits
- Section 115.61 – failing to report suspicion of sexual abuse
- Section 115.67 – failing to protect inmates from retaliation after reporting abuse
- Section 115.76 – failing to discipline staff for sexual misconduct

226.

As a direct and proximate cause of the negligence outlined above, the Coleman Management Team and the Prison Investigative Agencies caused damage to Ms. Mora including psychological trauma, emotional distress, depression, physical trauma and pain and suffering.

227.

Ms. Mora is entitled to damages from the United States of America under the Federal Tort Claims Act for the negligence of the Coleman Management Team and the Prison Investigative Agencies in an amount to be determined at trial.

## COUNT XIII – PLAINTIFF REBECA MORA'S CLAIM FOR ASSAULT AND BATTERY AS IT RELATES TO ACTIONS BY OFFICER PALOMARES

228.

Plaintiff Rebeca Mora reasserts and realleges paragraphs 13; 16-57; and 129-143 as if fully set forth herein.

229.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of Plaintiff Rebeca Mora through unwanted, non-consensual touching and sexual abuse and harassment as detailed in paragraphs 130-136 above.  Officer Palomares' actions caused damages to Ms. Mora including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act.

**WHEREFORE,** Plaintiff Rebeca Mora seeks entry of judgement against Defendant the United States of America for damages and any further relief the Court deems just and necessary.

### COUNT XIV – PLAINTIFF REBECA MORA'S CLAIM FOR ASSAULT AND BATTERY AS IT RELATES TO ACTIONS BY OFFICER PHILLIPS

230.

Plaintiff Rebeca Mora reasserts and realleges paragraphs 13; 16-57; and 129-143 as if fully set forth herein.

231.

Officer Phillips, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of Plaintiff Rebeca Mora through unwanted, non-consensual touching and sexual abuse and harassment as detailed in paragraphs 137-140 above.  Officer Phillips' actions caused damages to Ms. Mora including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act.

**WHEREFORE,** Plaintiff Rebeca Mora seeks entry of judgement against Defendant the United States of America for damages and any further relief the Court deems just and necessary.

## COUNT XV – PLAINTIFF REBECA MORA'S CLAIM FOR ASSAULT AND BATTERY AS IT RELATES TO ACTIONS BY OFFICER GONZALEZ

232.

Plaintiff Rebeca Mora reasserts and realleges paragraphs 13; 16-57; and 129-143 as if fully set forth herein.

233.

Officer Gonzalez, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of Plaintiff Rebeca Mora through unwanted, non-

consensual touching and sexual abuse and harassment as detailed in paragraphs

141-142 above.  Officer Gonzalez' actions caused damages to Ms. Mora including

psychological trauma, emotional distress, depression, physical trauma and pain and

suffering for which the United States of America is liable under the Federal Tort

Claims Act.

**WHEREFORE,** Plaintiff Rebeca Mora seeks entry of judgement against

Defendant the United States of America for damages and any further relief the

Court deems just and necessary.

### COUNT XVI – PLAINTIFF REBECA MORA'S CLAIM FOR FALSE IMPRISONMENT AS IT RELATES TO ACTIONS BY OFFICER PALOMARES

234.

Plaintiff Rebeca Mora reincorporates paragraphs 13; 16-57; and 129-143 as

if fully set forth herein.

235.

Officer Palomares, acting within the course and scope of his employment

with the BOP as an investigative or law enforcement official, unlawfully detained

and deprived Plaintiff Rebeca Mora of her liberty and freedom against her will and

consent, without legal authority or necessity, and for the sole purpose of engaging

in non-consensual sexual abuse and harassment as detailed in paragraphs 130-136

herein.  Officer Palomares' actions caused damages to Ms. Mora including

psychological trauma, emotional distress, depression, physical trauma and pain and

suffering for which the United States of America is liable under the Federal Tort

Claims Act.

    **WHEREFORE,** Plaintiff Rebeca Mora seeks entry of judgement against

Defendant the United States of America for damages and any further relief the

Court deems just and necessary.

<div align="center">

**COUNT XVII – PLAINTIFF REBECA MORA'S
CLAIM FOR FALSE IMPRISONMENT AS IT
<u>RELATES TO ACTIONS BY OFFICER PHILLIPS</u>**

</div>

<div align="center">

236.

</div>

    Plaintiff Rebeca Mora reincorporates paragraphs 13; 16-57; and 129-143 as

if fully set forth herein.

<div align="center">

237.

</div>

    Officer Phillips, acting within the course and scope of his employment with

the BOP as an investigative or law enforcement official, unlawfully detained and

deprived Plaintiff Rebeca Mora of her liberty and freedom against her will and

consent, without legal authority or necessity, and for the sole purpose of engaging

in non-consensual sexual abuse and harassment as detailed in paragraphs 137-140

herein.  Officer Phillips' actions caused damages to Ms. Mora including

psychological trauma, emotional distress, depression, physical trauma and pain and

suffering for which the United States of America is liable under the Federal Tort Claims Act.

**WHEREFORE,** Plaintiff Rebeca Mora seeks entry of judgement against Defendant the United States of America for damages and any further relief the Court deems just and necessary.

### COUNT XVIII – PLAINTIFF REBECA MORA'S CLAIM FOR FALSE IMPRISONMENT AS IT RELATES TO ACTIONS BY OFFICER GONZALEZ

238.

Plaintiff Rebeca Mora reincorporates paragraphs 13; 16-57; and 129-143 as if fully set forth herein.

239.

Officer Gonzalez, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, unlawfully detained and deprived Plaintiff Rebeca Mora of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 141-142 herein.  Officer Gonzalez' actions caused damages to Ms. Mora including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act.

**WHEREFORE,** Plaintiff Rebeca Mora seeks entry of judgement against Defendant the United States of America for damages and any further relief the Court deems just and necessary.

### COUNT XIX – PLAINTIFF REBECA MORA'S CLAIM FOR EMOTIONAL DISTRESS AS IT RELATES TO ACTIONS BY OFFICER PALOMARES

240.

Plaintiff Rebeca Mora reincorporates paragraphs 13; 16-57; and 129-143 as if fully set forth herein.

241.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional infliction of emotional distress of Plaintiff Mora through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 130-136 herein. Officer Palomares' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Mora, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act.

**WHEREFORE,** Plaintiff Rebeca Mora seeks entry of judgement against Defendant the United States of America for damages and any further relief the Court deems just and necessary.

## COUNT XX – PLAINTIFF REBECA MORA'S CLAIM FOR EMOTIONAL DISTRESS AS IT RELATES TO ACTIONS BY OFFICER PHILLIPS

242.

Plaintiff Rebeca Mora reincorporates paragraphs 13; 16-57; and 129-143 as if fully set forth herein.

243.

Officer Phillips, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional infliction of emotional distress of Plaintiff Mora through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 137-140 herein. Officer Phillips conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Mora, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act.

**WHEREFORE,** Plaintiff Rebeca Mora seeks entry of judgement against Defendant the United States of America for damages and any further relief the Court deems just and necessary.

### COUNT XXI – PLAINTIFF REBECA MORA'S CLAIM FOR EMOTIONAL DISTRESS AS IT RELATES TO ACTIONS BY OFFICER GONZALEZ

244.

Plaintiff Rebeca Mora reincorporates paragraphs 13; 16-57; and 129-143 as if fully set forth herein.

245.

Officer Gonzalez, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional infliction of emotional distress of Plaintiff Mora through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 141-142 herein. Officer Phillips conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Mora, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act.

**WHEREFORE,** Plaintiff Rebeca Mora seeks entry of judgement against Defendant the United States of America for damages and any further relief the Court deems just and necessary.

<u>**COUNT XXII – PLAINTIFF LAUREN REYNOLDS'
CLAIM FOR NEGLIGENCE**</u>

246.

Ms. Reynolds incorporates by reference the allegations set forth in paragraphs 1 – 157 of this Complaint for Damages as if fully set forth herein.

247.

The Coleman Management Team and the Prison Investigative Agencies owed a duty to Ms. Reynolds while incarcerated at the Coleman Prison Camp to "protect public safety by ensuring that federal offenders serve their sentences of imprisonment in facilities that are <u>safe</u>, <u>humane</u>, cost efficient and appropriately <u>secure</u>" as mandated by the BOP.

248.

The Coleman Management Team and the Prison Investigative Agencies breached their duties to Ms. Reynolds by negligently supervising, managing and retaining Officer Kuilan during Ms. Reynolds' incarceration at the Coleman Prison Camp.

249.

109

The Coleman Management Team and the Prison Investigative Agencies breached their duties to Ms. Reynolds by providing the Officer Kuilan with <u>unrestricted</u> and <u>unsupervised</u> one-on-one access to Plaintiffs while she was incarcerated at the Coleman Prison Camp despite knowledge of prior allegations of sexual abuse and harassment of female inmates brought against Officer Kuilan.

250.

The Coleman Management Team and the Prison Investigative Agencies breached their duties to Ms. Reynolds by creating a system where victims of sexual abuse and harassment are punished for reporting the sexual misconduct of prison staff by transfer to more secure facilities, removal from educational and vocational programs, placement in special housing units, loss of early release rights, detrimental write-ups and loss of work privileges.

251.

The Coleman Management Team and the Prison Investigative Agencies breached their duties to Ms. Reynolds under PREA as follows:

- Section 115.11 – failing to enforce zero tolerance policy
- Section 115.13 – failing to supervise and monitor (video surveillance) one-on-one inmate/officer contact
- Section 115.15 – permitting improper cross-gender pat downs
- Section 115.17 – hiring, promoting and retaining officers who "may" have had improper sexual contact
- Section 115.43 – punishing sex victims with involuntary segregated housing, loss of privileges and work permits
- Section 115.61 – failing to report suspicion of sexual abuse

110

- Section 115.67 – failing to protect inmates from retaliation after reporting abuse
- Section 115.76 – failing to discipline staff for sexual misconduct

252.

As a direct and proximate cause of the negligence outlined above, the Coleman Management Team and the Prison Investigative Agencies caused damage to Ms. Reynolds including psychological trauma, emotional distress, depression, physical trauma and pain and suffering.

253.

Ms. Reynolds is entitled to damages from the United States of America under the Federal Tort Claims Act for the negligence of the Coleman Management Team and the Prison Investigative Agencies in an amount to be determined at trial.

**WHEREFORE,** Plaintiff Lauren Reynolds seeks entry of judgement against Defendant the United States of America for damages and any further relief the Court deems just and necessary.

## COUNT XXIII – PLAINTIFF LAUREN REYNOLDS' CLAIM FOR ASSAULT AND BATTERY

254.

Ms. Reynolds incorporates by reference the allegations set forth in paragraphs 14; 16-57; and 144-152 of this Complaint for Damages as if fully set forth herein.

255.

Officer Kuilan, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of *Ms. Reynolds*, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 144-152 herein.  Officer Kuilan caused damage to Ms. Reynolds including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

**WHEREFORE,** Plaintiff Lauren Reynolds seeks entry of judgement against Defendant the United States of America for damages and any further relief the Court deems just and necessary.

## COUNT XXIV – PLAINTIFF LAUREN REYNOLDS' CLAIM FOR FALSE IMPRISONMENT

256.

Ms. Reynolds' incorporates by reference the allegations set forth in paragraphs 14; 16-57; and 144-152 of this Complaint for Damages as if fully set forth herein.

257.

Officer Kuilan, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, unlawfully detained and deprived *Ms. Reynolds* of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraphs 144-152 herein. Officer Kuilan caused damage to Ms. Reynolds including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

**WHEREFORE,** Plaintiff Lauren Reynolds seeks entry of judgement against Defendant the United States of America for damages and any further relief the Court deems just and necessary.

## COUNT XXV – PLAINTIFF LAUREN REYNOLDS' CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

258.

Ms. Reynolds incorporates by reference the allegations set forth in paragraphs 14; 16-57; and 144-152 of this Complaint for Damages as if fully set forth herein.

259.

Officer Kuilan, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional infliction of emotional distress of **Ms. Reynolds** through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 144-152 herein. Officer Kuilans' conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Reynolds, and (4) severe and damaging for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

<u>**COUNT XXVI – PLAINTIFF MAGGIE LEON'S
CLAIM FOR NEGLIGENCE**</u>

260.

Plaintiff **Maggie Leon** incorporates by reference the allegations set forth in paragraphs 1-157 of this Complaint for Damages as if fully set forth herein.

261.

The Coleman Management Team and the Prison Investigative Agencies owed a duty to Ms. Leon while incarcerated at the Coleman Prison Camp to "protect public safety by ensuring that federal offenders serve their sentences of imprisonment in facilities that are <u>safe</u>, <u>humane</u>, cost efficient and appropriately <u>secure</u>" as mandated by the BOP.

114

262.

The Coleman Management Team and the Prison Investigative Agencies breached their duties to *Maggie Leon* by negligently supervising, managing and retaining the Offending Officers during *Maggie Leon's* incarceration at the Coleman Prison Camp.

263.

The Coleman Management Team and the Prison Investigative Agencies breached their duties to *Maggie Leon* by providing the Offending Officers with underlined and unsupervised one-on-one access to *Maggie Leon* while incarcerated at the Coleman Prison Camp despite knowledge of the Offending Officers' past sexual abuse and harassment of female inmates.

264.

The Coleman Management Team and the Prison Investigative Agencies breached their duties to *Maggie Leon* by creating a system where victims of sexual abuse and harassment are punished for reporting the sexual misconduct of prison staff by transfer to more secure facilities, removal from educational and vocational programs, placement in special housing units, loss of early release rights, detrimental write-ups and loss of work privileges.

265.

The Coleman Management Team and the Prison Investigative Agencies breached their duties to *Maggie Leon* under PREA as follows:

115

- Section 115.11 – failing to enforce zero tolerance policy
- Section 115.13 – failing to supervise and monitor (video surveillance) one-on-one inmate/officer contact
- Section 115.15 – permitting improper cross-gender pat downs
- Section 115.17 – hiring, promoting and retaining officers who "may" have had improper sexual contact
- Section 115.43 – punishing sex victims with involuntary segregated housing, loss of privileges and work permits
- Section 115.61 – failing to report suspicion of sexual abuse
- Section 115.67 – failing to protect inmates from retaliation after reporting abuse
- Section 115.76 – failing to discipline staff for sexual misconduct

As a direct and proximate cause of the negligence outlined above, the Coleman Management Team and the Prison Investigative Agencies caused damage to *Maggie Leon* including psychological trauma, emotional distress, depression, physical trauma and pain and suffering.

266.

*Maggie Leon* is entitled to damages from the United States of America under the Federal Tort Claims Act for the negligence of the Coleman Management Team and the Prison Investigative Agencies in an amount to be determined at trial.

## COUNT XXVII – PLAINTIFF MAGGIE'S CLAIM FOR ASSAULT AND BATTERY AS IT RELATES TO ACTIONS BY OFFICER PALOMARES

267.

Plaintiff *Maggie Leon* incorporates by reference the allegations set forth in paragraphs 13; 16-57; and 153-157 of this Complaint for Damages as if fully set forth herein.

116

268.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of **Maggie Leon**, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraphs 153-154 herein.  Officer Palomares caused damage to **Maggie Leon** including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

## COUNT XXVIII – MAGGIE LEON'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS IT RELATES TO  ACTIONS BY OFFICER PALOMARES

269.

Plaintiff **Maggie Leon** incorporates by reference the allegations set forth in paragraphs 13; 16-57; and 153-157 of this Complaint for Damages as if fully set forth herein.

270.

Officer Palomares, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional infliction of emotional distress of **Maggie Leon** through unwanted, non-consensual sexual assault and/or sexual battery and/or sexual harassment as

detailed in paragraphs 153-154 herein. Officer Palomares' conduct was (1)

intentional and reckless with knowledge that emotional distress would likely result,

(2) outrageous and went beyond all bounds of decency to be tolerated in a civilized

community, (3) the direct and proximate cause of the emotional distress endured

by Ms. Leon  and (4) severe and damaging, for which the United States of America

is liable under the Federal Tort Claims Act in an amount to be determined at trial.

## COUNT XXIX MAGGIE LEON'S CLAIM FOR FALSE IMPRISONMENT AS IT RELATES TO ACTIONS BY OFFICER PALOMARES

### 271.

Plaintiff **Maggie Leon** incorporates by reference the allegations set forth in

paragraphs 13; 16-57; and 153-157 of this Complaint for Damages as if fully set

forth herein.

### 272.

Officer Palomares, acting within the course and scope of his employment

with the BOP as an investigative or law enforcement official, unlawfully detained

and deprived **Maggie Leon** of her liberty and freedom against her will and consent,

without legal authority or necessity, and for the sole purpose of engaging in non-

consensual sexual assault and/or sexual battery and/or sexual harassment as

detailed in paragraphs 153-154 herein.   Officer Palomares caused damage to Ms.

118

Leon including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

## COUNT XXX – PLAINTIFF MAGGIE LEON'S CLAIM FOR ASSAULT AND BATTERY AS IT RELATES TO OFFICER CAMPBELL

273.

Plaintiff *Maggie Leon* incorporates by reference the allegations set forth in paragraphs 13; 16-57; and 153-157 of this Complaint for Damages as if fully set forth herein.

274.

Officer Campbell, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of *Maggie Leon*, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraph 155 herein. Officer Campbell caused damage to Ms. Leon including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

119

## COUNT XXXI – PLAINTIFF MAGGIE LEON'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS IT RELATES TO ACTIONS BY  OFFICER CAMPBELL

275.

Plaintiff *Maggie Leon* incorporates by reference the allegations set forth in paragraphs 13; 16-57; and 153-157 of this Complaint for Damages as if fully set forth herein.

276.

Officer Campbell, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional infliction of emotional distress of *Maggie Leon* through unwanted, non-consensual sexual assault and/or sexual battery and/or sexual harassment as detailed in paragraph 155 herein. Officer Campbell's conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Leon  and (4) severe and damaging, for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

## COUNT XXXII – PLAINTIFF MAGGIE LEON'S CLAIM FOR FALSE IMPRISONMENT AS IT RELATES TO ACTIONS BY  OFFICER CAMPBELL

277.

Plaintiff *Maggie Leon* incorporates by reference the allegations set forth in paragraphs 13; 16-57; and 153-157 of this Complaint for Damages as if fully set forth herein.

288.

Officer Campbell, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, unlawfully detained and deprived *Maggie Leon* of her liberty and freedom against her will and consent, without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraph 155 herein. Officer Campbell caused damage to Ms. Leon including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

## COUNT XXXIII – PLAINTIFF MAGGIE LEON'S CLAIM FOR ASSAULT AND BATTERY AS IT RELATES TO OFFICER LAUDENSTAGER

289.

Plaintiff *Maggie Leon* incorporates by reference the allegations set forth in paragraphs 13; 16-57; and 153-157 of this Complaint for Damages as if fully set forth herein.

290.

Officer Laudenstager, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional assault and battery of *Maggie Leon*, through unwanted, non-consensual sexual abuse and harassment as detailed in paragraph 156 herein.  Officer Laudenstager caused damage to Ms. Leon including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

### COUNT XXXIV – PLAINTIFF MAGGIE LEON'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS IT RELATES TO OFFICER LAUDENSTAGER

291.

Plaintiff *Maggie Leon* incorporates by reference the allegations set forth in paragraphs 13; 16-57; and 153-157 this Complaint for Damages as if fully set forth herein.

292.

Officer Laudenstager, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, engaged in the intentional infliction of emotional distress of **Maggie Leon** through unwanted, non-consensual sexual assault and/or sexual battery and/or sexual harassment as detailed in paragraph 156 herein. Officer Laudenstager's conduct was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Ms. Leon and (4) severe and damaging, for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

### COUNT XXXV – PLAINTIFF MAGGIE LEON'S CLAIM FOR FALSE IMPRISONMENT AS IT RELATES TO OFFICER LAUDENSTAGER

293.

Plaintiff **Maggie Leon** incorporates by reference the allegations set forth in paragraphs 13; 16-57; and 153-157 of this Complaint for Damages as if fully set forth herein.

294.

Officer Laudenstager, acting within the course and scope of his employment with the BOP as an investigative or law enforcement official, unlawfully detained and deprived **Maggie Leon** of her liberty and freedom against her will and consent,

123

without legal authority or necessity, and for the sole purpose of engaging in non-consensual sexual abuse and harassment as detailed in paragraph 156 herein. Officer Laudenstager caused damage to Ms. Leon including psychological trauma, emotional distress, depression, physical trauma and pain and suffering for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

    **WHEREFORE**, Plaintiffs requests that the Court:

5) Grant judgment in favor of Plaintiffs on their claims for Negligence, Assault and Battery, False Imprisonment, and Intentional Infliction of Emotional Distress;

6) Award damages to Plaintiffs in amounts to be determined at trial;

7) Grant Plaintiffs a jury trial on all claims triable by jury; and

8) Grant such other and further relief the Court deems just and proper.

Respectfully submitted this 29nd day of June 2020.

        **DEMILES LAW, P.A.**

        By: */s/ James A. DeMiles*
        James A. DeMiles, Esq.
        Florida Bar No. 15974
        James@DeMilesLaw.com
        3440 Hollywood Blvd., Suite 415
        Hollywood , Florida 33021-6933
        (954) 241-4246 (Telephone)

Counsel for Plaintiffs *Amanda Dimuro, Rebecca Mora, and Lauren Reynolds*

**BUSCH, SLIPAKOFF, MILLS & SLOMKA, LLC**

By: */s/Bryan E. Busch*
BRYAN E. BUSCH (*Pro Hac Vice*)
Georgia Bar No. 006055
bb@bsms.law
3350 Riverwood Parkway, NE
Suite 2100
Atlanta, Georgia 30339
(404)800-4064 (Telephone)

By: /s/ Christopher Y. Mills
CHRISTOPHER Y. MILLS
Florida Bar No. 72207
cm@bsms.law
319 Clematis Street
Suite 109
West Palm Beach, Florida 33401

*Counsel for Plaintiffs Rachelle Beaubrun, Kayla Buchanan, Kristen Goduto, Kara Guggino, Sara Hoehn, April Johnson, Terry Nagy-Philips, Ann Ursiny, Cristian Villata-Garcia, Karen Watson, Carmeane Berman, Amanda Flowers, Judi Aloe*

**SOREN LAW GROUP, P.A.**

By: */s/ Max G. Soren*
Max G. Soren, Esq.
Florida Bar No.: 623431

inbox@sorenlawgroup.com
4200 NW 7th Avenue
Miami, Florida 33127
(786) 431-1333 (Telephone)

*Counsel for Plaintiffs Amanda
Dimuro, Rebecca Mora, and Lauren
Reynolds*

**REIZENSTEIN AND ASSOCIATES, P.A.**

By: */s/ Philip L. Reizenstein*
Philip L. Reizenstein, Esq.
Florida Bar No. 634026
Philreizenstein@protonmail.com
2828 Coral Way
Suite 540
Miami, Florida 33145
(305) 444-0755 (Telephone)

*Counsel for Plaintiff Maggie Leon*
**KELLIE PETERSON, ESQ., PA**

By: */s/ Kellie Peterson*
Kellie Peterson, Esq.
Florida Bar No.: 524581
Kellie@kelliepeterson.net
2828 Coral Way Ste 540
Miami, FL 33145-3228
(305) 444-0755 (Telephone)

*Co-Counsel for Plaintiff Maggie
Leon*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on June 29, 2020, I electronically filed the

foregoing with the Clerk of the County by using the CM/ECF electronic filing

system, which will send notice of the filing to the following CM/ECF participants:

Adam R. Smart
Assistant United States Attorney
USA No. 195
Julie R. Posteraro
Assistant United States Attorney
USA No. 157
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone: (407) 648-7500
adam.smart@usdoj.gov
Julie.Posteraro@usdoj.gov
*Counsel for Defendant*


*/s/ James DeMiles*
JAMES DEMILES